# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

FLORIDA GROWERS ASSOCIATION, INC.,
NATIONAL COUNCIL OF AGRICULTURAL
EMPLOYERS, FLORIDA CITRUS MUTUAL,
FLORIDA FRUIT AND VEGETABLE
ASSOCIATION, G&F FARMS, LLC, and
FRANBERRY FARMS, LLC,

     *Plaintiffs*,

v.                                                                  Case No. 8:23-cv-_____

JULIE A. SU, Acting Secretary of Labor,
in her official capacity; BRENT PARTON,
Principal Deputy Assistant Secretary of
Labor, in his official capacity; BRIAN
PASTERNAK, Administrator of the
Employment and Training Administration,
Office of Foreign Labor Certification,
in his official capacity; JESSICA
LOOMAN, Acting Administrator, Wage
and Hour Division, in her official capacity,

     *Defendants*.

_____/

## COMPLAINT FOR DECLARATORY AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF (DECLARATORY RELIEF REQUESTED; PRELIMINARY AND <u>PERMANENT INJUNCTIVE RELIEF REQUESTED</u>)

6235014v1/35237-0001

**INTRODUCTION**

1. American agriculture depends on the work of hundreds of thousands of foreign agricultural workers each year to grow, harvest, and transport our nation's crops. The U.S. Department of Labor has just finalized a new rule that will illegally increase the wages for these workers, jeopardizing farmers' ability to produce food here. This misguided rule violates the legal boundaries that Congress adopted when it created the visa program, ignores extensive public comments and economic reasoning, and reverses longstanding agency and judicial interpretation of how the Department of Labor is to set such wages.

2. Moreover, the existing wage-setting rule from the Department of Labor ("DOL" or the "Department") that this new rule supplements, is itself a violation of the Administrative Procedure Act ("APA") and should be set aside, as well, with directions to the Department of Labor to continue processing H-2A applications under that rule until it can issue a rule that complies with Congress' mandate, as soon as possible.

3. Congress created a non-immigrant visa program to allow U.S. employers to hire workers who have "a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform agricultural labor or services… of temporary or seasonal nature." 8 U.S.C. § 1101(a)(15)(H)(ii)(a) (the "H-2A" program).

4. For a farm or farm labor contractor to hire H-2A workers, Congress required the Secretary of Labor to certify two points: (1) that "there are not sufficient

2

workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition" and (2) "the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States *similarly employed*." 8 U.S.C. § 1188(a)(1)(A) and (B) (emphasis added). Put simply, Congress intended to avoid actual wage depression for current U.S. farm workers if similarly employed H-2A workers were allowed to work in the U.S. doing similar work.

5.      With this Congressional enactment in mind, the Department has long recognized that "the labor certification program is not the appropriate means to escalate agricultural earnings above the adverse effect level or to set an 'attractive wage.'" 68 Fed. Reg. 11,460, 11,464 (Apr. 9, 1987).  In setting H-2A wage rates, the Secretary of Labor – to be clear – "has no authority to set a wage rate on the basis of attractiveness to workers. His [or her] authority is limited to making an economic determination of what rate must be paid all workers to neutralize any 'adverse effect' resultant from the influx of temporary foreign workers."  *Williams v. Usery*, 531 F.2d 305, 306 (5th Cir. 1976).

6.      Since Congress separated the agricultural (H-2A) and non-agricultural (H-2B) visa programs in 1986, the Department of Labor (the "Department" or "DOL") has used what it calls the "Adverse Effect Wage Rate" ("AEWR")[1] as a minimum wage for H-2A visa workers and U.S. workers performing the same work

---

[1] Acronyms used in this complaint are summarized in Exhibit 1, below.

for that employer.[2]  For most of that time, DOL has set the AEWR through an annual survey of U.S. farmworker wages conducted by the U.S. Department of Agriculture ("USDA"), called the Farm Labor Survey ("FLS").  In the preamble to the final rule under challenge in this action, DOL stated that "The FLS is the most comprehensive survey of wages paid by farmers and ranchers.  The data collected in the FLS allows the Department to establish AEWRs using the most current wage rates."[3]

7.      The FLS generates average farmworker wages for crop and livestock workers, either across a single state (Florida, California, and Hawaii) or across groups of states.  The FLS surveys for total compensation paid by a farm, including overtime, Christmas or birthday bonuses, and piece-rate payments, rather than straight hourly rates.  The FLS does not include farm labor contractors.  The FLS does not consider non-wage expenses of H-2A employers that the Department of Labor requires them to provide, including but not limited to, international and local transportation and employer-provided housing, all entirely free-of-charge to the employee.  *See, e.g.,*  20 C.F.R. § 655.122(d) & (h).

8.      The Department explains its calculation and imposition of an AEWR as follows: "By computing an AEWR to approximate the equilibrium wages that would result absent an influx of temporary foreign workers, the AEWR serves to put incumbent farm workers in the position they would have been in but for the H-2A

---

[2] Earlier H-2 prevailing wage requirements date back to at least 1963. 73 Fed. Reg. 77,166.
[3] *Adverse Effect Wage Rate Methodology for the Temporary Employment of H–2A Nonimmigrants in Non-Range Occupations in the United States*, Final Rule, 88 Fed. Reg. 12,760, 12,768 (Feb. 28, 2023) ("Final Rule" or the "Rule") (Exhibit 2, attached below).

program." 88 Fed. Reg. 12,773, quoting 75 Fed. Reg. 6884, 6891 (Feb. 12, 2010).  But just before the quoted language in the Final Rule, the Department had admitted in 2010 (the previous AEWR methodology change) that it was following "economic theory" in finding that "equilibrium" wage, which holds that, in labor shortage situations,

> the observed wage would increase by an amount sufficient to attract more [U.S./non-H-2A] workers until supply and demand were met in equilibrium.  Absent an increase of workers under the H-2A program, wages would rise above the currently observed wage in order to dispel the labor shortage until sufficient additional domestic labor was attracted into the market from neighboring geographic areas or other occupations.

75 Fed. Reg. 6891.  The quote used in the Final Rule follows immediately after that.  So, the Department concedes that it is setting H-2A wages not at an "equilibrium" to guard against specific "adverse effect" to current wages of U.S. workers similarly employed (as Congress mandated) but, rather, to be sufficiently attractive to lure U.S. workers not already similarly employed into these positions to offset the labor shortage caused by those workers not wanting the jobs in the first place.  This is precisely what the Department had previously said that it would not do, and what the Fifth Circuit told the Department it must not do.

9.     These are the current AEWRs based on the FLS, showing the rates and the grouping of states:



FY 2023 Adverse Effect Wage Rates

https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/AEWR-Map-2023.pdf

10.    At the end of the Bush administration, the Department briefly looked at using Bureau of Labor Statistics' Occupational Employment Statistics survey data ("BLS" and "OES")[4], rather than the FLS, to set AEWRs.  The new Obama DOL

---

[4] Beginning in Spring 2021, the OES was rebranded as the Occupational Employment and Wages Survey ("OEWS"), with no change to methodology or scope.

quickly took action to block that idea, sharply criticizing the notion of using OES data at all for setting farmworker wages:

> The selection of the Bureau of Labor Statistics (BLS) Occupational Employment Survey (OES) in the 2008 Final Rule was based on an underestimation of its inadequacies. The OES agricultural wage data has a number of significant shortcomings with respect to its accuracy as a measure of the wages of hired farm labor suitable to be used as the AEWR. Perhaps its most substantial shortcoming in this context is that the OES data does not include wages paid by farm employers. Data is not gathered directly from farmers but from non-farm establishments whose operations support farm production, rather than engage in farm production.

75 Fed. Reg. 6896. Without explaining or even acknowledging its about-face, the Department now proposes to use OEWS data to set the wages for thousands of H-2A farmworkers. The Department has not changed the OES/OEWS to include farm employers. And since those surveys capture wages for urban, year-round work in tangentially related non-farm occupations, it should come as no surprise that the OEWS generates much higher, more "attractive" wage rates than USDA's FLS does.

11.    Forgetting both its earlier reservations about the use of the OEWS data and the fact that H-2A jobs must be certified by the Secretary of Labor as "agricultural labor or services" before any H-2A wage will be paid, the Department suddenly turns to OEWS non-farm wages when doing so will create higher farmworker wages that might be more attractive to U.S. workers not already working in agriculture – again, exactly what the Department has always said it would not do, and what binding circuit precedent in this Court says the Department <u>cannot</u> do.

7

12.     Specifically, the Department is artificially targeting certain seasonal job duties within the larger farm workforce and then concluding that, although they are certified by the Department as seasonal agricultural positions, they are more "similarly employed" to permanent non-agricultural workers than they are to other seasonal farm workers.  And these non-farm wage rates do not apply only to work that might overlap non-farm occupations; they apply to every minute of work, by every worker, for the duration of the seasonal employment.

13.     For example, a strawberry farm in Hillsborough County is certified by DOL to employ 50 H-2A workers to harvest strawberries.  To preserve their freshness, berries must be taken to a cooling facility or processor shortly after picking.  So, one of the 50 H-2A workers may drive a truck full of strawberries a mile or less to that facility and then drive straight back and pick up a shovel or resume picking with their fellow workers.  Under the Department's new Rule, all 50 of those workers must be paid the statewide mean wage for all heavy-duty truck drivers in Florida, $21.62/hour.  The Department thinks that paying the $14.33/hour farmworker wage in Florida would "adversely affect" long-haul drivers for Amazon or FedEx in Miami.

14.     The Department concedes that applying the highest possible AEWR to a mix of duties will result in a wage "above the market equilibrium wage" and requiring employers to pay that wage "may create DWL [deadweight loss] in the labor market."  88 Fed. Reg. 12,789.

15.     Or consider an apple orchard in western New York.  The Department's regulations require H-2A employers to provide local transportation between the free

8

employer-provided housing and the worksite.  20 C.F.R. 655.122(h)(3).  If the H-2A contract lists that van-driving duty as something that might be asked of the workers on that contract, then the preamble to the Final Rule states that every worker on that contract will be transformed from a farmworker to a "chauffeur."  88 Fed. Reg. 12,780. Suddenly the wage for an H-2A worker at an apple orchard jumps from the already high $16.95/hour AEWR to the statewide mean for a "chauffeur" of $19.52/hour. So, H-2A farmworker wages in western New York might adversely affect the earnings of chauffeurs driving hedge fund managers to their private jets in the Hamptons?  The Department is not only failing to compare apples-to-apples; they are comparing apples-to-limousines!

16.     Plaintiffs ask the Court to enjoin the Final Rule as soon as possible, and to enjoin the current AEWR methodology after that, so as not to unduly interrupt the Department's labor certification process.

## THE PARTIES

17.     Plaintiffs G&F Farms, LLC and Franberry Farms, LLC are family-owned strawberry farms based in Dover, Florida and Plant City, Florida, both in Hillsborough County.  *See* Declaration of Michelle Williamson at ¶ 2 ("Williamson Dec."; attached hereto as Exhibit 3).  Michelle Williamson's family has grown strawberries on that same land since the 1880's and hopes to see her grandchildren continue that legacy, as the sixth generation to farm there.  *Id.*  Because of the Final Rule, Plaintiffs G&F Farms and Franberry Farms will see their labor costs increase by more than $240,000 for this year, compared to 2022.  *Id.* at ¶ 4-5.  As they harvest their

strawberries, they must be hauled a short distance to be cooled for shipping, so some (but not all) of the farms' employees are required to drive trucks occasionally. *Id.* at ¶ 9. This work is not similar to long-haul or urban truck driving elsewhere in the State of Florida. *Id.* The farms sell into a competitive market that greatly restricts the ability to pass these labor cost increases on to consumers (and would exacerbate food inflation, even if they could). *Id.* at ¶ 6, 10. The AEWR increases are not limited to H-2A workers; the farms will need to increase the wages or salaries of their entire workforce; and the AEWRs do not include the free housing and transportation provided to workers. *Id.* at ¶¶ 4, 11. The Department of Labor's wage requirements will increase the farms' labor costs by more than their operating margins, causing them to operate at a loss and potentially cease to operate. *Id.* at ¶ 7. And we are not alone, I know that other family farms like ours will also cease to operate with these higher costs and level prices. *Id.* at ¶ 8. Plaintiff Florida Growers Association, Inc. ("Florida Growers Association") is a Florida not-for-profit corporation, comprised of Florida farms producing citrus, strawberries, specialty crops, and other crops. *See* Declaration of Paul Meador at ¶ 2 ("Meador Dec. at ¶ __"; attached hereto as Exhibit 4). Florida Growers Association employs a number of H-2A farm workers, primarily to haul harvested crops to the point of storage or initial processing, including in Hardee and Polk Counties. *Id.* Florida Growers Association contracts with H-2A workers, without whom it would not be able to perform contracts it has signed with its grower clients. *Id.* at ¶¶ 2, 7. Florida Growers Association's business is structured around bringing its grower-clients' crops from the groves and the fields where they are grown

10

to storage and processing facilities. *Id.* at ¶ 4. The H-2A program is critical for Florida Growers Association to perform its work for its members. *Id.* at ¶¶ 2,4-5, 8. The Department's wage rule would increase the labor costs for the members of the association by more than $5 million this year; a cost increase that could not be passed on to consumers. *Id.* at ¶¶ 9-10. The result would be immediately ruinous to the Association's member-employers. *Id.* at ¶ 11.

18.    Plaintiff National Council of Agricultural Employers ("NCAE") is a national association organized under the laws of the District of Columbia. Founded in 1964, NCAE is the only national association focusing exclusively on agricultural labor issues from the agricultural employer's viewpoint. *See* Declaration of Michael Marsh at ¶¶ 1, 2. ("Marsh Dec. at ¶__"; attached hereto as Exhibit 5). NCAE represents labor-intensive agriculture before Congress, with federal agencies and, where necessary, in court. *Id.* at ¶ 2. NCAE's membership, including farmers represented by its association members, represents an estimated 80% of all U.S. agricultural employers directly engaged in the production of food and nursery crops in the United States, and its members employ roughly 85% of all H-2A workers in the United States. *Id.* at ¶ 3.

19.    On behalf of its members, NCAE submitted comments to the Department of Labor regarding the Department's use of AEWRs in 2019, 2020, and 2021, the rulemaking process that led to the Final Rule. *Id.* at 6. NCAE's President also submitted letters to U.S. Secretary of Agriculture Tom Vilsack on this issue and repeatedly petitioned the Department of Labor to test for the existence of "adverse

effect" from the employment of H-2A workers, but the only response received was that the Department of Labor would address the existence of adverse effect, generally, in this rulemaking. *Id.* NCAE brings this action on behalf of its H-2A employer members and the H-2A employer-members of its member associations.

20.    Plaintiff Florida Fruit and Vegetable Association ("FFVA") was founded in 1941 and incorporated under Florida law in 1943. Declaration of Michael Joyner at ¶ 2 (attached hereto as Exhibit 6). Based in Maitland, Florida, FFVA has been serving Florida's grower-shipper community for more than 80 years. *Id.* at ¶ 1. FFVA's membership represents the vast majority of fruit and vegetable production in the State of Florida, including vegetables, citrus, tropical fruit, berries, tree crops, and more. *Id.* at ¶ 4. A significant portion of FFVA's membership participates in the H-2A temporary visa program, either as employers or by contracting with H-2A labor contractors for harvesting, hauling, and packing duties. *Id.* FFVA works with its members to file the necessary paperwork and documentation to participate in the H-2A program and works on behalf of its members to ensure that the program operates under the requirements of the INA and continues to allow FFVA's members to remain in business and deliver their crops to market. *Id.* at ¶ 5.

21.    Labor costs are typically the single largest expense of FFVA's members, and Florida has more H-2A positions certified than any other state. *Id.* at ¶ 6. FFVA's members are generally "price takers" in the market; limited in their ability to pass on cost increases, including significant labor cost increases. *Id.* at ¶ 7. Between the increase in the FLS-based AEWR between 2022 and 2023 and the new DOL rule,

FFVA's members are facing wage increases of 74% or more, and are not sure how to classify or divide their workforce to comply with this new rule that has been rushed out by DOL. *Id.* at ¶¶ 8-10.

22.     Plaintiff Florida Citrus Mutual ("FCM") was founded in 1948 and is Florida's largest citrus grower organization. Declaration of Matt Joyner at ¶ 1 (Ex. 7). FCM's 2,000 grower members produce citrus throughout the State of Florida, much of which relies on H-2A workers to harvest and transport. *Id.* at ¶¶ 2, 5. Florida citrus has already been challenged by "citrus greening," causing a more than 70% reduction in orange crops in Florida since 2005. *Id.* at 4. Combining those losses with a double-digit wage increases will be further destructive to the state's citrus industry. *Id.* Given the importance of the H-2A program to its members, FCM advocates on their behalf on H-2A issues like those presented in this action. *Id.* at ¶ 2.

23.     Defendants are appointed officials within the Department of Labor, responsible for the issuance and implementation of the challenged Rule. The Department is the federal agency responsible for the drafting, promulgation, and implementation of the Rule, tasked by Congress with balancing the labor needs of U.S. agricultural employers with guarding against adversely affecting existing U.S. farm workers' wages and working conditions.

24.     Defendant Julie Su is the Acting United States Secretary of Labor. Secretary Su is responsible for all functions of the Department, including the Employment and Training Administration and the Office of Foreign Labor Certification, which issue H-2A labor certifications. Secretary Su is sued in her official

capacity.

25.     Defendant Brent Parton is the Principal Deputy Assistant Secretary of Labor. Assistant Secretary Parton is the Acting Employment and Training Administrator of the Department of Labor. The Employment and Training Administration, through the Office of Foreign Labor Certification, issues labor certifications under the H-2A program. Assistant Secretary Parton signed the Final Rule and is sued in his official capacity.

26.     Defendant Brian Pasternak is the Administrator of the Department of Labor's Office of Foreign Labor Certification ("OFLC").  OFLC is the office within the Employment and Training Administration responsible for assigning AEWRs and issuing labor certifications.  Administrator Pasternak is sued in his official capacity.

27.     Defendant Jessica Looman is the acting Administrator of the Department's Wage and Hour Division. The Wage and Hour Division enforces the adverse effect wage rate. Administrator Looman is sued in her official capacity in order to address injunctive relief related to potential future enforcement of illegally-issued wage rates.

## JURISDICTION AND VENUE

28.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 1361 and 5 U.S.C §§ 702-04.

29.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201-02.

30.     Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1) because

14

Plaintiff G&F Farms, LLC is a resident of this judicial district. Plaintiffs Florida Growers Association, FFVA, FCM, and NCAE all have members residing in and/or conducting agricultural operations in Hardee, Polk, and Hillsborough Counties and other counties within this district. Venue lies in this district under that provision also because a substantial part of the events, omissions, or harm occurred and will occur in those counties within this district.

## FACTUAL BACKGROUND

### "Adverse Effect"

31.   For the Department to issue a labor certification permitting an employer to hire H-2A agricultural workers, the Secretary must make two findings. First, the Secretary must find that "there are not sufficient [domestic] workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition," 8 U.S.C. § 1188(a)(1)(A). Second the Secretary must find, that "the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1)(B).

32.   The Department rigorously tests the first element of this test - setting forth a number of requirements for H-2A employers regarding advertising, recruiting, and hiring all "able, willing, and qualified" U.S. applicants for the farmworker position(s) in question. *See, e.g.,* 20 C.F.R. § 655.135 (hiring requirement, recruitment requirements, "50% rule" requiring employers to hire U.S. applicants through the first half of the contract period, regardless of whether an H-2A workers is already in the

temporary position, etc.); 20 C.F.R. §§ 655.150-158 (posting job opportunities on interstate clearance system; contacting former employees; additional "positive recruitment"; referrals of workers from state workforce agencies; submitting detailed recruitment reports of efforts and results).

33.    For the second statutory element, however, the Department offers no means for testing the existence of actual "adverse effect" and identifies no data that such an effect exists. No effort is made to test for the existence (much less the extent, if any) of the "adverse effect" on U.S. workers as a result of employers hiring H-2A workers.

34.    Unable to point to any actual "adverse effect" from H-2A employment, the Department actually concedes that "exponential increase in use of the H-2A program since 2015" has coincided with greater wage growth in the domestic farm workforce than has been seen in the non-farm U.S. workforce. 86 Fed. Reg. 68,185 (Dec. 1, 2021) (Notice of Proposed Rulemaking giving rise to the Rule).

35.    This overheating of farm worker wages results, at least in part, from how the Department has set the H-2A "adverse effect wage rate" or "AEWR" since 1987, with only a brief interruption in 2009-2010 discussed below.

36.    The stated purpose of the FLS-based AEWR, according to the Department, is to respond to domestic farmworker labor shortages that are increasingly being met with H-2A workers but "'would normally drive wages up,'" and "'to approximate the equilibrium wage that would result absent an influx of temporary foreign workers … serv[ing] to put incumbent farm workers in the position

16

they would have been in but for the H-2A program.'" *Id.*, quoting 75 Fed. Reg. 6891 (2010 Rule).

37. So, the Department admits, as it did in 2010, that it is not setting the AEWR to keep the employment of H-2A workers from "adversely affect[ing]" *current* wages of U.S. workers "similarly employed."  Rather, it is setting the AEWR to replicate the wages that would be sufficiently attractive to U.S. workers not already employed as farm workers, offsetting the ongoing shrinking of the domestic farm labor workforce – the "but for" wage needed to "drive wages up" to a point where they will attract more domestic workers to take these jobs.  There is no statutory mandate to create a wage to attract U.S. workers to seasonal agricultural jobs.

38. Instead, the Department of Labor assumes adverse effect and requires an AEWR.  The Department's erroneously named "Adverse Effect Wage Rate" ("AEWR") is simply a premium wage for foreign workers, derived from an average across all agricultural work by state or region based on survey data obtained by the U.S. Department of Agriculture's National Agricultural Statistical Service's Farm Labor Survey ("USDA"; "NASS"; and "FLS").  The FLS collects voluntary responses on a semiannual basis, collecting "total wages paid" - which includes overtime payments, Christmas and birthday bonuses, performance bonuses, longevity bonuses, and piece-rate incentive pay earnings, rather than purely hourly wages.  The wage rates stated in the FLS report are not market wages and are not used anywhere except for the Department of Labor's AEWR-setting methodology.

39. Secretary of Agriculture Sonny Perdue was asked by a Missouri farm

about USDA's role in setting AEWRs and responded that "The Farm Labor Survey has been conducted for more than 80 years, using basically the same survey methods. It was not designed to be used as a source of wage rates for a guest worker program. Rather, it provides an accurate count of the number of persons employed in agriculture and the average wage rate across all skill levels and occupations." (Exhibit B to Marsh Declaration (Ex. 5)).  This is echoed by the expert report of Dr. Bronars. (Ex. E to Marsh Dec., at ¶ 5 (Ex. 5)).

40.   The FLS explicitly excludes farm labor contractors ("FLCs"), companies that provide labor to someone else's farming operation.  When the use of the FLS as the basis for a Department-ordered AEWR was instituted in 1987, FLCs comprised a relatively small portion of the agricultural labor force.  Every year since 2016, however, more H-2A labor certifications have been issued to FLCs than to individual employers. 88 Fed. Reg. 12,771 n.71.  Purposely excluding the single largest sector of the H-2A program seems like a glaring blind spot in the Department's preferred data source, but the Department makes no apology for this, nor any effort to explain its decision.

41.   The reports by Drs. Stephen Bronars and Zachariah Rutledge, both Ph.D. economists who specialize in labor-market economics, included with the attached declaration of Michael Marsh, set forth additional concerns with the survey methodology used by the Department in setting the AEWR – both the FLS-based and the OEWS-based methodologies.  These include response rates, which employers are included or excluded from consideration, sample sizes, and other flaws in the Department's wage-setting process.

18

42.     For example (although, the reports contain <u>extensive</u> critiques of the Department's survey and wage-setting methodologies), Dr. Bronars explains why the FLS fails to provide an appropriate entry-level or starting wage for H-2A employment. Ex. E to Marsh Declaration at ¶ 6. Worse, though, using a "mean" wage based on a survey of existing wages creates an inevitable and permanent "echo effect" when that information is used to set the following year's required wage rates. *Id.* at ¶¶ 21, 24.

43.     Employers must pay the highest of the AEWR, any collectively bargained wage rate, the state or federal minimum wage, or the state prevailing wage for that crop or occupation, of which the AEWR is almost always the highest of the group. 20 C.F.R. § 655.120. Thus, beyond making an industry-wide and often multistate average into a minimum, contrary to the statutory requirements, DOL does not evaluate whether any "adverse effect" exists whatsoever, much less for any worker "similarly employed" as any particular H-2A worker.

44.     While the Department of Labor may argue that setting an artificially high minimum wage is intended to prevent "wage depression" or "adverse effect" before it can appear, imposing these wages presumes (without a scintilla of proof) that the employment of H-2A workers is already having an "adverse effect" on the local U.S. workforce that will not perform seasonal farm labor or would result in such harm without requiring such high wage levels.

45.     From Fiscal Year ("FY") 2005 through FY 2022, the number of H-2A temporary or seasonal agricultural worker positions certified by the Department of

19

Labor grew from 48,336 to 371,619, more than 600% growth over that period. But these jobs are, by definition, of relatively brief duration (averaging just over 5 months), so that equates to barely 150,000 full-time equivalent positions ("FTEs"). USDA estimates that there are 1.3 million FTEs in agriculture. Other estimates range from 1.5 million to as many as 3 or 4 million FTEs, but even at a conservative estimate of 2.4 million from USDA's 2017 Census of Agriculture, H-2A employment is a small proportion of the total agricultural labor workforce in America.

46.    And H-2A truck-driving, the position most impacted by the new OEWS final rule, is far smaller still. The final rule puts the number of H-2A truck-drivers for all of last year at 2,184.[5] This is compared to BLS' estimate of nearly 2 million workers employed in the "heavy and tractor-trailer truck drivers" category (SOC code 53-3032).[6] The American Trucking Association reported more than 81,000 unfilled truck-driver positions in 2021 and roughly 78,000 in 2022; projecting a shortage of more than 160,000 by 2031 at current rates.[7] Not only is there no evidence that H-2A truck-drivers are actually adversely affecting the wages of U.S. truck-drivers (agricultural or otherwise), but there is no reason to believe they even could cause any effect on those wages.

47.    All told, the new OEWS-based wage rule uses flawed surveys to impose wages on seasonal farm workers based on the earnings rate of non-agricultural

---

[5] https://tinyurl.com/FY2022H2AData

[6] The Census Bureau reports 3.4 million truck drivers; which makes this point even stronger but also highlights the fundamental limits of the government's information and the unavoidable inaccuracy of using these artificial SOC codes.

[7] https://tinyurl.com/truckingshortage

permanent workers who are not "similarly employed." The Department of Labor acted outside its statutory authority in issuing this rule, and authored an arbitrary-and-capricious rule that should be set aside immediately, before it can destroy American farming.

## The FLS-Based Methodology Is Also Flawed

48. The system in place immediately prior to the Final Rule taking effect a few weeks ago was also illegally promulgated and should be set aside. Again, even under the AEWR methodology that relies on the USDA's Farm Labor Survey, the Department of Labor has failed to identify adverse effect, has no means of testing for its existence, and has set the wage rate at a level to attract U.S. workers into seasonal farmworker positions they do not want, which it is forbidden to do.

49. The Department illegally attempted to restrict comments in the rulemaking that led to the Final Rule, to keep commenters from addressing the flaws at the heart of the current AEWR methodology. The Department attempted to do that in 2009, as well, but then as now, the APA does not permit this. Commenters, including the National Council of Agricultural Employers and its members, submitted a number of comments addressing the flaws with the FLS-based AEWR system.

50. The Department of Labor may not ignore those comments, and must now defend to this Court why it sets the AEWR as it does for H-2A workers coded in one of the six SOC codes used in the FLS. The Department would prefer to insist that the 2010 AEWR rule is the current rule and continue hiding behind a six-year

statute of limitations.    But, by revisiting the AEWR process last month, the Department has reopened review of the legality of its AEWR regime.

## IRREPARABLE AND IMMINENT HARM

51.    The harm from the Final Rule takes several forms, with different effects over time.  First, the procedural harm is in a federal agency issuing an illegal rule in violation of the APA and the authorizing legislation, here, the Immigration and Nationality Act, as amended.  Any time a government agency acts illegally, it should be of great concern.

52.    This is particularly so where the illegal action will cause immediate and irreparable harm to a crucial sector of the economy and our nation's security.  The harm here is through requiring American farms to double their wage bills suddenly, contrary to the law Congress enacted.  Either the farms will be able to pass along these costs to consumers, exacerbating historically high inflation at the grocery store, or what is more likely, they will not be able to pass through these costs and will be forced out of business within the coming weeks.  These farms are selling their crops in a highly competitive international market, selling to the same customers as farms in Canada and Mexico paying farmworkers a fraction of the FLS-based AEWR, let alone these sky-high OEWS-based wage rates.  Marsh Dec. at ¶¶ 15-17, Ex. I.

53.    The effect of the Final Rule is not speculative; the wages are known, the rule is already in effect, and once those wages are paid, they are not recoverable.  Employers have no recourse to recover "overpaid" wages from H-2A workers or U.S. workers in corresponding employment.  Nor could they recover them from the federal

22

government for illegally issuing this rule and the wages it imposes.

54.    Even before work begins on applications filed on or after the effective date of the Final Rule, March 30, 2023, employers will incur harm.  If an employer submits a job order and is assigned a non-FLS code with higher-than-AEWR wages, and a U.S. worker applies for the position, that creates an unbreakable contractual requirement to pay that worker that higher-than-AEWR wage for at least 75% of the hours set forth in the job order.  20 C.F.R. §§ 655.122(i).  Even withdrawing the job order and walking away from the H-2A program will not remove this requirement, under the Department's H-2A regulations.  20 C.F.R. §§ 655.124(a), 655.136; and 655.172.

55.    Farms and farm contractors will have no way to avoid the looming disaster that the Final Rule will cause.  Only this Court can avert that disaster.

## CLAIMS

## COUNT I

### The Final Rule Violates the APA

### The Department Has Acted Outside of Statutory Authority in Violation of 8 U.S.C. § 1188(a)(1)(B) (5 U.S.C. § 706(2)(A), (C))

56.    Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1-55 above.

57.    Although Congress did not dictate a specific methodology for the Department to use to avoid "adverse effect," it was remarkably clear about *what* work and *which* workers were to be protected.  Labor certifications are specific to a need for "the labor or services in the petition."  8 U.S.C. § 1188(a)(1)(A).  The second

finding builds on that set of "labor or services," in that "the employment of the alien *in such labor or services* will not adversely affect the wages and working conditions of workers in the United States *similarly employed*." 8 U.S.C. § 1188(a)(1)(B) (emphasis added).

58.    By explicitly choosing to ignore seasonal agricultural wages in favor of year-round non-farm wages, the Department of Labor has ignored the restrictions that Congress set in statute, and is addressing wages of workers in the United States who are not "similarly employed" and performing "labor or services" well outside those listed in any "petition."  Thus, the Department of Labor is acting in excess of its statutory authority, in violation of the APA.  5 U.S.C. § 706(2)(c).

59.    Since each state workforce agency will make the initial determination of which SOC code and, therefore, which wage rate will apply to a given application, with one of the Department of Labor's Certifying Officers reviewing the decision, there is a tremendous potential for inconsistency in how wage rates are assigned.  This creates equal protection violations to employers in one state vis-à-vis another state; the same work will be "coded" and compensated differently depending on one's state of residence or operation.  This is a further violation under Section 706(2)(c), as well as Section 706(2)(b).

60.    The Final Rule is issued contrary to and without statutory authority and must be vacated, pursuant to Section 706(2)(C) of the APA.  Defendants must be enjoined from implementing or otherwise enforcing any part of the Final Rule.

## COUNT II

### The Final Rule Violates the APA

### The Final Rule is Arbitrary and Capricious
### (5 U.S.C. § 706(2)(A))

#### A. "As-Written" Challenge

61. Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1-55 above.

62. The APA authorizes courts to set aside any regulation that is arbitrary and capricious. 5 U.S.C. § 706(2)(a). The Department's Final Rule is exactly that.

63. The Department of Labor ignored extensive comments on the proposal to use OEWS to set wages, generally, and to apply the "single duty" test to set the wages at the highest possible rate out of all possible wage rates. There was no rational reason to ignore extensive comments and existing judicial decisions and other Department wage-setting procedures on how to guard against the potential for "adverse effect" that look at the specific work being performed or, at least, considering the "primary duty" of the position. The Department's decision to impose the worst-case-scenario wage is simply punitive, but reflects an arbitrary and capricious decision by the agency.

#### B. Impermissible Vagueness

64. The Final Rule is impermissibly vague, as well, creating unnecessary chaos in an already-challenging regulatory process. Small employers with a range of farm duties are being forced by this rule to pay their workers the wages of a job they

are not performing or to search for some artificial way to parse duties and balkanize their workforce into individual pigeonhole positions bearing no similarity to normal farming operations.

65.     There are at least two issues with the vagueness of the rule as-written. First, employers trying to determine which job duties might be flagged by the state workforce agency or Department of Labor as touching on a non-FLS code, and making impossible decisions about chopping up their job duties into specific, "siloed" positions.

66.     Second, there is the issue of corresponding employment.  When H-2A employers have a single labor certification, they can compare the work done by their U.S. workers and determine if any of it overlaps with any of the job duties in the H-2A labor certification.  If employers are forced to file numerous separate job orders because of fears of how the Department will "code" specific job duties, then each employer will face the vague and daunting task of determining with which job order is any given U.S. workers performing "corresponding" employment.  Again, the highest possible rate will apply, regardless of the extent of overlap or length of time performing any given job duty.  This will create compliance nightmares for H-2A employers.

## C. "Short Fuse" Effective Date

67.     For a rule that will result in hundreds of millions of dollars in liability to American farms, the Department of Labor has rushed this rule into place and offered essentially no guidance on what comes next.  A thirty-day period is not nearly enough

time in which to completely overhaul the H-2A visa program. It was arbitrary and capricious of the Department to implement the Final Rule with such a "short fuse" to do so.

## D. Retroactive Applicability

68.    The Final Rule states on its face that it will only apply to labor certifications based on applications filed on or after March 30, 2023, being the date 30 days after the publication of the Rule. 88 Fed. Reg. 12,763-12,764. But the Department has also stated that applications filed (or even certified) before the Final Rule's effective date will be required to pay the OEWS-based higher wages if they were "coded" with an SOC code outside the 6 FLS codes, beginning when the Bureau of Labor Statistics publishes new OEWS data on July 1, 2023.

69.    This decision to apply the Final Rule retroactively is a violation of law and an arbitrary and capricious decision by the Department. But this retroactive liability is facing some of the Plaintiffs' members in the very near future. *See, e.g.,* FFVA Dec. at ¶ 11.

70.    Employers like this have no opportunity to avoid calamity. The Department's H-2A regulations require employers to offer workers three-fourths of the hours of a contract, even if the workers are laid off. 20 C.F.R. § 655.122(i)(1). An H-2A employer failing to offer enough hours is, instead, required to "pay such worker the amount the worker would have earned had the worker, in fact, worked for the guaranteed number of days." 20 C.F.R. § 655.122(i)(1)(iv). And the H-2A requirements (including wage rates) apply to any U.S. worker in "corresponding

employment" under the contract or even any worker who applies for the job, even if the employer later withdraws their application or cancels their certification.

71.     The Department permits only very limited exceptions to this requirement; contract periods may only be shortened with the permission of the Department's Certifying Officer, either by the agreement of the employer and employees (20 C.F.R. § 655.122(i)(1)(ii)) or based on a determination that "the services of the worker are no longer required for reasons beyond the control of the employer due to fire, weather, or other Act of God that makes the fulfillment of the contract impossible."  20 C.F.R. § 655.122(o).  Neither scenario is likely to occur in the anticipated scenario of an employer facing an unexpected and ruinous wage hike.

72.     The Final Rule is arbitrary and capricious and must be vacated, pursuant to Section 706(2)(A) of the APA.  Defendants must be enjoined from implementing or otherwise enforcing any part of the Final Rule.

## COUNT III

**The Final Rule Violates the APA in Using the FLS Wages, As Well
8 U.S.C. § 1188(a)(1)(B) (5 U.S.C. § 706(2)(A), (C))**

73.     Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1-55 above.

74.     In addition to the APA violations committed in the Final Rule mandating the payment of OEWS-based wages, the Department of Labor has violated the APA in requiring employers to pay FLS-based wages.  The Department re-opened the FLS-based methodology through the notice-and-comment process and the promulgation of the Final Rule regarding how the Department sets and issues

28

AEWRs.

75.    The Department of Labor is using a flawed survey that the USDA, which administers the survey, has clearly stated was not intended to and should not be used to set wages.  Marsh Dec. at ¶ 7, Ex. B.  The economists' reports attached as Exhibits E, F, & G to the Marsh Declaration are incorporated herein by reference and set forth a panoply of flaws that render the use of that survey to set H-2A wages arbitrary and capricious.

76.    Those fatal flaws include, but are by no means limited to, the failure to include farm labor contractors, the failure to screen out H-2A employers or U.S. employers setting their pay based on the AEWR, and the failure to capture an actual hourly wage rather than overtime, bonuses, piece rates, and other non-hourly compensation.  The use of the prior year's average to set the next year's minimum creates an inevitable and permanent "echo effect" in wages, as well.  And ignoring the non-wage payments required in the H-2A program (free housing, transportation, etc.) when comparing H-2A wages to U.S. wages further distorts the wage-setting process in a way that the Department does not even try to account for.

77.    Perhaps worst of all, however, is that the Department acknowledges setting FLS-based AEWRs for 98% of the H-2A program[8] to replicate a rate at which enough U.S. workers would be attracted into seasonal agricultural jobs to make the H-2A program unnecessary.  It is settled law that the Department is not allowed to

---

[8] The Department's estimate that 98% of wages under the Final Rule will continue to be paid based on the FLS-based AEWR is laughably inaccurate, but for purposes of stating the Department's apparent position, is used here (with significant caveats).

do this, and doing so exceeds the authority provided by Congress and violates the INA and the APA.

78.    The Department's AEWR methodology violates the APA and must be vacated, pursuant to Sections 706(2)(A) and (C) of the APA.  Defendants must be enjoined from implementing or otherwise enforcing any part of the current AEWR methodology.

**COUNT IV**

**The Final Rule Violates the Regulatory Flexibility Act**
**(5 U.S.C. § 601, *et seq.*)**

79.    Plaintiffs incorporate by reference the allegations set forth in ¶¶ 1-55 above.

80.    The Final Rule also violates the requirements of the Regulatory Flexibility Act.  5 U.S.C. § 601, *et seq.*  Section 603 of Title 5 requires an agency issuing a rulemaking to explain, among other things, why the agency had chosen this version of the final rule, after comparing it to "any significant alternatives."

81.    The Department received extensive comments from stakeholders about the differences between agricultural work and non-agricultural work (not all "truck-driving" is identical) and even the differences between the range of duties that might be included in an H-2A job order.  Stakeholders urged the Department to limit the application of OEWS-based wage rates, if used at all, to those positions where the "primary duty" of the position fell outside the scope of USDA's FLS.  Another alternative proposed by commenters was to link the required wage to the specific job duty performed – pay a "truck-driving wage" when an employee is actually operating

30

a truck, but pay a "farmworker wage" when they are performing harvesting activities, for example.  All of these ideas were waved away by DOL.

82.    The "alternatives" cited by the Department to applying non-farm OEWS wage rates to some key agricultural jobs were: (1) to apply non-farm OEWS wages to all farm jobs if they were higher than the state's FLS-based AEWR; or (2) to apply non-farm OEWS wages to all farm jobs without considering FLS-based wage findings at all.  These are not legitimate "significant alternatives."  Not surprisingly, each of those ridiculous proposals was even worse than the one actually chosen.

83.    This is like a patient coming to a doctor with a runny nose, and the doctor proposing to cut off the patient's finger.  When the patient balks at the idea – quite understandably, being unrelated to the problem and totally inappropriate as a solution – the doctor suggests alternatives of: (1) cutting off the patient's entire arm or (2) cutting off an arm and a leg.  In that context, the finger seems relatively less outrageous, but that does not make it a sound idea in the first place!

84.    The Department did not even consider less egregious alternatives like: (1) using an actual market wage for workers; (2) continuing to pay farm workers based on surveys of farm worker wages; or (3) making any effort whatsoever to find out if there actually is any adverse effect or even could be any adverse effect.  This is not simply a case of "sour grapes" by commenters to a rule whose suggestions were not adopted by an agency.  This is an agency acting completely outside the requirements of the APA and RFA to achieve its misguided notions of social engineering.

85.    The specific decisions made explicitly state that the Department is trying

to manufacture a wage that will be sufficiently attractive to keep or lure U.S. workers into these seasonal agricultural jobs.  That idea has been expressly forbidden by controlling circuit precedent.

86.     The Department summarily dismissed the idea that different rates of pay could apply on a single contract, insisting that only the highest-possible applicable wage must be paid to all workers under an H-2A contract at all times, regardless of the work they actually perform.

87.     Likewise, the Department waved away numerous comments suggesting that it consider the "primary duty" or "majority duty" of a position when setting its wage.  Little ink was spilled by the Department in rejecting this idea; a blanket conclusion that it would be unworkable was deemed sufficient.  88 Fed. Reg. 12,781.

88.     Yet, in other labor certification determinations, this is precisely what the Department does every day in the "PERM" permanent visa program.  Just as in the H-2A program, the Department is issuing labor certifications there to avoid adversely affecting U.S. workers "similarly employed."  20 C.F.R. § 656.40(b)(2).  But for PERM labor certifications, the Department defines that term to look at more than any single job duty: "similarly employed means having substantially comparable jobs in the occupational category in the area of intended employment" 20 CFR § 656.40(d).

89.     This shift in the H-2A labor certification process mirrors the move to expand the idea of "corresponding employment" from the 1987 definition of "workers hired … in the occupations and for the period of time set forth in the job

32

order"[9] to the current definition of employing U.S. worker "in any work included in the job order."[10]

90.    Similarly, the Department defines certain overtime exemptions based on the employee's "primary duty" in their position. *See, e.g.,* 29 C.F.R. §§ 541.100, 541.200, and 541.300.

91.    When commenters suggested paying according to the specific work being performed, DOL was similarly dismissive, rejecting the idea out of hand. But that is exactly what is done for Department-approved piece-rates on H-2A contracts, where workers are paid a specific rate based on units of output, with the employer later determining the appropriate amount of pay between the piece rate and the Department's minimum hourly rate. 20 CFR 655.122(i)(2).

92.    And when protecting U.S. workers against "adverse effect," task-specific payments are exactly what the D.C. Circuit recommended recently in *Overdevest Nurseries LP v. Walsh*, 2 F.4th 977 (D.C. Cir. 2021) (cited extensively, for other purposes, by the Department in the Final Rule). The Court held that U.S. workers would be protected from adverse effect "by requiring employers to pay non-H-2A workers the same amount that they pay the H-2A workers ***when they are doing the same work***." *Id.* at 984 (emphasis added). More specifically, when suggesting ways that the employer might have avoided the "Catch-22" of creating corresponding employment for all possible duties on a farm, the Court specifically suggested that

---

[9] 29 C.F.R. § 501.0 (1987).
[10] 20 C.F.R. § 655.103(b) (2010).

"Overdevest could have simply paid the domestic workers the same wage as H-2A workers *whenever the H-2A workers were performing the same work*."  *Id.* at 986 (emphasis added).  Thus, according to the court, a rate-of-pay linked to the specific work performed within a pay period, rather than an across-the-board peak-level wage, was sufficiently protective against adverse effect.

93.   As set forth in Professor Rutledge's report (Ex. G to March Declaration), the Department wildly underestimates the "transfer cost" of the final rule; a convenient euphemism for massive nationwide wage hike.  The Department of Labor possesses or could easily have accessed all of the data needed to make an accurate calculation of the cost of the Final Rule to small businesses or other agricultural businesses, but utterly failed to do what the RFA required it to do.

94.   By failing to accurately measure cost or consider significant alternatives, or even meaningfully attempting to do either, the Department of Labor has acted in violation of the Regulatory Flexibility Act.  The Final Rule must be vacated and withdrawn, and the Department enjoined from enforcing any part of the Final Rule.

**WHEREFORE, Plaintiffs pray that the Court:**

95.   Enter a preliminary injunction, pending a decision on the merits, enjoining Defendants from: (i) implementing the Final Rule, 88 Fed. Reg. 12,760 (Feb. 28, 2023); (ii) requiring any employer from posting for recruitment online or otherwise advertising or paying any H-2A wage rate higher than the applicable AEWR published by Defendants at 87 Fed. Reg. 77,142 (Dec. 16, 2022); (iii) from enforcing the payment of any wage rates arising the Final Rule against any employer.

As part of such injunction, direct Defendants to continue processing H-2A applications using the wage rates published on December 16, 2022 until such time as Defendants can implement a revised methodology that complies with the requirements of 8 U.S.C. § 1188(a)(1)(B);

96.     Enter a declaratory judgment as to Counts I, II, III, and IV that the Final Rule and FLS-based AEWR methodology are invalid, and enter an order vacating the Final Rule and the definitions of "Adverse effect wage rate" and "Average adverse effect wage rate" at 20 C.F.R. § 655.103(b) and the methodology at 20 C.F.R. § 655.120(b), and permanently enjoining Defendants from implementing them or from issuing any further AEWR notices that do not include a finding of actual "adverse effect," that fail to consider domestic farm labor contractor wages, that fail to consider the cost of H-2A employer-provided housing and transportation, or that fail to survey actual hourly wages rather than gross pay;

97.     Award Plaintiffs their costs and expenses, including reasonable attorney's fees, whether under the Equal Access to Justice Act or otherwise; and

98.     Award such further and additional relief as is just and proper.

**Dated:**        **April 21, 2023**                SMITH, GAMBRELL AND RUSSELL, LLP

                                                **/s/ Christopher J. Schulte**
                                                CHRISTOPHER J. SCHULTE
                                                (DC Bar # 500878), *pro hac vice* forthcoming
                                                1055 Thomas Jefferson St., NW, Suite 400
                                                Washington, DC  20007
                                                Telephone:   (202) 263-4344
                                                Facsimile:   (202) 263-4322
                                                Email:        cschulte@sgrlaw.com

**/s/ Ian J. Dankelman**
IAN J. DANKELMAN (Fla. Bar No. 112439)
201 N. Franklin St., Suite 3550
Tampa, Florida  33602
Telephone:    (813) 488-2920
Facsimile:    (813) 488-2960
Email:        idankelman@sgrlaw.com
              daigotti@sgrlaw.com


SIMONS HALL JOHNSTON PC

**/s/ Brad M. Johnston**
BRAD M. JOHNSTON
(Nev. Bar # 8515), *pro hac vice* forthcoming
22 State Route 208
Yerington, Nevada  89447
Telephone:    (775) 463-9500
Facsimile:    (775) 465-4032
Email:        bjohnston@shjnevada.com

*Counsel for Plaintiffs*

36