UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FLORIDA GROWERS ASSOCIATION, INC.,
*et al.*,

       *Plaintiffs*,

v.

                               No. 8:23-cv-00889-CEH-CPT

JULIE A. SU, Acting Secretary of Labor, in her
official capacity, et al.,

       *Defendants*.

## PLAINTIFFS' TIME-SENSITIVE MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Rule 65, Federal Rules of Civil Procedure, and Local Rule 6.02 of the Rules of the United States District Court for the Middle District of Florida, the Plaintiffs ask the Court to enter a preliminary injunction enjoining the leadership of the Department of Labor ("DOL") from enforcing a final rule "revising the methodology by which it determines the hourly Adverse Effect Wage Rates (AEWRs) for non-range occupations…" (the "Rule").  20 C.F.R. § 655.120(b). Plaintiffs request a ruling on or before May 31, 2023. The Motion is time-sensitive because the Rule is causing harm to America's farming community by requiring compliance with the unlawful Rule; irreparable harm will result if the Rule remains in place beyond then.

The persons subject to restraint are the Defendants, in their official capacities

as leadership of the U.S. Department of Labor. Exhibit 1, Declaration of Attorney Christopher J. Schulte, at ¶2. The conduct to be enjoined is the implementation of the Rule. *Id.* at ¶ 3. Specifically, Plaintiffs seek to enjoin the Office of Foreign Labor Certification from requiring employers to post or otherwise advertise H-2A job orders with wages other than the FLS-based AEWRs published by Defendants at 87 Fed. Reg. 77,142 (Dec. 16, 2022). *Id.* at ¶ 3(2). With respect to Defendant Looman, Plaintiffs seek an injunction against the Wage and Hour Division of the Department of Labor from enforcing any requirement of H-2A employers to pay any wage rates resulting from the methodology in the Rule. *Id.* at ¶ 3(3). As the Defendants will suffer no economic harm, the Court should not require a bond. *See gen. Air Force Officer v. Austin*, 588 F.Supp.3d 1338 (M.D. Ga. 2022); *Wynn v. Vilsack*, 545 F.Supp.3d 1271 (M.D. Fla. 2021); *see also* Exhibit 1 at ¶ 4.

## INTRODUCTION

Congress created the H-2A seasonal agricultural visa program to allow farms and farm labor contractors like Plaintiffs and their members to temporarily employ foreign farmworkers. 8 U.S.C. § 1101(a)(15)(H)(ii)(a) (the "H-2A" visa program). In doing so, Congress authorized the Secretary of Labor to issue labor certifications to such employers, with two conditions: (1) the employer prove that "able, willing, and qualified" U.S. workers are not available for the specific labor or services requested; and (2) the employment of the H-2A workers "in such labor or services" would not "adversely affect" the wages and working conditions of U.S. workers "similarly

employed." 8 U.S.C. § 1188(a)(1).

The Department of Labor was not authorized to set wages to "attract" U.S. workers into these seasonal agricultural positions, and was instead only authorized to take steps to avoid "adverse effect" on existing U.S. workers' wages. The Department long acknowledged this distinction, dating back to the Department's original H-2A regulations in 1987: "the labor certification program is not the appropriate means to escalate agricultural earnings above the adverse effect level or to set an 'attractive wage.'" 68 FR 11,460, 11,464 (Apr. 9, 1987).

Almost 50 years ago, the Department successfully defended against claims by U.S. workers that the agency should set higher wages for farm worker visas to make the positions more attractive to U.S. workers who had chosen not to perform that work. *Williams v. Usery*, 531 F.2d 305, 306 (5th Cir. 1976) (the Secretary of Labor "has no authority to set a wage rate on the basis of attractiveness to workers. His [or her] authority is limited to making an economic determination of what rate must be paid all workers to neutralize any 'adverse effect' resultant from the influx of temporary foreign workers.").[1]

The Department of Labor, however, has been setting wages at a level to be attractive to U.S. workers not already employed in seasonal agriculture and have just issued a new rule that will send farmworker wages sky high, based on surveys of non-

---

[1] Fifth Circuit decisions issued prior to the 1981 Fifth Circuit Reorganization are considered controlling precedent in this Court. *See, e.g., Bonner v. City of Pritchard*, 661 F.2d 1206 (11th Cir. 1981).

farm employers and year-round non-agricultural workers not "similarly employed" with H-2A farmworkers.  All of this exceeds the narrow power conveyed by Congress and is arbitrary and capricious.  Plaintiffs respectfully but urgently ask the Court to preliminarily enjoin the Department's new wage rule before it permanently ruins Florida farms, specifically, and American agriculture, generally.

## BACKGROUND

American farms have come to depend on the work of thousands of foreign seasonal agricultural workers each year to grow, harvest, and transport our nation's crops.  The domestic U.S. farmworker population has decreased consistently over the past several decades, leading Congress to create the "H-2A" seasonal agricultural visa program, named for its subsection in the Immigration and Nationality Act, as amended.  8 U.S.C. §§ 1101(a)(15)(H)(ii)(a).

As created by Congress in 1986, the H-2A program allows U.S. farms and farm labor contractors to employ foreign nationals in seasonal agriculture under two conditions, as certified by the Secretary of Labor.  First, "there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition" and, second, "the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States *similarly employed*." 8 U.S.C. § 1188(a)(1)(A) and (B) (emphasis added).  Congress intended to avoid actual wage depression for current U.S. farm workers if similarly-employed H-2A workers

were allowed to work in the U.S. doing similar work.

The Department of Labor, acting through Defendants, recently issued a Rule revising the agency's H-2A wage-setting methodology at 20 C.F.R. § 655.120(b). *Adverse Effect Wage Rate Methodology for the Temporary Employment of H–2A Nonimmigrants in Non-Range Occupations in the United States*, Final Rule, 88 Fed. Reg. 12,760 (Feb. 28, 2023) ("Final Rule" or the "Rule"; Doc. 1-3). Ignoring extensive public comments about the dangers of the proposed changes to the Department's wage-setting methodology, Defendants have issued a rule that will require agricultural employers to pay non-farm, non-agricultural wages to all of the seasonal farmworkers covered by an H-2A contract, whether or not they actually perform the work done by these non-agricultural permanent workers. 88 Fed. Reg. 12,760, *et seq.* The result will be drastically higher wage rates (double or worse), without any plausible nexus to protecting the wages of U.S. workers "similarly employed."[2]  This obviously violates Congress' mandate in creating the program and requires vacatur.

Beyond acting outside its statutory authority, the Department knows better than to use this new wage methodology. It loudly rejected this wage data the last time it changed the wage-setting methodology:

> The selection of the Bureau of Labor Statistics (BLS) Occupational Employment Survey (OES) in the 2008 Final Rule was based on an underestimation of its inadequacies. The OES agricultural wage data has a number of significant shortcomings with respect to its accuracy as a measure of the wages of hired farm labor suitable to be used as the

---

[2] *See* Exhibit 2, Report by Dr. Bronars at ¶ 58, attached as Exhibit E to Doc. 1-6 (p. 50 of 145).

> AEWR. Perhaps its most substantial shortcoming in this context is that
> the OES data do not include wages paid by farm employers.

75 Fed. Reg. 6896 (Feb. 12, 2010).  Now, conveniently selective amnesia seems to
have swept the agency, as the current administration has entirely forgotten what it
knew the last time it was in power.  The same Department that attacked the use of
OES data to set farm wages has done nothing to change the survey to include farms;
the only change between using OES data being a terrible and deciding that it is a
necessity to use that data is rebranding OES as OEWS in Spring 2021.

The Department claims, disingenuously, that this new wage rule will only affect
the wages of 2% of all H-2A workers; 98% will still pay wages based on the
Department of Agriculture's Farm Labor Survey.  88 Fed. Reg. 12,766.  Buried in a
footnote, however, the Department admits that its 98% estimate only looks at
positions "coded" as outside the six occupational codes surveyed by the FLS, but does
not address the fact that all H-2A hourly work, *regardless of SOC code*, has been
subject to the same minimum wage requirement from the beginning of the program.
So, job orders with a mix of duties (harvesting work but also occasional truck-driving
or maintenance work) have been coded as "farm worker" or "agricultural equipment
operator."  There was no reason to parse these job orders like DOL will now.

The text of the Rule specifically states that the Department intends to apply the
new wage methodology so that the highest possible wage out of the mix of duties in a
given work contract and to apply that maximum-possible wage to all of the work
performed under the contract, whether that work matches the non-farm work giving

rise to the OEWS wage rate or not.  88 Fed. Reg. 12,802; 20 C.F.R. § 655.120(b)(5). This is the greatest source of harm in the rule.

If any workers might ever perform work, the Department will require that all workers must be paid at that level for <u>all</u> work – explicitly rejecting proposals to set wages based on the "primary duty" of the position or to pay the rate applicable to the specific work performed. Exhibit 2, Declaration of Michael Marsh, Doc. 1-6. The Department claims[3] that these more specifically tailored solutions are unworkable, but the Department uses those exact methods in other contexts. For permanent visas (which, arguably would have a greater potential effect on the U.S. workforce than a seasonal job only lasting a few months), the Department defines the same "similarly employed" phrase to mean "having substantially comparable jobs in the occupational category in the area of intended employment." 20 C.F.R. § 656.40(d). When applying overtime exemptions, the Department looks to the employee's "primary duty" out of all the duties assigned. *See, e.g.,* 20 C.F.R. §§ 541.100, 541.200 and 541.300.

Even in the narrow context of H-2A agricultural labor, a farmworker might have several different pay rates within a single workday.[4]  Harvest workers are often paid on a "piece rate" basis, based on the number of units picked rather than just the number of hours worked in picking that crop.  *See* FN 5, *infra.*  Different rates apply to different crops, so a worker picking berries in Hardee County, Florida might earn

---

[3] 88 Fed. Reg. 12,781.
[4] 20 C.F.R. § 655.122(i)(2), (l)(2).

$14.33/hour for non-harvesting work, the FLS-based AEWR, but would earn $1.90 per 12 "clamshell" pack of strawberries or $0.70 per pound of blueberries, then after lunch might earn $1.25/bin of watermelons, $3.00/bin of cantaloupe, $1.00 per 3/4 bushel box of peppers, or $1.00/box of squash, or any of the other dozen piece rates on the same DOL-approved contract.[5]  For job orders like that, with a mix of activities, the Department simply states that the workers be paid for the rate applicable to the <u>specific</u> <u>work</u> they are performing, with the only limit being to the extent that the piece rate earnings fall below that $14.33/hour rate for the day, the employer will pay the difference.  20 C.F.R. § 655.122(l)(2).

Employers are certified by the Department to pay their workers this way, and have been doing so for generations in Florida and elsewhere. *See, e.g.,* FN5, Exhibit 3. The Department does not choose from the highest possible rate and apply that to all work on the contract – these workers are not paid $0.70 for a pound of blueberries <u>and</u> a pound of watermelons.  *Id.*  That would be ridiculous.  And the Department knows that is ridiculous, and has made the sound decision not to require it.  Until now.

The example offered in the Complaint at ¶ 15, is a real-world example that will occur in the very near future if this Rule is not enjoined.  All H-2A employers are required by the Department to provide free transportation between the free employer-provided housing and the worksite.  20 C.F.R. § 655.122(h)(3).  Typically, that van-driving duty is included in the H-2A work contract – one of the workers with

_____

[5] https://api.seasonaljobs.dol.gov/job-order/H-300-23004-681125, Exhibit 3

a valid driver's license will drive the van, then get out and work alongside the other farmworkers all day, picking apples or pulling weeds, or whatever farm work is called for that day, then drives his or her coworkers a few minutes back to the housing.

Under the Department's new rule, however, each and every farmworker on that contract would no longer be paid the rate that the Department has found to apply to "similarly employed" farmworkers in the state; they would all be paid the statewide mean wage rate for chauffeurs. 88 Fed. Reg. 12,780. For H-2A workers at New York apple orchards, this will drive their hourly wage from under $17/hr to nearly $20/hr – all to protect the wages of chauffeurs in Manhattan or the Hamptons? And this is just an example that the Department itself included in the preamble to the Rule! 88 Fed. Reg. 12,780. There will be any number of shocking outcomes from the Rule, but this is one where the Department highlighted its absurd position.

This is not the only area where the Department ignores the core agricultural nature of farm work and, instead, applies a literal non-agricultural comparison to find a higher wage to require farmers to pay. The job duties of crop farmworkers (Exhibit 4, SOC Code 45-2092) and livestock workers (Exhibit 5, Code 45-2093) each include, according to the Department of Labor, "repair fences" and "maintain and repair fences," respectively.[6] This makes sense. Stringing barbed wire to enclose crops or cattle has been a critical piece of American agriculture since the 1870s; the invention

---

[6] *See* https://www.onetonline.org/link/summary/45-2092.00, Exhibit 4 and https://www.onetonline.org/link/summary/45-2093.00, Exhibit 5

of barbed wire is widely credited with "taming the West"[7], Exhibit 6.  It pre-dates the Department of Labor, itself, by several decades.  Yet, even since the filing of the Complaint in this case, the Department has taken the position that crop or livestock positions that refer to installing fencing on a farm are suddenly not farm work at the Department's farm worker wage of $17.33/hour in North Dakota, but are actually "fence erector" positions and, therefore, required to be paid $23.96/hour, just like non-farm workers installing fences around pools or in suburban back yards.[8]  ***By definition***, H-2A work must qualify as "agricultural" labor in order to be certified for visas at <u>any</u> pay rate.  But the Department now ignores 150+ years of history and the agricultural nature of the work and picks out a single word and then looks far and wide for a non-farm wage that might match that word (and involve a higher wage to inflate H-2A wages) in order to impose that higher wage on farmers.

## ARGUMENT

## I.    LEGAL STANDARD

To prevail on a motion for a preliminary injunction, a moving party must show:

(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

---

[7] https://www.latimes.com/archives/la-xpm-2000-sep-02-mn-14602-story.html, Exhibit 6

[8] According to BLS, there are 160 "fence erectors" <u>statewide</u> in North Dakota.  The Department wants you to believe that their livelihoods are in danger from cattle farm workers being paid as farm workers.  Really?

*Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Even under the *Chevron* deference standard, where an agency is interpreting an authorizing statute, the agency's actions will be vacated where, as here, "they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A. v. Natural Resources Defense* Council, 467 U.S. 837, 843 (1934). Deference is at its lowest point when the statutory language is not ambiguous and where the agency fails to even acknowledge having changed its position: "To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *F.C.C. v. Fox Television Stations*, *Inc.,* 556 U.S. 502, 515 (2009).

The Department offers no acknowledgement whatsoever, let alone a "reasoned explanation" for its about-face on the use of OES/OEWS data to set farmworker wages. *Cf.* 75 Fed. Reg. 6896 (attacking OES data's "inadequacies" and "significant shortcomings with respect to its accuracy as a measure of the wages of hired farm labor suitable to be used as the AEWR"). Now, just a few years later, without any indication that the 2010 rulemaking even happened, the Department declares the OEWS data not just adequate and without shortcomings, but insists that not using this data will absolutely guarantee adverse effect to U.S. workers' wages.

Thus, the Department's interpretation of its authorizing statute is entitled to no special deference. The statute has not changed by so much as a comma between

2010 and 2023, so no deference is owed to an agency who interpret that identical statute in diametrically opposite ways without explanation.  The Department is not acting based on some unique expertise, but merely based on political whims.

## II.   ASSOCIATION STANDING

As a matter of law, "'an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"  *Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1316 (11th Cir. 2021), quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

Each of the four association Plaintiffs in this action, therefore, possess standing to challenge the Department of Labor's wage methodologies.  The National Council of Agricultural Employers, Florida Citrus Mutual, and the Florida Fruit and Vegetable Association all have members who participate in the H-2A visa program and already are or will soon be required to pay the adverse effect wage rates set by the Department.  *See, e.g.,* Exhibits 4-7 to the Complaint (Exhibit 2, Marsh Declaration at ¶¶ 3-6; Exhibit 7, FCM Declaration at ¶¶ 5 and 7; Exhibit 8, FFVA Declaration at ¶¶ 4-5, 8, and 13).[9]  Plaintiff Florida Growers Association is actually a joint-employer in the

---

[9] Plaintiffs G&F Farms, LLC and Franberry Farms, LLC are members of FFVA, and their Director of Operations, declarant Michelle Williamson, is a board member of FFVA. Williamson Declaration at ¶ 1, Exhibit 8.

H-2A program with its members.  (Exhibit 9, Meador Declaration at ¶ 2-5).  Each association is specifically engaged in H-2A labor issues on behalf of its member-employers, and additional individual members are not needed to assert the claims regarding the Department of Labor's illegal activity.  Thus, the associations have standing to bring this action.

## III.    PLAINTIFFS MEET THE ELEMENTS FOR PRELIMINARY RELIEF

### A.    Success on the Merits

Plaintiffs have demonstrated a likelihood of success on the merits on their claims related to the Rule. "[T]o prevail on its motion for injunctive relief, Plaintiff[s] must only demonstrate a substantial likelihood of success as to one cause of action." *Quality Lab. Mgmt., LLC v. Mullen*, No. 6:21-cv-589, 2021 WL 4948140, at *2 (M.D. Fla. July 12, 2021). Agency action must be set aside if it is inconsistent with the organic legislation adopted by Congress. 5 U.S.C. §§ 706(2)(A), (C).

> The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law … but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity.

*Dixon v. United States*, 381 U.S. 68, 74 (1965) (quoting *Manhattan Gen. Equip. Co. v. Comm'r*, 297 U.S. 129, 134 (1936)). Put simply, agency action inconsistent with the authorizing statute is invalid and subject to vacatur.  *See, e.g., Bayou Lawn & Landscape Servs. v. Sec'y of Lab.*, 713 F.3d 1080 (11th Cir. 2013) (vacating H-2 rule promulgated by Department of Labor without statutory authority).

The Complaint raises two related theories for striking down the final rule.[10] Both relate to the specific directions that Congress gave to the Secretary of Labor with regard to administering the H-2A visa program.  The Rule exceeds the authority conveyed by Congress and does so in a manner that is arbitrary and capricious.  Thus, it doubly violates the APA and should be struck down.  Having broken the law by issuing the rule in the first place, it comes as little surprise that the Department has also violated additional procedural requirements in doing so.  Namely, the Regulatory Flexibility Act requires an agency to identify the cost of its regulatory action and show that "significant alternatives" had been considered and found to be inappropriate. The Department failed to meet its statutory requirements on that count, as well.

### 1. <u>Contrary to Statutory Authority</u>

Congress authorized the Secretary of Labor to issue labor certifications for temporary agricultural labor to employers, with exactly two conditions:  (1) the employer must prove that "able, willing, and qualified" U.S. workers are not available for the specific labor or services requested; and (2) the employment of the H-2A workers "in such labor or services" would not "adversely affect" the wages and working conditions of U.S. workers "similarly employed."  8 U.S.C. § 1188(a)(1).

---

[10] There are actually two wage-setting methodologies challenged here:  (1) the new OEWS-based wage rates introduced in Rule; and (2) the USDA survey-based wages. In the hopes of keeping the Department from "taking its ball and going home" if the Court rules against them and ceasing to adjudicate all new H-2A labor certification applications, Plaintiffs would ask that the status quo of using the USDA wages remain in place until the Department completes a new rulemaking process.  Plaintiffs reserve the right to move separately for injunctive relief against the other wage rule later.

The Secretary of Labor has no legal authority to require agricultural employers to pay wages <u>except</u> to ensure that employing H-2A workers in "the labor or services involved in the petition" would "adversely affect" the wages and working conditions of U.S. workers "similarly employed." *Cf. AFL-CIO v. Brock*, 835 F.2d 912 (D.C. Cir. 1987). Moreover, the Department is expressly barred from setting wages to increase farmworker wages or to make farm jobs more "attractive" to potential U.S. workers. *Williams v. Usery, supra,* 531 F.2d at 306.

The Rule sets wages to be attractive and to maximize earnings – precisely what the Department and the Fifth Circuit have always stated were improper and illegal. *Id.*; 68 FR 11,464. The Department is not protecting U.S. farmworkers "in such labor or services" who are "similarly employed."  Instead, the Department is using wage rates for non-farm occupations derived from a survey that explicitly does not look at farm wages.[11] They are not just comparing "apples to oranges," they are comparing apples to sparkplugs or oranges to Amazon packages.

Specifically, the mix of duties being paid at the maximum possible wage goes against Congress' grant of authority.  In fact, the Department concedes that applying the highest possible AEWR to a mix of duties will result in a wage "above the market equilibrium wage" and requiring employers to pay that wage "may create DWL [deadweight loss] in the labor market." 88 Fed. Reg. 12,789.  Statements like this are

---

[11] https://www.bls.gov/oes/oes_ques.htm, Exhibit 10, (FAQ A.5: "The OEWS survey is a semi-annual mail survey of non-farm establishments.")

peppered throughout the Rule. One would expect that to sound alarms at the Department, but the Department's illegal course of action was undeterred.

It is "axiomatic that an agency's power to promulgate legislative regulations is limited to the authority delegate to it by Congress." *Bayou, supra*, 713 F.3d at 1084, citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Where an agency issues legislative regulations beyond the authority delegated to it by Congress, those regulations are subject to vacatur, and "plaintiffs have shown a substantial likelihood of success on the merits of their claim that DOL has exercised a rulemaking authority that it does not possess." *Id.* at 1085.

Federal agency action like this – inserting itself into the employer-employee relationship to dictate a specific wage to be paid and either refusing to permit the employer to hire workers it has demonstrated a need for or penalizing an employer for not paying those agency-set wages – may only occur where Congress has lawfully authorized the agency to so act. Absent such specific authority, the agency has no more power to compel actions like that than any private citizen might have. The Department may chafe at Congressional restrictions or procedural limits like the APA or Regulatory Flexibility Act, but in a society of laws, the government may not pick and choose which laws it will follow. Actions in violation of the law must have consequences, even for powerful federal agencies.

## 2. Arbitrary and Capricious

Using non-farm wage surveys to dictate on-farm wages is also arbitrary and

capricious; particularly as the Department has written the Rule. Legions of comments by concerned farms and agricultural associations urged the Department that, if it insisted on using these non-farm wages, at least: (1) look to the "primary" or "main" duty of the work to see if the H-2A workers would be "similarly employed" or (2) apply the specific wage to the specific work that the Department considered to be "similar" employment, rather than applying the high-water wage to <u>all</u> workers at <u>all</u> <u>times</u> under the contract. *See, e.g.,* Exhibit 2, Marsh Dec., Doc. 1-6 at Ex. L, p.13. By ignoring those comments and imposing this absolutist approach to wage-setting, the Rule is arbitrary and capricious and must be set aside for that reason, as well.

Beyond the Department's law of authority to set wages based on those not "similarly employed" using non-farm wages, the Rule violates the APA through its retroactive application to contracts certified before the Rule took effect; even before it was published. "Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen, supra*, at 208.

On its face, the Rule applies to "all job orders submitted … on or after March 30, 2023." 88 Fed. Reg. 12,802 (20 C.F.R. § 655.120(b)(1)(iii)). Less publicly, however, the Department has revealed that it will apply these OEWS-based wages to job orders filed before March 30, even certified before March 30. In Exhibit 10, FAQs issued on March 9, 2023, the Department admits that it will require employers certified prior to the effective date with an SOC code outside the FLS survey to pay the higher, OEWS-

based wage rate when new OEWS wages are published on July 1, 2023.[12] In a webinar given by the Department on April 4, 2023, the Department reiterated this plan, stating that "Job orders filed prior to March 30, 2023, are subject to AEWR update(s) applicable to the employer's job opportunity, including update(s) that the OFLC Administrator publishes using the new methodology."[13]

In Exhibit 12, the Declaration of the President of the Florida Fruit and Vegetable Association, submitted as Exhibit E to the Complaint, Michael Joyner notes that at least one of his association's members applied for the current season in <u>late 2022</u>, months before the Rule was announced, and was certified to employ heavy truck drivers under SOC Code 53-3032. Exhibit 2, Doc. 1-6 at ¶ 11. Their current contract requires them to pay the Florida AEWR of $14.33, but their contract extends through the month of July 2023, meaning that they will be required by the Department to change their pay to the OEWS rate that replaces the current $21.62 for truck drivers. *Id.* This employer has no opportunity to challenge the Department's SOC code assignment or to take any other steps to mitigate its harm – the only way that they can avoid being subject to retroactive application of the Rule is if the Court enjoins the Department from taking this illegal action.

The Department of Labor has acted outside the legal authority granted by Congress; has ignored the warnings of stakeholders and acted in an arbitrary and

---

[12] https://tinyurl.com/OFLC-AEWR-FAQs, Exhibit 10 at Question 7 on p.6
[13] https://tinyurl.com/OFLC-AEWR-webinar, Exhibit 11, at p.4.

capricious manner; and is illegally applying the new rule retroactively against agricultural employers.  Plaintiffs have met their burden of showing a likelihood of success on the merits and should be granted preliminary injunctive relief.

### 3. Regulatory Flexibility Act

The Regulatory Flexibility Act requires, among other things, that an agency issuing a rule must explain why the agency has chosen this particular version of the rule, showing that it was compared the final version to "any significant alternatives." 5 U.S.C. § 603.  The agricultural employer community, including Plaintiff National Council of Agricultural Employers, submitted extensive comments to the Department on the proposed wage rule, in multiple rounds under two separate administrations. *See* Exhibit 2, Marsh Declaration, Doc. 1-6 at Exhibits J, K, and L.

Those comments raised serious concerns about the proposed use of OEWS non-farm wages to set farm wages (a concern that the Department of Labor shared until very recently), but also proposed specific and significant alternatives, based on how federal courts and the Department had applied wage requirements in other contexts.  Briefly, for example, the idea of paying a particular wage only when the applicable work is being performed[14] or looking at the "primary duty" of a farmworker position rather than cherry-picking individual tasks to identify "similar employment" based on a single point of overlap.

The Department spent little time in the Rule waving away these options,

---

[14] *See, e.g., Overdevest Nurseries LP v. Walsh*, 2 F.4th 977, 984 (D.C. Cir. 2021).

declaring them too complicated, too burdensome for employers (more burdensome than $10/hour wage increases?) or, without explanation or proof, creating the potential for employers to combine job duties to be able to employ higher-wage SOC code employees together with other farmworkers.[15]   The Small Business Administration, *an agency within the same administration*, specifically commented that the Department's rule failed to consider the actual costs of the proposed rule that has now become this final rule, including significant wage increases for H-2A employees.  Exhibit 2, Ex. H to Doc. 1-6, January 31, 2022 letter from SBA Office of Advocacy at pp. 4-8 (warning that wages will disrupt farming operations, make American farms less competitive, and put small farms out of business).

The only "alternatives" discussed in the Regulatory Flexibility portion of the Rule are to retain the highest-possible-wage-for-all-workers-and-all-hours approach but to use the problematic wage data sources for <u>even more</u> or for <u>all</u> jobs.  This falls far short of the RFA's requirements and requires the Rule to be remanded to the Department to conduct a proper analysis of the Rule's costs and alternatives.

B.   Irreparable Harm

In order to demonstrate irreparable harm as a result of the implementation of the Rule, the party seeking injunctive relief can show that it is likely to experience injury that cannot be cured by ultimate success on the merits in the case. *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) ("An injury is irreparable if it cannot

---

[15] *See* 88 Fed. Reg. 12,781.

be undone through monetary remedies." (citation omitted)).  In this situation, where the harm is the payment of an illegally-mandated wage rate, money damages are not available.  There is no "'adequate compensatory or other corrective relief [that] will be available at a later date.'"  *Brown v. Sec'y, U.S. Dep't of Health & Hum. Servs.*, 4 F.4th 1220, 1226 (11th Cir Cir.), *vacated on other grounds*, 20 F.4th 1385 (11th Cir. 2021), quoting *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).

Farms will not be able to recover the excessive wages paid from their employees nor from the Department of Labor, making this an unrecoverable financial loss. *See, e.g., Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres, More or Less, Over Parcel(s) of Land of Approximately 1.21 Acres, More or Less, Situated in Land Lot 1049*, 910 F.3d 1130, 1165–66 (11th Cir. 2018) (absence of a remedy to recover economic harm makes injury "irreparable").

Farms operate pursuant to contracts with their customers, and farm labor contractors (as the name suggests) operate pursuant to contracts with farms.  If labor costs grow as projected, they will exceed the operating margins for farms and FLCs and will put them in the inevitable but untenable position of having to cancel contracts or close down.  The inability to meet the farm's or FLC's contractual commitments because of this unforeseen doubling of labor costs will clearly cause a loss of reputation and goodwill.  As this Court has already held, "It is true that [d]amage to [a] plaintiff's reputation and goodwill [is] difficult to quantify and

21

[cannot] be undone through an award of money damages." *Kotori Designs, LLC v. Living Well Spending Less, Inc.*, No. 2:16-CV-637-FTM-99CM, 2016 WL 6833004, at *3 (M.D. Fla. Nov. 21, 2016) (quotation omitted).

Where DOL implements new rules like this, a plaintiff satisfies the irreparable harm requirement where the plaintiff has demonstrated that "new rules would have an immediate and significant impact on them, resulting in lost revenue, customers, and/or goodwill." *Bayou Lawn & Landscape Servs., supra*, 713 F.3d at 1085.

The harm that Plaintiffs and their employer members face is not only harm that cannot be undone through some future award of money damages, it is harm that is imminent.  There is no danger here of the Court "deciding a case in which no injury would have occurred at all." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n.2 (1992).  The full extent of the harm will be ongoing with each paycheck issued with the illegal rate of pay, but there is certainty that those wages will be paid.  *See Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979) ("one does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough"); *see also Eternal Word Television Network, Inc. v. Sebelius*, 935 F. Supp. 2d 1196, 1214 (N.D. Ala. 2013) (where an agency's final rule will apply to plaintiffs and is in effect, plaintiffs have a "real and immediate threat of future injury" and, thus, standing to seek injunctive relief against its application).

Where employers can demonstrate, as Plaintiffs have here, that "the rules at issue apply to the plaintiffs and will make their participation in the program more

expensive," they have met their initial burden for purposes of injunctive relief. *Bayou Lawn & Landscape Servs. v. Solis*, No. 3:12CV183/MCR/CJK, 2012 WL 12887385, at *4 (N.D. Fla. Apr. 26, 2012), *aff'd by Bayou Lawn & Landscape Servs., supra.*

Since Plaintiffs are all H-2A employers and associations comprised of H-2A employers, and the Rule will apply to those employers, Plaintiffs have met their burden for demonstrating irreparable harm as a result of the Rule. These employers will incur illegal and ruinous wage increases that will cause them to, at best, cancel contracts and ruin their reputations and, at worst, go out of business altogether.

On a more specific and urgent basis, even being required to advertise these positions at the OEWS-based wage rates creates immediate liability for H-2A employers. As discussed in the Complaint, Exhibit 13, (Doc. 1-1, at ¶¶ 70-71), even if the Rule is struck down a month from now, any U.S. workers accepting the position at the illegal, higher wage rate will be locked-in at that illegal rate for at least 75% of the contract, with no opportunity to lower wages later nor to terminate the contract.[16]

## C.   Balance of Equities / Public Interest

The Court must finally consider "whether the threatened injury to [Plaintiff] outweighs whatever damage an injunction might cause the Defendants." *Dunkin'*

---

[16] *See* 20 C.F.R. § 655.122(i)(1) ("three-fourths guarantee"); 20 C.F.R. § 655.120(b)(4) (if DOL publishes lower AEWR during contract period, "the employer must continue to pay at least the rate guaranteed on the job order"); 20 C.F.R. § 655.172(a) (employer withdrawing certified job order "still obligated to comply with the terms and conditions of employment contained in [it] ... with respect to all workers recruited in connection with that application and job order.").

*Donuts Franchised Rests. LLC v. D & D Donuts, Inc.*, 566 F. Supp. 2d 1350, 1361 (M.D. Fla. 2008). Because Plaintiffs request a preliminary injunctive relief against a federal agency, "the analysis of the balance of equities and the analysis of the public interest merge." *State v. Becerra*, 544 F. Supp. 3d 1241, 1302 (M.D. Fla. 2021). Although Plaintiff will suffer immediate harm absent preliminary relief staying the implementation of the Rule until this matter can be resolved on its merits, DOL will not suffer any harm whatsoever.

In the H-2 regulatory context, in particular, the Eleventh Circuit upheld the Florida district court's grant of a preliminary injunction where (as here), the plaintiff employers could show that "the new rules would have an immediate and significant impact on them, resulting in lost revenue, customers, and/or goodwill," whereas "DOL did not articulate any harm it would suffer as a result in a delay." *Bayou, supra*, 713 F.3d at 1085.  In response to an argument from DOL raising concerns with delaying the implementation of the H-2 rule in *Bayou*, because it would question the Department's "entire regulatory program," the Eleventh Circuit aptly held "[i]f the 'entire regulatory program' is *ultra vires*, then it should be called into question." *Id.*

The public interest weighs in favor of granting this relief. "After all, '[t]here is generally no public interest in the perpetuation of unlawful agency action.'" *Becerra*, 544 F. Supp. 3d at 1304 (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("Frustration of federal statutes and prerogatives are not in the

public interest, and we discern no harm from the state's non-enforcement of invalid legislation."). The failure of an agency to comply with its authorizing statute, much less an agency's arbitrary or capricious actions, is always contrary to the public interest and should be blocked at once. It is also in the public interest to encourage family farms and avoid arbitrarily and illegally forcing them out of business.

<u>CONCLUSION</u>

The Court should enjoin the Defendants from implementing or enforcing the Rule and enter the proposed order attached as Exhibit 14.

WHEREFORE, Plaintiffs request that the Court grant their motion and enjoin: Defendants from enforcing the Rule codified in  20 C.F.R. § 655.120(b)(the "Rule); the Office of Foreign Labor Certification from requiring employers to post or otherwise advertise H-2A job orders with wages other than the FLS-based AEWRs published by Defendants at 87 Fed. Reg. 77,142 (Dec. 16, 2022); and, with respect to Looman, the Wage and Hour Division of the Department from enforcing any requirement of H-2A employers to pay wage rates resulting from the Rule's methodology.

Dated: May 11, 2023         FLORIDA GROWERS ASSOCIATION, INC.; NATIONAL COUNCIL OF AGRICULTURAL EMPLOYERS; FLORIDA CITRUS MUTUAL; FLORIDA FRUIT AND VEGETABLE ASSOCIATION; G&F FARMS, LLC, AND FRANBERRY FARMS, LLC

By: */s/ Christopher J. Schulte*
Ian J. Dankelman, FBN 112439
SMITH GAMBRELL & RUSSELL LLP
201 N. Franklin St., Suite 3550
Tampa, FL 33602

Telephone:   (813) 488-2920
Facsimile:   (813) 488-2960
Email:          idankelman@sgrlaw.com
                    daigotti@sgrlaw.com

Christopher J. Schulte, *Pro Hac Vice*
SMITH GAMBRELL & RUSSELL LLP
1055 Thomas Jefferson Street, NW,
Suite 400
Washington, D.C., 20007
Telephone:   (202) 263-4344
Facsimile:   (202) 263-4322
Email:          cschulte@sgrlaw.com
                    ahewitt@sgrlaw.com

Brad M. Johnston, *Pro Hac Vice*
SIMONS HALL JOHNSTON PC
22 State Route 208
Yerington, Nevada 89447
Telephone:   (775) 463-9500
Facsimile:   (775) 465-4032
Email:          bjohnston@shjnevada.com

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 11, 2023, I filed the foregoing Motion ("Motion")

via CMECF which will serve all attorneys of record and I caused the within Motion and

exhibits to be delivered upon all individuals and entities on the attached service list.

By: */s/   Christopher J. Schulte*
Attorney