## UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

FLORIDA GROWERS ASSOCIATION,
INC., *et al.*,

    Plaintiffs,

v.                                                         Case No. 8:23-cv-889-CEH-CPT

JULIE A. SU, in her official capacity as
Acting Secretary of Labor, *et al.*,

    Defendants.

_____/

## DEFENDANTS' OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

WILLIAM C. PEACHEY
Director

GLENN M. GIRDHARRY
Deputy Director

AARON S. GOLDSMITH
Senior Litigation Counsel

JOSHUA S. PRESS
Senior Litigation Counsel
United States Department of Justice
Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Phone: (202) 305-0106
Facsimile: (202) 305-7000
e-Mail: joshua.press@usdoj.gov

*Attorneys for Defendants*

**INTRODUCTION**

More than two months after the United States Department of Labor ("DOL") issued its final rule modifying the methodology for calculating the Adverse Effect Wage Rate ("AEWR") for the H-2A Temporary Labor Certification Program ("H-2A Program"), Plaintiffs seek immediate relief in the form of a nationwide preliminary injunction. *See* ECF No. 16 (hereinafter, "Plaintiffs' Motion" or "Pls.' Mot."). In short, Plaintiffs' Motion requests universal vacatur of the rule DOL published at *Adverse Effect Wage Rate Methodology for the Temporary Employment of H–2A Nonimmigrants in Non-Range Occupations in the United States*, 88 Fed. Reg. 12760 (Feb. 28, 2023) ("2023 Rule"). Plaintiffs argue that the 2023 Rule is (1) *ultra vires* under the Immigration and Nationality Act ("INA"), (2) arbitrary and capricious under the Administrative Procedure Act ("APA"), and (3) violates the Regulatory Flexibility Act ("RFA"). These arguments are meritless.

Plaintiffs are wrong because it is both lawful and reasonable for DOL to require H-2A employers to protect similarly employed U.S. workers' wage rates by requiring that such employers pay H-2A workers for the jobs that they actually perform while temporarily working within the United States. *See* 88 Fed. Reg. at 12771–72 & 78–83. Plaintiffs' approach of using less accurate data based upon DOL's regulatory assessment of the datasets before it 13 years ago would result in more arbitrary wage-level determinations and depress the wages for similarly employed U.S. workers. *See id.* at 12771.

1

Plaintiffs' Motion also fails explain why a preliminary injunction is needed *immediately*. There is no reason to rush this matter; this case should be reviewed with the benefit of a full administrative record. Plaintiffs disregard that norm by arguing that they will suffer irreparable harm, and that they cannot recover damages from DOL. Yet this argument ignores how monetary harm is insufficient for a preliminary injunction unless a movant can demonstrate that the continued existence of their business is likely to cease absent immediate injunctive relief.

Finally, the public interest weighs in favor of Defendants. Plaintiffs' eleventh-hour attempt to enjoin the 2023 Rule nationwide should not be rewarded by injecting further instability into the H-2A program. Indeed, the harm to third-party agricultural workers who are already working and signing contracts based on the 2023 Rule outweighs Plaintiffs' speculative assertions of economic harm. For these reasons, Plaintiffs' Motion should be denied.

## BACKGROUND

### I. Statutory and Regulatory History

#### A. *The H-2A Temporary Agricultural Visa Program and the AEWR*

The H-2A visa program permits U.S. agricultural employers to hire foreign workers on a temporary basis "to perform agricultural labor or services ... of a temporary or seasonal nature." 8 U.S.C. § 1101(a)(15)(H)(ii)(a). In enacting the H-2A Program, Congress directed DOL to strike a balance between the "competing goals" of "providing an adequate labor supply and protecting the jobs of domestic

workers." *AFL-CIO v. Dole*, 923 F.2d 182, 187 (D.C. Cir. 1991). Accordingly, before an employer can file an H-2A visa petition with the United States Department of Homeland Security ("DHS"), they must first seek a labor certification from DOL that (1) there "are not sufficient workers" able, willing, and qualified to perform the labor at issue and (2) issuance of the H-2A visa "will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1)(A), (B); *see also* 8 C.F.R. § 214.2(h)(5)(i)(A). DOL meets § 1188's requirements, in part, by requiring employers to offer, advertise in their recruitment, and pay a wage that is the highest of the AEWR, the prevailing wage, the agreed-upon collective bargaining wage, the federal minimum wage, or the state minimum wage. *See* 20 C.F.R. §§ 655.120(a), 655.122(l). These rates work to prevent the hiring of foreign H-2A workers from adversely affecting the wages and working conditions of similarly employed U.S. workers.

The AEWR "is one of the primary ways the Department meets its statutory obligation to certify that the employment of H-2A workers will not have an adverse effect on the wages of agricultural workers in the United States similarly employed." 88 Fed. Reg. at 12761. The AEWR "is designed to prevent the potential wage-depressive impact of foreign workers on the domestic agricultural workforce." 75 Fed. Reg. 6884, 6891 (Feb. 12, 2010) ("2010 Rule"). Therefore, in designing the AEWR methodology, DOL sets a "rate [that] will neither ratchet wages upward, driving growers out of business nor perpetuate wage depression."

3

*Dole*, 923 F.2d at 187. Congress has not set a method for calculating the AEWR; rather, "calculating AEWRs has been left entirely to [DOL's] discretion." *AFL-CIO v. Brock*, 835 F.2d 912, 915 (D.C. Cir. 1987).

### B. Prior Methodologies for Calculating the AEWR

"DOL has used a number of methods for calculating the AEWR over the years." *UFW v. Chao*, 227 F. Supp. 2d 102, 108 n.13 (D.D.C. 2002). In December 2008, DOL began using the Occupational Employment Statistics ("OES") survey, administered by the Bureau of Labor Statistics ("BLS"), rather than the Department of Agriculture's ("USDA") Farm Labor Survey ("FLS"), to set the AEWRs for all H-2A job opportunity, subject to four "skill" levels that established the AEWR for an occupation based on an arithmetic formula. 73 Fed. Reg. 77110, 77176–77 (Dec. 18, 2008). DOL justified utilizing OES data because, *inter alia*, USDA "could terminate the [FLS] survey at any time and leave [DOL] without the basic data" to calculate the AEWR. *Id.* at 77174. That possibility "add[ed] a measure of instability and uncertainty for AEWR determinations in future years" that warranted a methodology that did not rely on the FLS. *Id.* at 77173. This change was upheld as lawful. *See UFW v. Solis*, 697 F. Supp. 2d 5, 8–11 (D.D.C. 2010).

On March 15, 2010, DOL again revised its AEWR methodology, defining the AEWR as the "annual weighted average hourly wage for field and livestock workers (combined) in the States or regions as published annually by the [USDA] based on its quarterly wage survey," or the FLS survey. 20 C.F.R. § 655.103(b); *see also* 75

4

Fed. Reg. at 6891. In explaining its decision to resume using the FLS to determine the AEWR for all H-2A occupations, DOL observed that the FLS "actually uses information sourced directly from farmers," while the OES "includes data from employers who operate farm support operations[.]" 75 Fed. Reg. at 6898.

In 2019, DOL again proposed changes to the AEWR methodology that would set the AEWR at the annual average hourly gross wage for a particular agricultural occupation in the State or region, as reported by the FLS if such data was available, and at the statewide annual average hourly wage for the Standard Occupational Classification ("SOC") from the OES survey if the FLS did not report a wage in a State or region. *See* 84 Fed. Reg. 36168, 36181 (July 26, 2019) ("2019 NPRM"). DOL explained that the FLS collects data by SOC, but it does not report wages at that level of specificity. 84 Fed. Reg. at 36181. Instead, the FLS reports four wage rates per State or region: (1) field workers,[1] (2) livestock workers,[2] (3) field and livestock workers combined, and (4) all hired workers. *Id.* Under the 2010 Rule, AEWR was thus established using the annual average hourly wage data for workers within the combined field and livestock category in the FLS despite wage data for certain higher-skilled occupations not being included in that dataset. *Id.* The 2019 NPRM's change was thus intended to produce more accurate AEWRs. *Id.* at 36171.

---

[1]   "Field workers include employees engaged in planting, tending and harvesting crops, including operation of farm machinery on crop farms." 80 Fed. Reg. 20300, 20308 (Apr. 15, 2015).

[2]   "Livestock workers include employees tending livestock, milking cows or caring for poultry, including operation of farm machinery on livestock or poultry operations." 80 Fed. Reg. at 20308.

DOL subsequently published a final rule on November 5, 2020, using this proposed bifurcated approach. *See* 85 Fed. Reg. 70445 (Nov. 5, 2020). That rule used the OEWS for occupations not surveyed by the FLS, but froze the FLS-based AEWRs at the 2020 AEWR rates for two years and adjusted them annually based on the BLS Economic Cost Index, and required payment of the higher wage rate if the job duties encompassed more than one occupation. *Id*. at 70477. That rule was vacated. *See UFW v. DOL*, 598 F. Supp. 3d 878 (E.D. Cal. April 4, 2022).

*C. The 2021 Notice of Proposed Rulemaking*

On December 1, 2021, DOL issued a notice of proposed rulemaking ("NPRM") announcing its intent to amend the regulations governing the methodology to determine the hourly AEWRs for non-range H-2A occupations (*i.e.*, all H-2A occupations other than herding and production of livestock on the range). *See* 86 Fed. Reg. 68174. The NPRM proposed four main changes to the AEWR methodology. First, DOL proposed to continue to use the FLS as the primary wage source for those occupations surveyed and reported by the FLS. If the FLS did not report a wage finding for the field and livestock workers (combined) occupational group, DOL's BLS Occupational Employment and Wage Statistics ("OEWS") survey (formerly known as the OES survey mentioned above) would serve as a wage source for that group's workers. *See id*. at 68179–81.[3]

---

[3]   The following six SOCs correspond to the field and livestock worker occupations where DOL proposed to set the AEWR based on the FLS, or the OEWS if the FLS is not available: (1) Graders and Sorters, Agricultural Products; (2) Agricultural Equipment Operators; (3)

Second, the NPRM proposed using the occupation-based OEWS to establish the AEWR for those occupations not consistently surveyed by the FLS. *See id.* at 68179 & 68181–83. This would apply to higher paid agricultural positions such as farm supervisors/managers, truck drivers, and those employed for contracted services such as construction or equipment operators supporting farm production. Third, the NPRM proposed to require employers to pay the highest wage applicable if the job opportunity can be classified within more than one occupation. For example, if a job opportunity requires the same duties as that of a field and livestock worker, as well as duties for that of a construction worker, the employer must pay the higher rate among those classifications. *See id.* at 68179 & 68183–84. Fourth, the NPRM proposed requiring the Office of Foreign Labor Certification Administrator to publish an update to the FLS AEWRs and OEWS AEWRs as a notice in the *Federal Register* at least once per year. *See id.* at 68179 84.

D. *The 2023 Rule*

On February 28, 2023, DOL published the 2023 Rule. *See* 88 Fed. Reg. 12760, 12760. After careful consideration of public comments, the 2023 Rule adopted the proposals described in the 2021 NPRM about the methodology for determining the AEWR, finalizing changes to 20 C.F.R. §§ 655.120(b)(1), (2), and

---

Farmworkers and Laborers, Crop, Nursery and Greenhouse; (4) Farmworkers, Farm, Ranch, and Aquacultural Animals; (5) Packers and Packagers, Hand; and (6) Agricultural Workers – Other. *See* 86 Fed. Reg. at 68179. DOL determined only 2% of workers would be employed in H-2A jobs where the AEWR would change under the proposed rule. *See* 86 Fed. Reg. at 68188.

(5). The 2023 Rule became effective on March 30, 2023.

## II.      Factual and Procedural History

This case commenced on April 21, 2023. *See* ECF No. 1 ("Complaint" or
"Compl."). The Plaintiffs are either (i) companies that participate in the H-2A
program, or (ii) agricultural associations who commented on the NPRM, with
member companies who participate in the H-2A program and object to potentially
paying higher wages to their employees. *See id.* at ¶¶ 17–22.

**STANDARDS OF REVIEW**

## I.      Preliminary Injunctions

"[A] preliminary injunction is an extraordinary remedy never awarded as of
right." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (per curiam) (quotations
and citation omitted). The moving party must establish "that he is likely to succeed
on the merits, that he is likely to suffer irreparable harm in the absence of
preliminary relief, that the balance of equities tips in his favor, and that an
injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S.
7, 20 (2008); *see also Café 207, Inc. v. St. Johns Cnty.*, 989 F.2d 1136, 1137 (11th
Cir. 1993). All of these elements must be satisfied to issue an injunction. *See id.*

## II.      Review Under the APA

The APA provides for judicial review of final agency actions, *see* 5 U.S.C.
§§ 702 & 704, and courts may "set aside [an] agency action" that is "arbitrary,
capricious, an abuse of discretion, or otherwise not in accordance with law," 5

U.S.C. § 706(2)(A). This review "is exceedingly deferential" and limited "to ensur[ing] that the agency came to a rational conclusion." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (quotation omitted). Essentially, courts consider whether the decision was within a "zone of reasonableness." *Jaxma Greenhouses, Inc. v. Vilsack*, No. 21-cv-444, 2022 WL 4229336, at *4 (M.D. Fla. July 11, 2022), *adopted by* 2022 WL 3054011 (M.D. Fla. Aug. 3, 2022). Moreover, this "deference is especially great in ... immigration." *Mazariegos v. U.S. Att'y Gen.*, 241 F.3d 1320, 1327 n.4 (11th Cir. 2001).

## ARGUMENT

## I.   The Plaintiffs Have No Likelihood of Success

### A.  *The 2023 Rule Is Not* Ultra Vires

Substantively, the Plaintiffs' Motion argues that the 2023 Rule is unlawful under the INA. *See* Pls' Mot. at 14–16. Specifically, Plaintiffs claim that DOL "is expressly barred from setting wages to increase farmworker wages or to make farm jobs more 'attractive' to potential U.S. workers." Pls.' Mot. at 15.[4] That is not what

---

[4]     Plaintiffs' Motion points to *Williams v. Usery*, 531 F.2d 305, 306 (5th Cir. 1976), for this proposition. *See, e.g.*, Pls.' Mot. at 3 & 15. But *Williams* was decided before Congress separated the H-2 visa program into the H-2A and H-2B programs—codifying DOL's role in the Immigration Reform and Control Act, Pub. L. No. 99-603, 100 Stat. 3359 (Nov. 6, 1986). And even if *Williams* were controlling here, the Fifth Circuit's decision there does not undermine the 2023 Rule. *See id.* ("The Secretary has no authority to set a wage rate on the basis of attractiveness to workers. His authority is limited to *making an economic determination of what rate must be paid all workers to neutralize any 'adverse effect' resultant from the influx of temporary foreign workers.*" (emphasis added)). In fact, the *Williams* court even upheld DOL's discretionary AEWR analysis based on what DOL believed, at that time, to be the most accurate available wage-level data. *See id.* at 307. The same is true here.

DOL is doing. The 2023 Rule simply uses a more accurate wage source for a small percentage of H-2A occupations not surveyed by the FLS to prevent the H-2A program from depressing the wages of U.S. workers who are "similarly employed" to H-2A workers. 8 U.S.C. § 1188(a)(1); *see also* 88 Fed. Reg. at 12771. Plaintiffs assert that the use of this more accurate wage source for these occupations creates incongruous comparisons. *See* Pls.' Mot. at 15. But DOL addressed this concern, noting that job opportunities will be assigned an SOC code based on the job duties listed in the job order, and that for certain occupations (*e.g.*, truck driving) the specific duties will dictate the appropriate code and therefore the appropriate AEWR. *See* 88 Fed. Reg. at 12782–83. This ensures that DOL is not, as Plaintiffs claim, "comparing apples to sparkplugs" but instead calculating an AEWR that more accurately reflects the wages of similarly employed U.S. workers performing the same job duties. And, contrary to Plaintiff's assertion, the 2023 Rule's requirement that employers pay the higher AEWR where the job opportunity encompasses more than one occupation is designed to ensure compliance with the mandate to protect against adverse effects on similarly employed U.S. workers' wages. *See* 88 Fed. Reg. at 12778; *see also* 86 Fed. Reg. 68183–84.

Preventing the employment of H-2A workers from depressing the wage levels of similarly employed U.S. workers within the rest of a State's job market is exactly what DOL has been delegated by Congress to do. *See Williams*, 531 F.2d at 307 (noting "the statutory purpose of guarding against ... wage deflation from the

employment of foreign workers"). All that Congress has specifically required here is that DOL "balance the competing goals of the statute—providing an adequate labor supply and protecting the jobs of domestic workers." *Dole*, 923 F.2d at 187. How that balance is achieved with the AEWR is "a judgment call which Congress entrusted to the Department." *Id.* Thus, the question is not truly one of authority, but a question of whether DOL exercised its authority in a reasonable manner.

### B. *The 2023 Is Neither Arbitrary Nor Capricious*

Plaintiffs relatedly argue that the rule is arbitrary and capricious because it is both irrational and could have retroactive effects. *See id.* at 16–19. They claim that the 2023 rule violates the APA because "[u]sing non-farm surveys to dictate on-farm wages is also arbitrary and capricious[.]" Pls.' Mot. at 16–17. But that argument conflates performing work *on* a farm to mean that such work is automatically "farm work." Not so. *See Luna Vanegas v. Signet Builders, Inc.*, 46 F.4th 636, 641 (7th Cir. 2022); *Farmers Reservoir & Irrigation Co. v. McComb*, 337 U.S. 755, 767 (1949). In this case, the 2023 Rule explains that the OEWS is more accurate than the FLS for the few jobs where wage levels will be different (such as supervisors), occupations that the FLS does not adequately survey, and positions that are more often employed by farm labor contractors (*e.g.*, construction companies supporting farm production like the one at issue in *Luna Vanegas*). In contrast, an AEWR based solely on the field and livestock worker (combined) category wage may have the effect of depressing wages in these other,

typically higher-paid SOC codes because the FLS field and livestock worker (combined) category does not reflect the wages in these SOC codes as accurately as the OEWS survey data does. *See* 88 Fed. Reg. at 12771. Thus, DOL reasonably concluded that using the OEWS data would better protect against adverse effects.

Moreover, and as with prior AEWR rules, the 2023 Rule is entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984); *see also UFW v. Solis*, 697 F. Supp. 2d at 9 (noting how DOL is entitled to receive *Chevron* deference in implementing the INA's adverse effect requirement). As this Court has explained, "[t]he Court reviews an agency's construction of a statute which it administers with the established principle of deference. First, the Court asks whether Congress has directly spoken to the precise question at issue. Second, if the statute is silent or ambiguous with respect to the issue, the Court will determine whether the agency's reading is based upon a permissible construction of the statute." *Williams v. Sec'y of DHS*, 925 F. Supp. 2d 1296, 1300 (M.D. Fla. 2014) (Honeywell, J.).

"Step one" is met here because the INA is completely silent regarding how AEWRs should be calculated. *See AFL-CIO*, 835 F.2d at 915; *Dole*, 923 F.2d at 184. With *Chevron*'s "step two," the Eleventh Circuit has already held that "DOL has 'broad discretion' to set AEWRs in accordance with 'any of a number of reasonable formulas[.]" *Fla. Fruit & Vegetable Ass'n v. Brock*, 771 F.2d 1455, 1460 (11th Cir. 1985) (quoting *Fla. Sugar Cane League, Inc. v. Usery*, 531 F.2d 299, 303–04 (5th

Cir. 1976)). The 2023 rule is within this "broad discretion" because DOL reasonably concluded that use of OEWS data for select SOCs where FLS data is unavailable, or where the OEWS contains more accurate data, paired with use of the FLS for other SOCs where the FLS generates data from farm employers, would allow DOL to better meet its statutory mandate to prevent depressed wages. *See, e.g.*, 84 Fed. Reg. at 36181 (the FLS has "not been able to report a statistically valid wage result for the major FLS category of supervisors"); 88 Fed. Reg. at 12771–72.

There are also no genuine "retroactivity" concerns here. *See* Pls.' Mot. at 17–18. This is so for two reasons. First, there is nothing "retroactive" about a regulation that goes into effect for H-2A employers more than a month after its publication date. *See* 88 Fed. Reg. at 12802. Plaintiffs claim that one member company has a contract that may be impacted by the 2023 Rule for a contract that runs until some point in July 2023. *See* Pls.' Mot. at 18 (citing ECF No. 1-6 at ¶ 11). But DOL's records indicate that the asserted member ("ATP Logistics") who *might* be impacted by the 2023 Rule in July did not have any such active certifications so as to be affected by the 2023 Rule. *See* Declaration of Shane Barbour (attached as Exhibit 1) at ¶ 10. Plaintiffs Florida Growers Association, Inc.; G&F Farms, LLC; and Fran Berry Farms LLC do not have any active certifications or applications which would be affected by the 2023 Rule. *See id.* at ¶¶ 3–8.

Second, even if this Court were to perceive the rule's future application as retroactively affecting past H-2A labor contracts, the Plaintiffs are equitably

estopped from raising this argument in light of their prior representations to DOL and DHS. Under the doctrine of equitable estoppel, "a party with full knowledge of the facts, which accepts the benefits of a transaction, contract, statute, regulation, or order may not subsequently take an inconsistent position to avoid the corresponding obligations or effects." *See Kaneb Servs., Inc. v. Fed. Savings & Loan Ins. Corp.*, 650 F.2d 78, 81 (5th Cir. 1981) (collecting cases). Like the petitioners in *Kaneb*, the Plaintiffs here understood the conditions that DOL placed on the approval of their H-2A applications, including the obligation that they pay workers the highest of the AEWR, prevailing wage, collective bargaining wage, or Federal or State minimum wage—even if those wage levels change in the interim. Specifically, the Plaintiffs represented that they understood that:

> [I]f the applicable AEWR or prevailing wage is adjusted during the contract period, and that new rate is higher than the highest of the AEWR, the prevailing wage, the CBA, the Federal minimum wage, or the State minimum wage, the employer will increase the pay of all employees in the same occupation to at least the higher rate no later than the effective date of the adjustment... Furthermore, if a new monthly AEWR is published during the contract period, and that new rate is higher than both the agreed-upon CBA wage, and the minimum wage imposed by Federal or State law or judicial action in effect at the time the work is performed, *the employer must pay at least that new monthly AEWR no later than the effective date of the update*.

*See* ETA Form 9142A, Appendix A (emphasis added) (attached as Exhibit 2).

Plaintiffs are likewise wrong to contend that the 2023 Rule is "retroactive" because it applies to prior conduct that predates the rule's promulgation. *See* Pls.' Mot. 17. In fact, the Eleventh Circuit has held that a regulation is not retroactive

14

"merely because it applies to prior conduct." *Ga. Power Co. v. Teleport Commc'ns Atlanta, Inc.*, 346 F.3d 1033, 1042 (11th Cir. 2003). Rather, a statute or regulation has an impermissible retroactive effect only if it "would impair rights a party possessed when he acted, increase liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* In this case, the 2023 Rule does not impair any right that Plaintiffs possessed when they entered into contracts with H-2A workers, because—as they expressly acknowledged—they did not have the right to decline to pay the required wage level(s) even if DOL increased the AEWR during the term of the employment contract. *See Ga. Power*, 346 F.3d at 1042. Similarly, the regulation does not sanction members for past conduct or impose new duties on "transactions already completed." *Id.*; *see also Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006) (retroactive rules "alter[] the past legal consequences of past actions" (citation omitted)). The 2023 Rule is thus reasonable, not impermissibly retroactive, and complies with the APA.[5]

### C. The Plaintiffs' RFA Claim Also Fails

As a last resort, the Plaintiffs' Motion makes a variation of the same argument with the RFA—claiming that DOL did not respond to "serious concerns about the proposed use of OEWS non-farm wages to set farm wages" and "spent little time in the Rule waving away" other "significant alternatives" (such as the

---

[5]   Moreover, even if the 2023 Rule were determined to be impermissibly retroactive for the one member who allegedly has entered into H-2A contracts that carry over into July 2023 (ATP Logistics), *see* Pls.' Mot. at 18, this would not be a basis for enjoining the 2023 Rule in its entirety.

"primary duty" test) to set the AEWR for H-2A workers. Pls.' Mot. at 19; *see also id.* at 19–20. The RFA, 5 U.S.C. §§ 601–612, requires federal agencies to consider the impact of their regulations on small entities. Its purpose is to require agencies to consider whether regulations can reduce burdens on small entities. *See* S. Rep. 96-878, Pub. L. No. 96-354, § 2, 94 Stat. 1164–65.

As an initial matter, this Court lacks jurisdiction to consider Plaintiffs' RFA claim because the RFA does not authorize judicial review of alleged violations of 5 U.S.C. § 603. *See* 5 U.S.C. § 611(a) (omitting judicial review for § 603); *see also Allied Loc. & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 79 (D.C. Cir. 2000). These Plaintiffs are also not small businesses and thus, cannot even bring an RFA claim. *See Alabama v. Ctrs. for Medicare & Medicaid Servs.*, No. 08-cv-881, 2010 WL 1268090, at *7 (M.D. Ala. Mar. 30, 2010). Indeed, the Complaint is devoid of any allegation in this regard, much less the proof required for a preliminary injunction. *See NAACP v. Trump*, 298 F. Supp. 3d 209, 235–36 (D.D.C. 2018).

More substantively, even if the Plaintiffs could bring an RFA cause of action, such a claim would fail because DOL's determination met the RFA's requirements. *See Council for Urological Interests v. Burwell*, 790 F.3d 212, 227 (D.C. Cir. 2015) ("So long as the procedural requirements of the certification are met, however, this court's review is 'highly deferential' as to the substance of the analysis[.]").

## II.   The Plaintiffs Have Failed to Show Irreparable Harm

"A delay in seeking a preliminary injunction of even only a few months ...

militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com*, 840 F.3d 2144, 1248 (11th Cir. 2016). "Indeed, the very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Id.* In this case, the Plaintiffs seek a nationwide preliminary injunction against the 2023 Rule but offer no explanation for why they waited nearly *two months* after the 2023 Rule was published to file the Complaint, and then waited nearly an additional *two weeks* later to move for nationwide preliminary injunctive relief. As explained decades ago, such "unexplained delay undercuts any sense of urgency and, therefore, Plaintiff has failed to demonstrate sufficient need for a preliminary injunction." *Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1356 (S.D. Fla. 2002). Had Plaintiffs timely moved for preliminary relief, their "claim could have been brought at such a time as to allow consideration of the merits" before even "requiring entry of a" preliminary injunction. *See Hill v. McDonough*, 547 U.S. 573, 584 (2006). Accordingly, this Court must "apply a strong presumption against the grant of a" preliminary injunction. *See id.* (cleaned up).

This "strong presumption" is buttressed by Plaintiffs' reliance upon the conjecture that the 2023 Rule will cause significant wage increases for H-2A workers that could then cause H-2A employers to face significant economic injury. *See* Pls.' Mot. at 20–23. But this is speculation that depends on the choices of third parties to this case, which does not establish irreparable harm. *See Fla. EB5 Invst.,*

17

*LLC v. Wolf*, 443 F. Supp. 3d 7, 12 (D.D.C. 2020).

Beyond speculation, the potential monetary injuries posed by the 2023 Rule are insufficient for a preliminary injunction. "Even if denial of injunctive relief would present some monetary injury to the plaintiff[], … not finding *irreparable* injury" would be proper. *Snook v. Trust Co. of Ga. Bank of Savannah, N.A.*, 909 F.2d 480, 487 (11th Cir. 1990) (emphasis in original). In other words, "[f]inancial damage alone is insufficient to warrant injunctive relief." *Seiko Kabushiki Kaisha*, 188 F. Supp. 2d at 1355. A threat to a plaintiff's existence or continued operations may constitute irreparable harm. *See Odebrecht Const., Inc. v. Sec'y of Fla. Dep't of Transp.*, 715 F.3d 1268, 1288 (11th Cir. 2013); *Pizza Fusion Holdings, Inc. v. Burton Holdings LLC*, No. 14-cv-62564, 2015 WL 11197817, at *1 (S.D. Fla. 2015). But the Plaintiffs fail to show that they would be personally harmed at anything close to this degree. *See Alsop v. Desantis*, No. 20-cv-1052, 2020 WL 4927592, at *4 (M.D. Fla. Aug. 21, 2020). Plaintiffs' Motion should therefore be denied. *See id.*

## III.    The Balance of Equities and Public Interest Favor Defendants

The final two *Winter* factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Based on the above, Plaintiffs have failed to demonstrate—as they must—that the threatened irreparable injury outweighs the threatened harm that a preliminary injunction would cause DOL and unrepresented third parties (both U.S. and H-2A workers), and that granting the injunction or order would not "be adverse to the public interest." *Star Satellite,*

18

*Inc. v. City of Biloxi*, 779 F.2d 1074, 1079 (5th Cir. 1986). That is not the case here.

Plaintiffs' Motion argues that this balance is one-sided because, it asserts, "DOL will not suffer any harm whatsoever" and unlawful activity is not in the public interest. Pls.' Mot. at 24. But, as discussed above, there is nothing unlawful with DOL improving its AEWR methodology to better achieve its statutory mandate. Further. the Plaintiffs make no showing that their alleged "irreparable injury" outweighs the harm an injunction would cause to employees seeking jobs with wages that would benefit from the 2023 Rule, employees promised wages under the 2023 Rule who would be confused, and to employers that would benefit from regulatory certainty. *See Southdown, Inc. v. Moore McCormack Res., Inc.*, 686 F. Supp. 595, 596 (S.D. Tex. 1988) (it is the movant's burden to show injunction causes "no disservice to unrepresented third parties").

Plaintiffs ignore these third parties, but "even though irreparable injury may otherwise result to plaintiff," courts may postpone an injunction "until a final determination of the rights of the parties" if the injunction would "adversely affect a public interest[.]" *Id. Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312–13 (1982) (citation omitted). That is the case here because Plaintiffs' request to enjoin the 2023 Rule would create substantial regulatory uncertainty for both employers and workers about proper wages. *See Nat'l Propane Gas Ass'n v. DHS*, 534 F. Supp. 2d 16, 20 (D.D.C. 2008); *see also Fla. EB5 Invst.*, 443 F. Supp. 3d at 14 (noting "strong interest in the uniform and proper application of ... regulations governing

the granting of visas").[6]

## IV.   The Requested Relief Of Universal Vacatur Is Overbroad

Even assuming the Plaintiffs can meet the four *Winter* factors discussed above (which they cannot), they have not established standing to seek relief for all H-2A employers. This is a problem because remedies must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established," a court's "constitutionally prescribed role is to vindicate the individual rights of people appearing before it," and "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1931–34 (2018). In fact, the Eleventh Circuit has already ruled that nationwide injunctive relief is overbroad and an abuse of discretion. *See Georgia v. President of the U.S.*, 46 F.4th 1283, 1304–07 (11th Cir. 2022). Plaintiffs ignore this decision, but it applies here.

## CONCLUSION

Based on the foregoing, the Court should deny Plaintiffs' Motion.

---

[6]   If this Court were to grant Plaintiffs a preliminary injunction, the Court may issue such an injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined[.]" Fed. R. Civ. P. 65(c). The amount of an injunction bond is a matter within the sound discretion of the district court. *See Carillon Importers, Ltd. v. Frank Pesce Int'l Group, Ltd.*, 112 F.3d 1125, 1127 (11th Cir. 1997). Plaintiffs' Motion brushes this issue aside by stating that "the Defendants will suffer no economic harm" from an injunction, and thus "the Court should not require a bond." Pls.' Mot. at 2. But that is mistaken because, once again, the Plaintiffs overlook both the harms to U.S. and H-2A workers who might be systematically underpaid if Defendants were to ultimately prevail in this lawsuit. *See Ala. ex rel. Siegelman v. EPA*, 925 F.2d 385, 390 (11th Cir. 1991). Moreover, a bond would be appropriate if it could be used to pay back employees whose work was summarily discounted after a preliminary injunction is issued. *Cf. Williams v. Walsh*, 619 F. Supp. 3d 48, 63–66 (D.D.C. 2022) (noting how both U.S. and H-2B workers may have backpay claims against employers). Defendants therefore submit that a Rule 65(c) bond would be proper here.

Respectfully submitted,

BRIAN M. BOYNTON  
Principal Deputy Asst. Att'y General  

*/s/ Joshua S. Press*  
JOSHUA S. PRESS  
Senior Litigation Counsel  

WILLIAM C. PEACHEY  
Director  

United States Department of Justice  
Civil Division  
Office of Immigration Litigation  

GLENN M. GIRDHARRY  
Deputy Director  

P.O. Box 868, Ben Franklin Station  
Washington, DC 20044  
Phone: (202) 305-0106  

AARON S. GOLDSMITH  
Senior Litigation Counsel  

Facsimile: (202) 305-7000  
e-Mail: joshua.press@usdoj.gov  

Dated: May 22, 2023  

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 22, 2023, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notice to all counsel of record.

*/s/ Joshua S. Press*

21