## UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

FLORIDA GROWERS ASSOCIATION,
INC., *et al.*,

    Plaintiffs,

v.

JULIE A. SU, in her official capacity as
Acting Secretary of Labor, *et al.*,

    Defendants.

_____/

Case No. 8:23-cv-889-CEH-CPT

**DEFENDANTS' MOTION TO
DISMISS AND INCORPORATED
MEMORANDUM OF LAW**

**DISPOSITIVE MOTION**

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants, by and through their undersigned counsel, hereby move to dismiss the Plaintiffs' Complaint, ECF No. 1 (hereinafter, "Complaint" or "Compl.") for lack of jurisdiction. Alternatively, Defendants move to dismiss Plaintiffs' claim under the Regulatory Flexibility Act ("RFA") for both lack of jurisdiction and failure to state a viable claim under law, and state as follows:

## **PRELIMINARY STATEMENT**

This case is an Administrative Procedure Act ("APA") challenge to the United States Department of Labor's ("DOL") final rule modifying the methodology for calculating the Adverse Effect Wage Rate ("AEWR") for the H-2A Temporary Labor Certification Program ("H-2A Program"). *See generally* ECF No. 1 (hereinafter, "Complaint" or "Compl."). More specifically, Plaintiffs seek universal vacatur of the rule DOL published at *Adverse Effect Wage Rate*

*Methodology for the Temporary Employment of H–2A Nonimmigrants in Non-Range Occupations in the United States*, 88 Fed. Reg. 12760 (Feb. 28, 2023) ("2023 Rule"). Plaintiffs claim that the 2023 Rule is (1) *ultra vires* under the Immigration and Nationality Act ("INA"), (2) arbitrary and capricious under the APA, and (3) violates the RFA. *See* Compl. ¶¶ 56–94.

But Plaintiffs have not shown that they have Article III standing to maintain this lawsuit. Although it is clear the Plaintiffs dislike the 2023 Rule, they do not have the irreducible minima of Article III standing necessary to maintain this lawsuit. Article III jurisdictional requirements are essential to maintain the proper separation of powers between the three co-equal branches of government. *See, e.g.*, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998). As the Eleventh Circuit has explained, "[a] plaintiff has Article III standing only if he can demonstrate he suffered (1) an injury in fact that is both (2) fairly traceable to the defendant's conduct and (3) likely redressable by a favorable decision." *Banks v. Sec'y of HHS*, 38 F.4th 86, 92 (11th Cir. 2022) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "To establish an injury in fact at step one, the plaintiff must demonstrate that [he] suffered an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Laufer v. Arpan LLC*, 29 F.4th 1268, 1272 (11th Cir. 2022) (cleaned up). "A concrete injury must be real, and not abstract, but can be either tangible or

2

intangible." *Id.* "A particularized injury is one that affects the plaintiff in a personal and individual way." *Id.*

These elements have not been satisfied here because the Plaintiffs do not have any labor certifications that will be affected by the 2023 Rule. Nor have Plaintiffs alleged that they are ready to submit labor certifications or applications that might be affected by the 2023 Rule. *See* ECF No. 22-1, Declaration of Shane Barbour ("Barbour Decl."). For example, Plaintiffs Florida Growers Association, Inc.; G&F Farms, LLC; and Fran Berry Farms LLC do not have any active certifications or applications that would yet be affected by the 2023 Rule. *See id.* at ¶¶ 3–8. In addition, many of the agricultural seasons have concluded and will not start up again until November—rendering such claims unripe. This is a separate problem because for a district court to have jurisdiction, the plaintiffs must have standing at the time of the filing of the complaint. *See Defenders of Wildlife*, 504 U.S. at 571 n.5; *Moyer v. Walt Disney World, Co.*, 146 F. Supp. 2d 1249, 1253 (M.D. Fla. 2000) ("[B]ecause standing is determined as of the date of the commencement of the lawsuit, any attempts to achieve standing after the suit was filed are ineffective." (internal footnote admitted)). Without any ongoing or imminent injury, the Plaintiffs here lack standing—much less the standing to seek universal vacatur of the 2023 Rule for everyone in the country. *See Defenders of Wildlife*, 504 U.S. at 564 ("'[S]ome day' intentions—without any description of concrete

plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require. ").

Alternatively, Plaintiffs' RFA claim should be dismissed. This Court lacks jurisdiction to consider the claim because the RFA does not authorize judicial review of alleged violations of 5 U.S.C. § 603, which are the RFA violations alleged in the Complaint. *See* 5 U.S.C. § 611(a) (omitting judicial review for § 603). Moreover, these Plaintiffs are also not small businesses or organizations and thus, cannot even bring an RFA claim. *See, e.g.*, *Alabama v. Ctrs. for Medicare & Medicaid Servs.*, No. 08-cv-881, 2010 WL 1268090, at *7 (M.D. Ala. Mar. 30, 2010).

## BACKGROUND

### I.      Statutory and Regulatory History

#### A. *H-2A Temporary Agricultural Visa Program and the AEWR*

The H-2A visa program permits U.S. agricultural employers to hire foreign workers on a temporary basis "to perform agricultural labor or services ... of a temporary or seasonal nature." 8 U.S.C. § 1101(a)(15)(H)(ii)(a). In enacting the H-2A Program, Congress directed DOL to strike a balance between the "competing goals" of "providing an adequate labor supply and protecting the jobs of domestic workers." *AFL-CIO v. Dole*, 923 F.2d 182, 187 (D.C. Cir. 1991) (Silberman, J.). Accordingly, before an employer can file a visa petition with the United States Department of Homeland Security ("DHS"), they must first seek a labor

4

certification from DOL that (1) there "are not sufficient workers" able, willing, and qualified to perform the labor at issue and (2) issuance of the H-2A visa "will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1)(A), (B); *see also* 8 C.F.R. § 214.2(h)(5)(i)(A). DOL meets § 1188's requirements, in part, by requiring employers to offer, advertise in their recruitment, and pay a wage that is the highest of the AEWR, the prevailing wage, the agreed-upon collective bargaining wage, the federal minimum wage, or the state minimum wage. *See* 20 C.F.R. §§ 655.120(a), 655.122(l). These rates work to prevent the hiring of foreign workers from adversely affecting the wages and working conditions of similarly employed workers in the United States.

The AEWR "is one of the primary ways the Department meets its statutory obligation to certify that the employment of H-2A workers will not have an adverse effect on the wages of agricultural workers in the United States similarly employed." 88 Fed. Reg. at 12761. The AEWR "is designed to prevent the potential wage-depressive impact of foreign workers on the domestic agricultural workforce." 75 Fed. Reg. 6884, 6891 (Feb. 12, 2010) ("2010 Rule"). In designing the AEWR methodology, DOL sets a "rate [that] will neither ratchet wages upward, driving growers out of business nor perpetuate wage depression." *Dole*, 923 F.2d at 187. Congress has not set a method for calculating the AEWR; rather, "calculating AEWRs has been left entirely to [DOL's] discretion." *AFL-CIO v.*

*Brock*, 835 F.2d 912, 915 (D.C. Cir. 1987).

B. *Prior Methodologies for Calculating the AEWR*

"DOL has used a number of methods for calculating the AEWR over the years." *UFW v. Chao*, 227 F. Supp. 2d 102, 108 n.13 (D.D.C. 2002). Beginning in 1963, DOL established a series of state AEWRs. 54 Fed. Reg. 28040 (July 5, 1989). These AEWRs were calculated using average hourly earnings from the 1959 Census of Agriculture, adjusted by a United States Department of Agriculture ("USDA")-determined index. *Id.* In 1965, DOL began setting AEWRs using average hourly farm wages from the 1950 Census of Agriculture. *Id.*; *see also* 29 Fed. Reg. 19101 (Dec. 30, 1964). Beginning in 1968, AEWRs were computed by adjusting the previous year's rate by the annual change in farmworker wages as reflected in USDA surveys. 54 Fed. Reg. at 28040 (also changing DOL methods). In 1987, DOL issued a new methodology that caused the AEWRs to decrease.[1] Instead of adjusting the prior year's rate by the percentage increase in farmworker wages measured by USDA's Farm Labor Survey ("FLS") (or "what the [D.C. Circuit] viewed as the prior practice of providing for an enhancement to correct for the past employment of legal and undocumented aliens"), the revised methodology simply set rates at the prior year's wages from USDA's survey. *Id.*

---

[1]  DOL issued this methodology after the enactment of the Immigration Reform and Control Act ("IRCA"), Pub. L. No. 99-603, 100 Stat. 3359 (Nov. 6, 1986). The IRCA subdivided the H-2 temporary worker visa program into the H-2A and H-2B programs and codified "the adverse effect prohibition that the Department had earlier introduced by regulations." *AFL-CIO*, 835 F.2d at 914.

In December 2008, DOL began using the Occupational Employment Statistics ("OES") survey, administered by the Bureau of Labor Statistics ("BLS"), rather than USDA's FLS, to set the AEWRs for all H-2A job opportunities, subject to four "skill" levels that established the AEWR for an occupation based on an arithmetic formula. 73 Fed. Reg. 77110, 77176–77 (Dec. 18, 2008). DOL justified utilizing OES data because, *inter alia*, USDA "could terminate the [FLS] survey at any time and leave [DOL] without the basic data" to calculate the AEWR. *Id.* at 77174. That possibility "add[ed] a measure of instability and uncertainty for AEWR determinations in future years" that warranted a methodology that did not rely on the FLS. *Id.* at 77173. This change was upheld. *See UFW v. Solis*, 697 F. Supp. 2d 5, 8–11 (D.D.C. 2010).

On March 15, 2010, DOL again revised its AEWR methodology, defining the AEWR as the "annual weighted average hourly wage for field and livestock workers (combined) in the States or regions as published annually by the U.S. Department of Agriculture based on its quarterly wage survey," or the FLS survey. 20 C.F.R. § 655.103(b); *see also* 75 Fed. Reg. at 6891. In explaining its decision to resume using the FLS to determine the AEWR for all H-2A occupations, DOL observed that the FLS "actually uses information sourced directly from farmers," while the OES "includes data from employers who operate farm support operations, including contract suppliers of temporary farm labor." 75 Fed. Reg. at 6898.

In 2019, DOL again proposed changes to the AEWR methodology that would

set the AEWR at the annual average hourly gross wage for a particular agricultural occupation in the State or region, as reported by the FLS such data was available, and at the statewide annual average hourly wage for the Standard Occupational Classification ("SOC") from the OES survey if the FLS did not report a wage in a State or region. *See* 84 Fed. Reg. 36168, 36181 (July 26, 2019) ("2019 NPRM"). DOL explained that the FLS collects data by SOC, but it does not report wages at that level of specificity. 84 Fed. Reg. at 36181. Instead, the FLS reports four wage rates per State or region: (1) field workers,[2] (2) livestock workers,[3] (3) field and livestock workers combined, and (4) all hired workers. *Id.* Under the 2010 Rule, the AEWR was thus established using the annual average hourly wage data for workers within the combined field and livestock category in the FLS despite wage data for certain, generally higher skilled, occupations not being included in that data. *Id.* The proposed change in the 2019 NPRM was intended to produce more accurate AEWRs. *Id.* at 36171.

DOL subsequently published a final rule on November 5, 2020, using this proposed bifurcated approach. *See* 85 Fed. Reg. 70445 (Nov. 5, 2020). That rule used the OEWS for occupations not surveyed by the FLS but froze the FLS-based

---

[2]   "Field workers include employees engaged in planting, tending and harvesting crops, including operation of farm machinery on crop farms." 80 Fed. Reg. 20300, 20308 (Apr. 15, 2015).

[3]   "Livestock workers include employees tending livestock, milking cows or caring for poultry, including operation of farm machinery on livestock or poultry operations." 80 Fed. Reg. at 20308.

AEWRs at the 2020 AEWR rates for two years and adjusted them annually based on the BLS Economic Cost Index, and required payment of the higher wage rate if the job duties encompassed more than one occupation. *Id*. at 70477. That rule was vacated. *See UFW v. DOL*, 598 F. Supp. 3d 878 (E.D. Cal. April 4, 2022).

### C. The 2021 Notice of Proposed Rulemaking

On December 1, 2021, DOL issued a notice of proposed rulemaking ("NPRM") announcing its intent to amend the regulations governing the methodology to determine the hourly AEWRs for non-range H-2A occupations (*i.e.*, all H-2A occupations other than herding and production of livestock on the range). *See Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States*, 86 Fed. Reg. 68174 (Dec. 1, 2021). Broadly speaking, the NPRM proposed four main changes to the AEWR methodology. First, DOL proposed to continue to use the FLS as the primary wage source for those occupations surveyed and reported by the FLS. In the event the FLS did not report a wage finding for the field and livestock workers (combined) occupational group (*e.g.*, in Alaska, where FLS does not survey), DOL's BLS Occupational Employment and Wage Statistics ("OEWS") survey—formerly the OES survey prior to March 31, 2021—would serve as a wage source for these occupations. *See id*. at 68179–81.[4]

---

[4] The following six SOCs correspond to the field and livestock worker occupations where DOL proposed to set the AEWR based on the FLS, or the OEWS

Second, the NPRM proposed using the occupation based OEWS to establish the AEWR for those occupations not consistently surveyed by the FLS. *See id.* at 68179 & 68181–83. This would apply to higher paid agricultural positions such as farm supervisors/managers, truck drivers, and those employed for contracted services such as construction or equipment operators supporting farm production. Third, the NPRM proposed to require employers to pay the highest wage applicable if the job opportunity cannot be classified within one occupation. For example, if a job opportunity requires the same duties as that of a field and livestock worker as well as duties for that of a construction worker, the employer must pay the higher rate among those classifications. *See id.* at 68179 & 68183–84. Fourth, the NPRM proposed requiring the Office of Foreign Labor Certification Administrator to publish an update to the FLS AEWRs and OEWS AEWRs as a notice in the *Federal Register* at least once per year. *See id.* at 68179 84.

D.  *The 2023 AEWR Rule*

On February 28, 2023, DOL published the 2023 AEWR Rule, amending the methodology for determining the AEWR. *See* 88 Fed. Reg. 12760, 12760. After careful consideration of comments from the public, the 2023 AEWR Rule adopted

---

if the FLS is not available: (1) Graders and Sorters, Agricultural Products; (2) Agricultural Equipment Operators; (3) Farmworkers and Laborers, Crop, Nursery and Greenhouse; (4) Farmworkers, Farm, Ranch, and Aquacultural Animals; (5) Packers and Packagers, Hand; and (6) Agricultural Workers – Other. *See* 86 Fed. Reg. at 68179. DOL determined only approximately 2% of workers would be employed in H-2A job opportunities where the AEWR will change under the proposed rule from the current baseline. *See* 86 Fed. Reg. at 68188.

the proposals in the 2021 NPRM described above without substantive change, finalizing changes to 20 C.F.R. §§ 655.103(b), 655.120(b)(1), (2), and (5). The 2023 AEWR Rule became effective on March 30, 2023.

## II.    Factual and Procedural History

This case commenced on April 21, 2023. *See* ECF No. 1. The Plaintiffs are either (i) companies that participate in the H-2A program, or (ii) agricultural organizations that allegedly have  members who have employed or intend to employ workers in the H-2A program. *See* Compl. ¶¶ 17–22.

### STANDARDS OF REVIEW

## I.    Dismissal Under Rule 12(b)(1)

A motion to dismiss for lack of subject-matter jurisdiction may challenge jurisdiction either factually or facially. *Makro Capital of Am., Inc. v. UBS AG*, 543 F.3d 1254, 1258 (11th Cir. 2008); *McElmurray v. Consol. Gov't of Augusta–Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). With a facial challenge, the allegations in the complaint are assumed to be true by the court, which then must determine whether the complaint sufficiently alleges a basis for subject-matter jurisdiction. *Id.* (citing *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). But with factual challenges, "a district court may consider extrinsic evidence, such as affidavits and testimony." *Scott v. Cash to Go, Inc.*, No. 6:13-cv-142, 2013 WL 1786640, at *1 (M.D. Fla. Apr. 26, 2013). "Since [a facial challenge] implicates the fundamental question of a trial court's jurisdiction, a 'trial court is free to weigh

the evidence and satisfy itself as to the existence of its power to hear the case' without presuming the truthfulness of the plaintiff's allegations." *Makro Capital*, 543 F.3d at 1258 (quoting *Morrison*, 323 F.3d at 925 n.5).

"Because standing is jurisdictional, a dismissal for lack of standing has the same effect as a dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)." *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1203 n. 42 (11th Cir. 1991). Standing "is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin,* 422 U.S. 490, 498 (1975). Consequently, "[i]f a plaintiff lacks standing, the 'case' or 'controversy' requirement of Article III, § 2 of the U.S. Constitution is not satisfied, and the case must be dismissed." *Koziara v. City of Casselberry*, 392 F.3d 1302, 1304 (11th Cir. 2004); *see also* U.S. Const. art. III, § 2.

## II.   Dismissal Under Rule 12(b)(6)

In reviewing a motion to dismiss under Rule 12(b)(6), courts must accept all allegations as true and construe them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). "To survive dismissal, the complaint's allegations must plausibly suggest that the [plaintiff] has a right to relief, raising that possibility above a speculative level; if they do not, the plaintiff's complaint should be dismissed." *James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F. 3d 1270, 1274 (11th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 663. "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts" will not survive a motion to dismiss. *Oxford Asset Mgt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

## ARGUMENT

### I.    The Company Plaintiffs Lack Standing

As an initial matter, the Plaintiffs asserting standing on their own (*i.e.*, Florida Growers Association, Inc. ("FGA"); G&F Farms, LLC ("G&F"); and Franberry Farms, LLC ("Franberry")) have not adequately alleged or shown that they will be injured by the 2023 Rule.

Start with FGA, where Plaintiffs rely on the declaration of Paul Meador, ECF No. 16-10 ("Meador Declaration"). Mr. Meador is the president of FGA, *id.* ¶ 1, and the FGA, as a joint employer with various crop growers, has apparently hired hundreds of H-2A workers for employment in the Florida vegetable and citrus harvests, including H-2A workers to be employed as heavy truck drivers or farm mechanics. But FGA's five labor certifications expired last month (H-300-22223-

411906, H-300-22223-412038, H-300-22195-353090, H-300-22195-352630, H-300-22168-292435) and "will not be affected by the new Occupational Employment and Wage Statistics (OEWS) wage requirements" of the 2023 Rule. Barbour Decl. ¶ 3. Moreover, FGA "does not have any pending H-2A applications ... as the direct employer of temporary workers." *Id.* The Meador Declaration also expresses concerns regarding potential wage increases for the first-line supervisors employed by his business, Everglades Harvesting, Inc., which is not a plaintiff in this case. Regardless, "there are no H-2A supervisors currently employed by Everglades and, based on last season's schedule, none will be re-hired before September." ECF No. 33 at 10–11. This is fatal for FGA to assert standing now under the H-2A program because plaintiffs must show a "certainly impending," *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990), harm, *see, e.g.*, *Garcia v. Acosta*, 292 F. Supp. 3d 93, 103–04 (D.D.C. 2019) (dismissing H-2A workers' claims regarding allegedly improper wage-rate calculations where the past season had concluded). They have failed to meet that standard here.

Bare statements of intent are not enough. *See Carney v. Adams*, 141 S. Ct. 493, 499 (2020) (A "plaintiff cannot establish standing by asserting an abstract general interest common to all members of the public." (quotation omitted)). Nor are "[a]llegations of possible future injury." *Whitmore*, 495 U.S. at 158. In other words, "an injury in law is not an injury in fact." *TransUnion*, 141 S. Ct. at 2205. Only an alleged harm that is "concrete and particularized" and "actual or

imminent, not conjectural or hypothetical" is enough to show that a party "has a case or controversy rather than, say, a strong and abiding interest in an issue, or a desire to obtain attorney's fees." *Defenders of Wildlife,* 504 U.S. at 560 (quotations omitted); *see also Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020). Such statements of intent are what the Plaintiffs rely upon here, but they are not enough.

This inadequate approach is further confirmed by the other companies involved here, G&F and Franberry. For these two companies, Plaintiffs point to the declaration of Michelle Williamson. ECF No. 16-9 ("Williamson Decl."). She is the director of operations for both G&F and Franberry, which both grow strawberries. *Id.* ¶¶ 1–2. And while it is clear that Ms. Williamson disagrees with the 2023 Rule, neither G&F nor Franberry directly employs H-2A workers. Although Ms. Williamson may be referring to a labor contractor that employs and pays H-2A workers, those contracting companies are not parties to this case. *See* Barbour Decl. ¶¶ 4–5. In addition, the 2022-23 Florida strawberry season has concluded and will not start up again until November.[5] That is far from "certainly impending" harm. *Whitmore*, 495 U.S. at 158.

---

[5]    *See* Brad Buck, "In the heart of Florida's strawberry season, an expert explains why they're so sweet," University of Florida/IFAS Blogs (Feb. 2, 2022), https://blogs.ifas.ufl.edu/news/2022/02/02/in-the-heart-of-floridas-strawberry-season-an-expert-explains-why-theyre-so-wonderful ("[I]t's a short season (November to March).").

## II.     The Associational Plaintiffs Also Lack Standing

Wishing to pivot from the deficiencies discussed above, the Plaintiffs' arguments for standing focus on associational standing. *See* ECF No. 16 at 12–13. As organizations, Plaintiffs can establish associational standing to enforce the rights of their members when "(a) [their] members would otherwise have standing to sue in their own right; (b) the interests [the lawsuit] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021) (internal quotation marks omitted). To demonstrate an injury-in-fact under this theory, Plaintiffs "need not establish that all of their members are in danger of suffering an injury," but merely show that "at least one member faces a realistic danger of suffering an injury." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014). But this does not "relax the requirement that an organization name at least one member who can establish an actual or imminent injury." *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1204 (11th Cir. 2018).

In this case, the organization Plaintiffs argue they satisfy this test because "[t]he National Council of Agricultural Employers, Florida Citrus Mutual, and the Florida Fruit and Vegetable Association all have members who participate in the H-2A visa program and already are or will soon be required to pay the adverse

effect wage rates set by the Department." ECF No. 16 at 12. A similar blanket assertion is repeated regarding FGA. *See id.* at 12–13. The problem with this argument is the same lack of "certainly impending" injury to any identified member of the organizational Plaintiffs.

Here, the only member that any of the organizational Plaintiffs can point to is discussed in the declaration of Michael Joyner for Plaintiff Florida Fruit & Vegetable Association ("FFVA"). *See* ECF No. 16-13 ("Joyner Declaration"); *see also* ECF No. 1-7. He is FFVA's President. *See* Joyner Decl. ¶ 1. The Joyner Declaration (much like the others filed on behalf of the organizational Plaintiffs) explains that FFVA assists many of its members with their H-2A applications, *id.* ¶ 8, but is not itself an employer of agricultural workers. The Joyner Declaration thus relies upon the experience of FFVA member ATP Logistics. *Id.* ¶ 11. But here again, ATP Logistics is not itself an employer of H-2A workers. *See* ECF No. 40 ("Transcript") at 80 (including Plaintiffs' counsel's concession on this point and describing another company). This would explain why ATP Logistics "does not have any active H-2A certifications or pending H-2A applications." Barbour Decl. ¶ 10.

There is thus *nothing* in the record to establish that any single Plaintiff in this case, or member of an organizational Plaintiff in this case, faces "certainly impending" harm by the 2023 Rule. Although the organizations have mentioned members at large, *see, e.g.*, Transcript at 107–08, they have failed to identify any

specific member that will be injured by the 2023 Rule. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) (requiring organizations to establish "that at least one identified member" will suffer an injury); *Ga. Republican Party*, 888 F.3d at 1203–04. That is fatal to their claim for standing.

Furthermore, even if the Court were to accept as true the allegations that the organizational Plaintiffs' members include companies who employ H-2A workers, the Plaintiffs have still has not shown that one of those unidentified members *will* suffer an injury. As it stands, any company that might employ agricultural workers face the same problem as the Plaintiffs here. Plaintiffs' generic prediction that the 2023 Rule will increase wages for someone, somewhere, does not establish that such an effect will impact the specific Plaintiffs before this Court. *Cf. Summers*, 555 U.S. at 497 (rejecting the argument that an organization could establish standing if there was "a statistical probability that some of [its] members are threatened with concrete injury"). Thus, because the Plaintiffs are not "certain to be injured by" the 2023 Rule, this case should be dismissed for lack of standing. *Ga. Republican Party*, 888 F.3d at 1204.

### III.   **Alternatively, Plaintiffs' RFA Claim Fails**

In the event that this Court rules that Plaintiffs have standing, their RFA claim should nevertheless be dismissed. This is shown by how the Plaintiffs' RFA claim hinges on 5 U.S.C. § 603, but that section does not even allow for judicial review. *See* Compl. ¶ 80. It is true that the RFA, 5 U.S.C. §§ 601–612, requires

federal agencies to consider the impact of their regulations on small entities. Its purpose is to require agencies to consider whether regulations can reduce burdens on small entities. *See* S. Rep. 96-878, Pub. L. No. 96-354, § 2, 94 Stat. 1164–65. But the RFA does not authorize judicial review of alleged violations of 5 U.S.C. § 603. *See* 5 U.S.C. § 611(a) (omitting judicial review for § 603). This Court therefore lacks jurisdiction to review the 2023 Rule under § 603, and the Plaintiffs' RFA claim should thus be dismissed. *See Allied Loc. & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 79 (D.C. Cir. 2000).

Even if the Plaintiffs wished to pursue their RFA claim through § 604 rather than § 603, the former subsection would still not provide Plaintiffs with a viable RFA claim. This is because § 605(b) states that neither § 603 nor § 604 apply if the head of the agency certifies that the rule, if promulgated, will not have a significant impact on a substantial number of small entities. 5 U.S.C. § 605(b). DOL so certified in the 2023 Rule, *see* 88 Fed. Reg. 12799, and Plaintiffs have not challenged that certification. *See Fla. Wildlife Fed'n, Inc. v. Jackson*, 853 F. Supp. 2d 1138, 1176 (N.D. Fla. 2012) ("The Administrator's certification is unassailable. The rule and its numeric nutrient criteria only indirectly impact small entities. The direct effect is on the State of Florida."). Consequently, the Plaintiffs are not entitled to judicial review of DOL's RFA analysis under § 604, either.

Moreover, Plaintiffs do not qualify as "small entit[ies]" and therefore cannot seek judicial review under the RFA. *See* 5 U.S.C. § 611(a)(1)). The RFA provides

19

that a covered "small entity" is a "small organization" or a "small business." 5 U.S.C. § 601(6) (defining a "small entity" to mean, *inter alia*, a "small organization" or "small business"); *id.* § 601(4) (defining a "small organization" to be "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field"); *id.* § 601(3) (defining "small business" as it is defined under the Small Business Act or standards adopted by the Small Business Administration (SBA)).

None of the organizational Plaintiffs here meets the RFA's definition of "small organization," as they each boast of their dominance in the field. *See* Compl. ¶¶ 17, 18, 20, 22; ECF No. 16-3 ¶ 3; ECF No. 16-8 ¶ 2; ECF No. 16-10 ¶ 7. Even if they were not dominant in their filed, however, FGA is the only organizational Plaintiff to even allege that it is "not-for-profit," which is another reason that the other organizational Plaintiffs do not qualify to bring an RFA claim. *See* 5 U.S.C. 601(a)(4).

Additionally, the Complaint does not allege that the company Plaintiffs are small businesses and thus, they have failed to state a claim under the RFA. *See Alabama v. Ctrs. for Medicare & Medicaid Servs.*, No. 08-cv-881, 2010 WL 1268090, at *7 (M.D. Ala. Mar. 30, 2010). Indeed, the Complaint is devoid of *any* allegation in this regard. *See NAACP v. Trump*, 298 F. Supp. 3d 209, 235–36 (D.D.C. 2018). And to the extent Plaintiffs may argue that both G&F Farms and Franberry Farms qualify because they are strawberry farms with less than $5.5

20

million gross annual receipts, those allegations are not in the Complaint and the Plaintiffs have provided *nothing* regarding this revenue information, which is also conspicuously absent from their affidavit. *See* ECF No. 16-9. The Plaintiffs' RFA claim should be dismissed accordingly. *See Nw. Min. Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 13 (D.D.C. 1998).

## CONCLUSION

Based on the foregoing, the Court should dismiss this case entirely.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Asst. Att'y General

WILLIAM C. PEACHEY
Director

GLENN M. GIRDHARRY
Deputy Director

AARON S. GOLDSMITH
Senior Litigation Counsel

Dated: June 27, 2023

*/s/ Joshua S. Press*
JOSHUA S. PRESS
Senior Litigation Counsel
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Phone: (202) 305-0106
Facsimile: (202) 305-7000
e-Mail: joshua.press@usdoj.gov

*Attorneys for Defendants*

## **LOCAL RULE 3.01(g) CERTIFICATION**

Counsel for Plaintiffs and Defendants conferred by videoconference on June 26, 2023, to discuss the relief requested in this motion before its filing. During that conversation, Plaintiffs' counsel indicated that they expected to oppose Defendants' motion.

*/s/ Joshua S. Press*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on June 27, 2023, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notice to all counsel of record.

*/s/ Joshua S. Press*