UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FLORIDA GROWERS ASSOCIATION,
INC., NATIONAL COUNCIL OF
AGRICULTURAL EMPLOYERS,
FLORIDA CITRUS MUTUAL,
FLORIDA FRUIT AND VEGETABLE
ASSOCIATION, G&F FARMS, LLC,
and FRANBERRY FARMS, LLC,

     Plaintiffs,

v.                             Case No. 8:23-cv-889-CEH-CPT

JULIE A. SU, Acting Secretary of Labor,
in her official capacity, et al.,

     Defendants.

_____/

## REPORT AND RECOMMENDATION

     Before me on referral is a motion for a preliminary injunction filed by Plaintiffs Florida Growers Association, Inc. (FGA); National Council of Agricultural Employers (NCAE); Florida Citrus Mutual (FCM); Florida Fruit and Vegetable Association (FFVA); G&F Farms, LLC (G&F); and Franberry Farms, LLC (Franberry) against Defendants Julie A. Su, the Acting Secretary of Labor; Brent Parton, Principal Deputy Assistant Secretary of Labor; Brian Pasternak, Administrator of the Employment and Training Administration in the Office of

Foreign Labor Certification (OFLC); and Jessica Looman, Acting Administrator of the Wage and Hour Division (collectively, DOL).  (Doc. 16).  Also before me on referral is a motion to dismiss brought by the Defendants pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Doc. 52).  After careful review and with the benefit of a hearing on the Plaintiffs' motion for a preliminary injunction, I respectfully recommend that the Defendants' motion to dismiss be granted in part and denied in part and that the Plaintiffs' preliminary injunction motion be denied.

## I.

## A.

This case centers around the H-2A program, which permits U.S. agricultural employers to hire foreign workers to perform temporary agricultural labor or services. *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(a); (Doc. 44 at 2).  The H-2A program is rooted in the H-2 program, which was created in 1952 when Congress enacted the Immigration and Nationality Act of 1952 (INA).  Immigration and Nationality Act of 1952, Pub. L. No. 414, ch. 477, 66 Stat. 163  (codified as amended at 8 U.S.C. § 1101 *et seq*.).  The H-2 program authorized the issuance of a class of temporary visas for nonresident aliens to engage in labor or services for a limited time frame "if unemployed persons capable of performing [such work could not] be found in this country."  8 U.S.C. § 1101(a)(15)(H)(ii); § 214(c), 66 Stat. at 168, 189–90; *see also Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Brock*, 835 F.2d 912, 913 (D.C. Cir. 1987) (summarizing the origins of the H-2A program).

In 1986, Congress passed the Immigration Reform and Control Act (IRCA) which amended the INA.  *See* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359.  The IRCA created a new "H-2A" classification for foreign nationals admitted to perform temporary agricultural labor or services.[1]  *Id*.  Aliens authorized to participate in this program are commonly known as H-2A workers. (Doc. 33 at 6).  The implementing regulations for the H-2A program are found at 20 C.F.R. §§ 655.100 to 655.185 and 29 C.F.R. §§ 501.00 to 501.47.  *Id.*

Employers seeking to retain H-2A workers must first file a temporary labor certification application with the DOL that satisfies certain criteria.  *See* 20 C.F.R. §§ 655.121(a)(1), 655.130; *see generally Everglades Harvesting & Hauling, Inc. v. Scalia*, 427 F. Supp. 3d 101, 105–06 (D.D.C. 2019).  The regulations governing such applications establish the minimum benefits, wages, and working conditions that must be offered by the petitioning employer to avoid adversely affecting similarly situated U.S. workers.  20 C.F.R. §§ 655.120, 655.122, 655.135.  Among these regulations is the "offered wage rate" provision, which mandates that for every hour or portion thereof worked during a pay period, the employer must pay its laborers the highest applicable wage rate.  20 C.F.R. §§ 655.120, 655.122(l).  The regulations necessitate that the employer not only compensate H-2A workers this amount but also U.S. workers in corresponding employment.  *See* 20 C.F.R. §§ 655.103(b), 655.182(d)(1).

---

[1] Nonresident aliens admitted to conduct temporary nonagricultural work now fall under the "H-2B" program.  *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(b).

The IRCA prohibits the Secretary of Labor from approving H-2A workers' visas unless the following circumstances are found to exist:

(A)     there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and

(B)     the employment of the alien in such labor or services will not *adversely affect* the wages and working conditions of workers in the United States *similarly employed*.

100 Stat. at 3411 (emphasis added) (codified as amended at 8 U.S.C. § 1188(a)(1)). Both of these elements must be shown to be present for the Secretary to grant an employer's H-2A worker application and to issue a "temporary agricultural labor certification." *Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States*, 88 Fed. Reg. 12760 (Feb. 28, 2023). By way of this process, the DOL endeavors to safeguard the wages of U.S. laborers from being "adversely affected" by H-2A workers.[2] *See id.*

Congress, however, did not define the phrase "adversely affected" and instead entrusted the DOL with the responsibility of "'ensur[ing] that the [employment] of farmworkers [meets] the statutory requirements.'" 88 Fed. Reg. at 12761 (quoting *AFL-CIO, et al. v. Dole*, 923 F.2d 182, 184 (D.C. Cir. 1991)). The DOL therefore has discretion to determine the methodological approach that best achieves a balance between the "competing goals" of maintaining "'an adequate labor supply and

_____

[2] The Secretary has delegated the authority to issue temporary agricultural labor certifications to the Assistant Secretary, Employment and Training Administration, who, in turn, has delegated that authority to the OFLC. *See* 88 Fed. Reg. at 12761; (Doc. 44 at 12).

protecting the jobs of domestic workers.'"   (Doc. 44 at 12) (quoting *Dole*, 923 F.2d at 187); *see also* 88 Fed. Reg. at 12761 ("The INA 'requires that the [DOL] serve the interests of both farmworkers and growers—which are often in tension.   That is why Congress left it to [the DOL's] judgment and expertise to strike the balance.'") (quoting *Dole*, 923 F.2d at 187).

As pertinent here, one of the principal mechanisms the DOL utilizes to accomplish this objective is to set the hourly "Adverse Effect Wage Rate" (AEWR). 20 C.F.R. § 655.120; (Doc. 44 at 2, 13).   The AEWR is one of several possible wage rates that the DOL may consider in addressing the highest applicable wage directive.[3] 20 C.F.R. §§ 655.120(a), 655.121(1).   The AEWR creates a wage floor that serves to prevent "localized wage stagnation or depression relative to the wages of [U.S.] workers similarly employed in areas and occupations" in which employers wish to hire H-2A workers.   88 Fed. Reg. at 12761.   The general aim of the AEWR is "to approximate the equilibrium wages that would result absent an influx of temporary foreign workers," thereby putting "incumbent farm workers in the position they would have been in but for the H-2A program."   (Doc. 44 at 4) (quoting 88 Fed. Reg. at 12768); *see also* (Doc. 44 at 3) (same) (quoting 88 Fed. Reg. at 12773).   While the AEWR is "one of the primary regulatory controls" to avoid "adverse effects," 88 Fed. Reg. at 12773, Congress has not designated a specific approach for calculating that

---

[3] The other wage rates are the prevailing hourly wage rate, the agreed-upon collective bargaining rate, and the Federal or State minimum wage rate in effect at the time work is performed.   *See* 20 C.F.R. §§ 655.120(a), 655.122(1); (Doc. 44 at 13) (citations omitted).

wage rate. *Am. Fed'n of Lab. & Cong. of Indus. Orgs.*, 835 F.2d at 915.  Rather, it has left that task "entirely to the [DOL's] discretion." *Id.* at 915.  In exercising the latitude afforded to it by Congress, the DOL need not assess the AEWR at the highest conceivable point nor the lowest, as long as the figure it selects effectuates the purpose of protecting against any "adverse impact on the wages of agricultural workers in the United States similarly employed." 88 Fed. Reg. at 12761.  The DOL also takes into account "factors relating to the sound administration of the H-2A program in deciding how to determine the AEWR." *Id.*

The manner by which the DOL has computed the AEWR has varied over the years.  Since 1987, the DOL has generally calculated the AEWR by using the U.S. Department of Agriculture's (USDA) annual survey of farmworker wages, commonly known as the Farm Labor Survey (FLS).  *See* (Doc. 44 at 13–18).  The FLS reports wages per State or region in four categories: (1) field workers, (2) livestock workers, (3) field and livestock workers (combined), and (4) all hired workers.[4]  (Doc. 44 at 4–5, 15).  The "field and livestock workers (combined)" category constitutes the lion's share of the H-2A job opportunities (Doc. 44 at 3) (quoting 88 Fed. Reg. at 12768) and is comprised of the following six occupations: (1) Graders and Sorters, Agricultural Products; (2) Agricultural Equipment Operators; (3) Farmworkers and Laborers, Crop, Nursery, and Greenhouse; (4) Farmworkers, Farm, Ranch, and Aquacultural

---

[4] The FLS does not survey all geographic locations (e.g., Alaska and Puerto Rico).  *See* 88 Fed. Reg. at 12770; (Doc. 44 at 4).

Animals; (5) Packers and Packagers, Hand; and (6) Agricultural Workers, All Other. *See* 88 Fed. Reg. at 12766; (Doc. 44 at 17 n.5, 19) (citation omitted).

Until 2008, the DOL set the AEWR for each year "at a level equal to the previous year's annual regional average hourly wage rates for field and livestock workers (combined)," as determined by the FLS. *Labor Certification Process for the Temporary Employment of Aliens in Agriculture in the United States; Adverse Effect Wage Rate Methodology*, 54 Fed. Reg. 28037, 28038 (July 5, 1989). In 2008, however, the DOL switched to utilizing Occupational Employment Statistics (OES) survey data from the Bureau of Labor Statistics (BLS) to calculate AEWRs for all H-2A job opportunities. (Doc. 44 at 5, 13). The DOL justified this change on, among other grounds, its apprehension that the USDA "could terminate the [FLS] survey at any time and leave [the DOL] without the basic data" to set the AEWR. *See Temporary Agricultural Employment of H-2A Aliens in the United States; Modernizing the Labor Certification Process and Enforcement*, 73 Fed. Reg. 77110, 77173 (Dec. 18, 2008); (Doc. 44 at 13–14). The DOL found this possibility "add[ed] a measure of instability and uncertainty for AEWR determinations" in subsequent years and warranted an approach that did not rely on the FLS. (Doc. 44 at 14) (citing 73 Fed. Reg. at 77173) (internal quotation marks omitted). The DOL's decision to employ OES data was upheld as lawful. *Id.*; *see United Farm Workers v. Solis*, 697 F. Supp. 2d 5, 8–11 (D.D.C. 2010).

The DOL, however, suspended its use of the OES data soon thereafter and, in 2010, resumed employing the FLS data to compute the AEWR. *See Temporary Employment of H-2A Aliens in the United States*, 74 Fed. Reg. 25972, 25972 (May 29,

2009) (suspending calculating the AEWR using OES data); *Temporary Agricultural Employment of H-2A Aliens in the United States*, 75 Fed. Reg. 6884, 6891 (Feb. 12, 2010) (2010 Rule) (announcing the continued reliance on FLS data to calculate the AEWR); *see also* (Doc. 44 at 6, 14) (citing 20 C.F.R. § 655.103(b); 75 Fed. Reg. at 6891, 6898). In explaining this change-of-course, the DOL observed that the FLS "is the only annually available data source that actually uses information sourced directly from farmers," and that the FLS's "broader geographic scope ma[de it] more consistent with both the nature of agricultural employment and the statutory intent of the H-2A program." 75 Fed. Reg. at 6898–99; *see also* (Doc. 44 at 6, 14). During this time period, the AEWR was formulated using the annual average hourly wage data for workers within the combined field and livestock category in the FLS despite wage data for certain higher-skilled occupations not being included in that dataset. (Doc. 44 at 15).

In 2019, the DOL published a proposed rule whereby it sought to alter its AEWR methodology to achieve an "occupation-based wage." *Temporary Agricultural Employment of H-2A Nonimmigrants in the United States*, 84 Fed. Reg. 36168, 36171 (July 26, 2019); *see also* (Doc. 44 at 14–15). Under this proposal, the DOL would maintain its practice of employing the FLS to set the AEWR but would establish separate AEWRs for distinct agricultural jobs within a state or region. *See* 84 Fed. Reg. at 36171; (Doc. 44 at 14). In those instances where the FLS did not report data within a state or region for a particular position, the DOL would look to OES data to gauge the AEWR. 84 Fed. Reg. at 36171; (Doc. 44 at 14). The DOL believed this occupation-based approach, along with the attendant use of OES data to calculate the AEWR for

some jobs, was warranted based upon its concern that continuing to use a more generalized AEWR methodology "could produce a wage rate that [was] not sufficiently tailored to the wage necessary to protect against adverse effect." 84 Fed. Reg. at 36171.

In 2020, the DOL published a final rule (2020 Rule) adopting the proposed rule's utilization of OES data to set the AEWR for some occupations. *See Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States*, 85 Fed. Reg. 70445, 70446 (Nov. 5, 2020); (Doc. 44 at 15–16). The 2020 Rule, however, implemented a new methodology for setting the AEWR for the combined field and livestock worker positions. 85 Fed. Reg. at 70446. Specifically, the 2020 Rule stated that the DOL would set the AEWR for field and livestock worker occupations by relying on 2019 FLS data to establish a baseline wage rate for these jobs and would adjust the AEWR annually commencing in 2023 based upon the Employment Cost Index (ECI), which is a measure of the rate of change in employee compensation calculated by the FLS. *Id.* The 2020 Rule also announced that it would not institute the new AEWR approach until 2023 and would instead freeze the AEWR for two years at the 2020 rates (calculated using 2019 FLS data). *Id.* The DOL deemed this new framework to be appropriate in light of its continued discomfort that the FLS data might not be available in future years. *Id.* This concern was predicated, in part, on the USDA's pronouncement in 2020 that it suspended FLS data collection and would not be publishing the FLS that year. *See Notice of Revision to the Agricultural Labor Survey and Farm Labor Reports by Suspending*

9

*Data Collection for October 2020*, 85 Fed. Reg. 61719 (Sept. 30, 2020); *see also United Farm Workers v. U.S. Dep't of Lab.*, 509 F. Supp. 3d 1225, 1232–33 (E.D. Cal. 2020). Although that suspension was later blocked and the USDA was ordered to compile FLS data that year, *United Farm Workers v. Perdue*, 2020 WL 6318432 (E.D. Cal. Oct. 28, 2020), the DOL referenced in the 2020 Rule the remaining "uncertainty" regarding the longer-term prospects of the FLS.  *See* 85 Fed. Reg. at 70446.

The 2020 Rule was subsequently challenged and preliminarily enjoined in *United Farm Workers v. U.S. Dep't of Labor*, 509 F. Supp. 3d 1225 (E.D. Cal. 2020).  The court in *United Farm Workers* found the plaintiffs sufficiently demonstrated that the DOL did not adequately explain its reasoning for adopting a two-year freeze of the AEWR rates, failed to explain how the 2020 Rule properly protected U.S. field and livestock workers against adverse effects, and neglected to analyze the extent of economic harm experienced by domestic farmworkers.  *Id.* at 1242, 1245.  The 2020 Rule was ultimately vacated in 2022 on these same grounds.  *See United Farm Workers v. U.S. Dep't of Labor*, 598 F. Supp. 3d 878, 887–88 (E.D. Cal. 2022); (Doc. 44 at 16).  Not long after, the 2010 Rule's AEWR methodology was reinstated.  (Doc. 44 at 16).

In December 2021, the DOL issued a new Notice of Proposed Rulemaking (NPRM) that contemplated several changes to the AEWR methodology.  *See Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States*, 86 Fed. Reg. 68174 (Dec. 1, 2021); (Doc. 44 at 16–17).  First, the DOL proposed continuing to rely on the FLS to set the AEWR

for the "vast majority of H-2A job opportunities represented by [the] six occupations comprising the field and livestock worker (combined) category within the FLS." 86 Fed. Reg. at 68179; *see also* (Doc. 44 at 17).   Under this proposal, if the FLS did not report a wage finding for the field and livestock workers (combined) occupational group, the DOL's Occupational Employment and Wage Statistics (OEWS) survey would be utilized to formulate the AEWR.  *See* (Doc. 44 at 17) (citing 86 Fed. Reg. at 68179–81).   Formerly known as the OES survey, the OEWS survey collects wage information from agricultural employers, including from farm labor contractors that arrange "with growers to provide them needed labor and then use the H-2A program to hire foreign workers to complete this [work]."  *Everglades Harvesting & Hauling, Inc.*, 427 F. Supp. 3d at 106; *see also* (Doc. 44 at 6, 20) (farm labor contractors support fixed-site agricultural employers by providing agricultural labor or services similar to those carried out by workers retained by fixed-site agricultural employers) (citing 88 Fed. Reg. at 12770).

Second, the DOL suggested employing the OEWS data to establish the AEWR for those occupations that did not fall within the FLS field and livestock worker (combined) category.  *See* 86 Fed. Reg. at 68181; (Doc. 44 at 17 & n.6).  According to the NPRM, "[t]his would apply to higher paid agricultural positions[,] such as farm supervisors/managers, truck drivers, and those employed for contracted services such as construction or equipment operators supporting farm production." (Doc. 44 at 17–18) (citing 86 Fed. Reg. at 68181–82).  For the jobs outside the field and livestock worker (combined) category, the AEWR would be "the statewide annual average

hourly wage for the occupational classification, as reported by the OEWS survey." 86 Fed. Reg. at 68181. To determine the classification to which a particular job opportunity belonged, the certifying officer (CO) at the DOL charged with reviewing H-2A petitions would consider "the totality of the information in an H-2A application and job order"[5] and would "compare[ ] the duties of the employer's job opportunity with the [Standard Occupational Classification (SOC)[6]] definitions and tasks that are listed in the Department's Occupational Information Network" (O*NET).[7] *Id.* at 68183; (Doc. 44 at 20, 22). The CO would then assign the SOC code or codes that best represent the employer's job opportunity. 86 Fed. Reg. at 68183.

Third, the NPRM recommended that employers be mandated to pay the highest applicable wage rate where a job opportunity consisted of a combination of duties that fell both inside and outside of the combined field and livestock workers category. (Doc. 44 at 18); 86 Fed. Reg. at 68183–84. By way of example, under the NPRM, "if a job opportunity requir[ed] the same duties as that of a field and livestock worker, as

---

[5] According to the parties, a job order contains a narrative describing a job opportunity. *See* (Doc. 40 at 12–14).

[6] The SOC "is a federal statistical standard used by federal agencies to classify workers into occupational categories for the purpose of collecting, calculating, or disseminating data." Standard Occupational Classification, U.S. BUREAU OF LABOR STATISTICS, https://www.bls.gov/soc/ (last visited Jan. 4, 2024). Under this system, all workers are assigned to "one of 867 detailed occupations according to their occupational definition." *Id.* Detailed occupations in the SOC with similar job duties, and in some cases skills, education, and/or training, are grouped together. *Id.*

[7] The O*NET is "a database containing information on hundreds of standardized and job-specific descriptors for occupations, whose data collection is sponsored by the [DOL] and the Employment and Training Administration." *Dolly H. v. Kijakazi*, 2023 WL 6566603, at *8 (S.D. W. Va. Aug. 31, 2023), *report and recommendation adopte*d, 2023 WL 6174413 (S.D. W. Va. Sept. 22, 2023).

well as duties for that of a construction worker, the employer must pay the higher rate among those classifications."  (Doc. 44 at 18) (citing 86 Fed. Reg. at 68183–84).

And fourth, "the NPRM proposed requiring the [OFLC] Administrator to publish an update to the FLS AEWRs and OEWS AEWRs as a notice in the *Federal Register* at least once per year."  (Doc. 44 at 18) (citing 86 Fed. Reg. at 68179–84).

Following a notice and comment period during which numerous stakeholders offered input, the DOL published a final rule at the end of February 2023 (2023 Rule) which incorporated all the above-described changes to its AEWR methodology.  (Doc. 44 at 18) (citing 88 Fed. Reg. at 12760).  The 2023 Rule became effective roughly a month later.  (Doc. 44 at 18); *see also* 20 C.F.R. § 655.120(b).  According to the DOL, as of July 2023, applications filed (or certified) before the 2023 Rule's effective date must now pay the OEWS-based higher wages if they are designated an occupational code outside the six FLS codes comprising the field and livestock workers (combined) category.  (Doc. 44 at 10).

## B.

Composed of a group of individual entities and associations, the Plaintiffs initiated this lawsuit after the DOL published the 2023 Rule.  (Doc. 1).  In their complaint, the Plaintiffs seek declaratory and injunctive relief for violations of the Administrative Procedure Act (APA), 5 U.S.C. § 706, and the Regulatory Flexibility Act (RFA), 5 U.S.C. § 603.  *Id.*  In support of their APA claim, the Plaintiffs assert, *inter alia*, that the 2023 Rule contravenes the INA, and is also arbitrary and capricious because it lacks an adequate justification for using the OEWS data and is retroactive.

*Id.* To buttress their RFA claim, the Plaintiffs aver that the Defendants failed to discuss all alternative solutions in promulgating the 2023 Rule. *Id.*

By way of their preliminary injunction motion, the Plaintiffs request that the Court temporarily enjoin: 1) the Defendants from enforcing the 2023 Rule on a nationwide basis; 2) the OFLC "from requiring employers to post or otherwise advertise H-2A job orders with wages other than the FLS-based AEWRs published by [the] Defendants at 87 Fed. Reg. 77,142 (Dec. 16, 2022);" and 3) "the Wage and Hour Division of the [DOL] from enforcing any requirement of H-2A employers to pay wage rates resulting from the Rule's methodology." (Doc. 16 at 25). The Plaintiffs also ask that the 2010 Rule remain in place until the DOL completes a new rulemaking process. *Id.* at 14 n.10. To bolster their motion, the Plaintiffs attach a number of documentary exhibits, including several declarations from certain of the Plaintiffs and their counsel, articles disputing certain parts of the 2023 Rule, and educational materials the DOL distributed to the public related to the 2023 Rule. (Docs. 16-2–16-15).

The Defendants filed a response in opposition to the Plaintiffs' preliminary injunction motion, which included their own declaration, along with another exhibit.[8] (Doc. 22). After the Defendants submitted their response, I conducted a hearing on the matter. (Doc. 40). At that proceeding, both sides presented arguments but did not

---

[8] The Defendants' unsworn declaration, like the ones offered by the Plaintiffs, *see e.g.*, (Docs. 16-3, 16-8, 16-9, 16-10, 16-13), was made pursuant to "18 U.S.C. § 1746." (Doc. 22-1). This citation is incorrect. The statute governing unsworn declarations is 28 U.S.C. § 1746. Despite this error, I will treat the parties' declarations as valid for purposes of my Report and Recommendation (R&R).

seek to introduce any additional evidence.  M.D. Fla. R. 3.01(h), (i).  Following the hearing, I issued an Order directing the parties to provide supplemental legal memoranda (Doc. 32), as well as a "joint statement of agreed-upon facts,"[9] which they did (Docs. 42, 43, 44).  Amici James Simpson, Stephanus De Klerk, and Farmworker Justice (Amici) were also permitted to file a brief in favor of the 2023 Rule.  (Docs. 31, 33).

Subsequent to these submissions, the Defendants filed a motion to dismiss the Plaintiffs' complaint pursuant to Rules 12(b)(1) and 12(b)(6), asserting that the individual and associational Plaintiffs did not have standing to bring the action and that the Court lacked jurisdiction over the Plaintiffs' RFA claim in any event.  (Doc. 52).  The Plaintiffs filed a response in opposition to the Defendants' motion.  (Doc. 53).

More recently, the Defendants submitted a notice of supplemental authority regarding a decision issued by a court in the Western District of North Carolina in the lawsuit captioned *USA Farm Labor Inc. v. Su, et al.*, ___ F. Supp. 3d ___, 2023 WL 6283333 (W.D.N.C. Sept. 26, 2023) (*USA Farm Labor*).  (Doc. 61).  The Plaintiffs filed a response to the Defendants' supplemental notice a short time later.  (Doc. 64).  The parties' competing motions are therefore now ripe for the Court's consideration.

---

[9] Because the parties were instructed to include only "agreed-upon *facts*" in their joint statement (Doc. 32) (emphasis added), I have not considered any portion of that submission which constitutes legal argument.

II.

I commence my analysis with the Defendants' jurisdictional challenges to the Plaintiffs' standing and RFA claim, which together serve as the basis for the Defendants' motion to dismiss.  I will address each of these challenges in turn.

A.

The law of standing is derived from Article III of the Constitution and "'is built on a single basic idea—the idea of separation of powers.'"  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 820 (1997)). Consistent with this concept, "Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'"  *Id.*  A legal dispute qualifies as a "Case or Controversy" if "at least one plaintiff . . . ha[s] standing to sue."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019); *see also Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (finding that in cases where there are multiple plaintiffs, only "one plaintiff must have standing to seek each form of relief requested in the complaint"); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977) (noting that if there is one plaintiff "who has demonstrated standing to assert the[ ] rights [at issue] as his own," a court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit" as well).  A plaintiff's standing to sue must exist at the time its complaint is filed.  *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1212 (11th Cir. 2019) ("Article III standing must be determined as of the time that the plaintiff's complaint is filed.") (citations omitted); *Cook v. Bennett*, 792 F.3d 1294, 1298 (11th Cir. 2015) (same).

"Because standing is jurisdictional, a dismissal for lack of standing has the same effect as a dismissal for lack of subject matter jurisdiction under [Rule] 12(b)(1)." *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (internal quotation marks and citation omitted).   A Rule 12(b)(1) motion contesting subject matter jurisdiction "can be based upon either a facial or factual challenge to the complaint." *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007).   A facial attack requires a court to accept the allegations in the complaint as true and to cabin its review to the four corners of the complaint. *Id.*; *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990).   A factual attack, by contrast, allows a court to go beyond the pleadings and to consider evidence extrinsic to the complaint, such as testimony and affidavits. *McElmurray*, 501 F.3d at 1251; *see also Goodman v. Sipos*, 259 F.3d 1327, 1331 n.6 (11th Cir. 2001).   Where a factual challenge to subject matter jurisdiction is brought, the plaintiff bears the burden of proving that jurisdiction exists by a preponderance of the evidence. *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002); *Salerno v. Fla. S. Coll.*, 488 F. Supp. 3d 1211, 1216 (M.D. Fla. 2020).   As the Defendants rely on declarations in support of their motion to dismiss, I will deem their attack on the Plaintiffs' standing to be a factual one.

The elements for standing vary depending upon the type of plaintiff bringing a lawsuit.   For an individual entity to have standing, it must show that (1) it has suffered an injury in fact, (2) the injury is fairly traceable to the defendant's conduct, and (3) the injury would likely be redressed by the sought-after judicial relief. *Thole v. U.S. Bank*

*N.A.*, 140 S. Ct. 1615, 1618 (2020); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).   An associational plaintiff, on the other hand, has standing when "(a) its members would otherwise have standing to sue in their own right; (b) the interests [the association] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."   *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021) (internal quotation marks and citation omitted).[10]   To establish an injury in fact under associational standing, however, a plaintiff need not prove that all their members "face[ ] a realistic danger" of suffering harm.   *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014).   It is enough for an organization to identify at least one member that can establish the requisite injury in fact.   *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1204 (11th Cir. 2018) ("To establish standing . . . , an organization must 'make specific allegations establishing that at least one identified member ha[s] suffered or [will] suffer harm.'") (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)).

Whether as an individual or as an association, a plaintiff must prove each of the standing elements "in the same way as any other matter on which [a] plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at successive

---

[10] Although the first two prongs of this test are grounded in the Constitution, the third reflects a prudential concern that Congress can eliminate.   *See United Food & Com. Workers Union v. Brown Grp., Inc.*, 517 U.S. 544, 555–58 (1996).

stages of the litigation." *Lujan*, 504 U.S. at 561.  Where a plaintiff seeks a preliminary injunction, it must make a "clear showing" that all the standing criteria are satisfied. *State v. Becerra*, 544 F. Supp. 3d 1241, 1251 (M.D. Fla. 2021) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

The sole component of the standing analysis contested by the Defendants here is whether the Plaintiffs meet the injury in fact prong.  *See*, *e.g.*, (Doc. 52 at 13) (contending that the individual Plaintiffs "have not adequately alleged or shown that they will be *injured*") (emphasis added); *id.* at 18 (insisting that this case should be dismissed "because the Plaintiffs are not 'certain to be *injured* by' the 2023 Rule") (emphasis added) (citation omitted).  An injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). These requirements, along with redressability, "ensure[ ] that federal courts decide only the rights of individuals, and that federal courts exercise their proper function in a limited and separated government."  *TransUnion*, 141 S. Ct. at 2203 (internal quotation marks and citations omitted).

For an injury to be "concrete," it must be concrete "in both a qualitative and temporal sense," *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990), and "must actually exist," *Spokeo*, 578 U.S. at 340.  An injury is "particularized" where it "affect[s] the plaintiff in a personal and individual way."  *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560 n.1).  And while averments of a future injury may suffice, the injury must be

"imminent" in the sense that it must be "certainly impending" or that there is "a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks and citation omitted); *see also New York*, 139 S. Ct. at 2565 (stating that "future injuries" may be enough to establish standing if "there is a substantial risk that the harm will occur"); *Strickland v. Alexander*, 772 F.3d 876, 883 (11th Cir. 2014) ("Where the plaintiff seeks declaratory or injunctive relief, as opposed to damages for injuries already suffered, . . . the injury-in-fact requirement insists that a plaintiff 'allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future.'") (quoting *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1346 (11th Cir. 1999)); *Becerra*, 544 F. Supp. 3d at 1252 ("A future injury qualifies as 'imminent' if [a] plaintiff faces a 'sufficient likelihood' of suffering the alleged injury.") (quoting *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1112–13 (11th Cir. 2021)).  Allegations of a "possible future injury" or even an "objectively reasonable likelihood" of a future injury are insufficient.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10 (2013) (internal quotation marks, alterations, and emphasis omitted); *see also Summers*, 555 U.S. at 497 (rejecting the theory that an organization can establish standing if "there is a statistical probability that some of [its] members are threatened with concrete injury").

That said, "[a] future injury is significantly more likely 'when the threatened acts that will cause [the] injury are authorized or part of a policy[.]'" *Worthy v. City of Phenix City*, 930 F.3d 1206, 1215 (11th Cir. 2019) (quoting *31 Foster Children v. Bush*, 329 F.3d 1255, 1266 (11th Cir. 2003)).  Further, "immediacy requires only that the

anticipated injury occur with[in] some fixed period of time in the future, not that it happen in the colloquial sense of soon or precisely within a certain number of days, weeks, or months." *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008) (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211–12 (1995)). As the Eleventh Circuit has explained:

> "Imminence" as a doctrinal standard is somewhat elastic, and applying it is not an exercise in conceptual analysis but an attempt to advance the purposes behind the case-or-controversy requirement of Article III, including the guaranty of actual adversity between the parties, the limitation on the power of federal courts, and the reservation of judicial resources to resolve more concrete and pressing disputes.

*Browning*, 522 F.3d at 1161 (internal quotation marks and citations omitted).

In cases like this one which "challeng[e] the legality of government action or inaction, the nature and extent of facts that must be averred . . . in order to establish standing depends considerably upon whether [a] plaintiff is . . . an object of the action (or forgone action) at issue." *Lujan*, 504 U.S. at 561–62. If a plaintiff is the object of the action, "there is ordinarily little question that the action or inaction has caused [the plaintiff] injury." *Id*. "Courts have thus found standing 'self-evident' where the plaintiffs were representatives of or they themselves were regulated parties." *Am. Sec. Ass'n v. U.S. Dep't of Labor*, 2023 WL 1967573, at *8 (M.D. Fla. Feb. 13, 2023) (citing *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1286–87 (D.C. Cir. 2005)).

For purposes of the standing inquiry here, the Plaintiffs can be divided into two camps: farms and associations of farms. With respect to the former category, which

is comprised of Franberry and G&F, the Plaintiffs allege in their complaint, *inter alia*, that the 2023 Rule will cause Franberry and G&F's labor costs to increase substantially in 2023 and may force them to "cease" their operations. (Doc. 1 at 9–10). To buttress this allegation, the Plaintiffs attach to both their complaint and their preliminary injunction motion the declaration of Michelle Williamson, who is the Director of Operations for Franberry and G&F. (Docs. 1-4, 16-9). Williamson attests that Franberry and G&F have hired H-2A workers in recent years, and will continue to do so "every season for the foreseeable future," since their business relies on migrant farmworkers due to the difficulty of finding enough labor to staff their farms. (Docs. 1-4 at 2–3, 5; 16-9 at 2–3, 5). Williamson further represents that Franberry and G&F secure their H-2A workers both directly and through H-2A labor contractors like Everglades Harvesting, Inc. (Everglades). (Docs. 1-4 at 3, 5; 16-9 at 3, 5). Because of the 2023 Rule, however, Williamson maintains that the wage costs for Franberry and G&F will increase by more than $100,000 for each farm over the next year and, to bolster this assertion, she identifies several examples of the positions which will be negatively impacted financially by the rule. (Docs. 1-4 at 2; 16-9 at 2). In particular, she states:

> With each passing year, we have had more and more trouble finding, hiring, and retaining our workforce. In recent years, this situation has left us no choice but to participate in the H-2A visa program—through contracting with H-2A labor contractors and through applying to the [DOL] to employ H-2A workers directly.
>
> The H-2A regulations require us to pay the [AEWR] to any workers covered by an H-2A contract . . . during the period of that

contract. . . .  And the AEWR is a floor, not a ceiling; we have to pay our more experienced workers more than the baseline entry-level wage the [DOL] requires.  So, every time the [DOL] moves to increase the H-2A minimum wage rates, we have to raise *all* of our wage rates for our entire workforce of approximately 200 employees.

\* \* \*

The proposed increases for our supervisors to $26.92 and truck drivers to $21.62 will put our family business in jeopardy.  For just two H-2A employees, these new wage rates from the [DOL] will increase G&F['s] . . . wages by $62,111 this year over last year; Franberry . . . will see a $62,597 increase for two other H-2A workers year-over-year. Increasing the pay to our U.S. non-H-2A workers will cost each farm an additional $58,000 per year.  That means more than $120,000 for *each* farm in increased wages because of this new rule.

\* \* \*

The base AEWR is not the only labor cost, either.  We provide free housing to our direct-hire H-2A workers, and pay a service premium percentage on top of the wage rate to H-2A labor contractors . . . to provide housing and transportation to their H-2A workers.  So, we will end up paying the higher wage that Everglades has to pay, plus a higher surcharge on top of that. . . .

We will be hiring H-2A workers every season for the foreseeable future, so long as we can remain in business, so this wage increase is very real and entirely unavoidable without the Court's help.

(Docs. 1-4 at 2–5; 16-9 at 2–5).[11]

---

[11] The Plaintiffs assert in their complaint that they suffer an additional harm "[e]ven before work begins on applications filed on or after the effective date of the [2023] Rule."  (Doc. 1 at 23).  According to the Plaintiffs, this is because "[i]f an employer submits a job order and is assigned a non-FLS code with higher-than-AEWR wages, and a U.S. worker applies for the position, that creates an unbreakable contractual requirement to pay that worker that higher-than-AEWR wage for at least 75% of the hours set forth in the job order."  *Id.*  Williamson does not reference this alleged harm in her declaration, nor—more broadly—do the Plaintiffs seem to rely on it to advance their claim of standing.  As a result, I will not address this averment here.

In response to Williamson's declaration, the Defendants contend that Franberry and G&F fail to establish standing because they do not allege "they are ready or able to submit labor certifications or applications [which] might be affected by the 2023 [R]ule" and that their motion is not ripe in any event because many of the agricultural seasons do not start up again until this time of the year, which is well after their complaint was filed.  (Docs. 42 at 3; 52 at 3).  To support these claims, the Defendants offer the declaration of Shane Barbour, who is the Center Director for the DOL component that handles the adjudication of H-2A applications, among other responsibilities.  (Doc. 22-1).  Barbour asserts that the pertinent database "indicates" Franberry and G&F utilize a farm labor contractor, Everglades, to secure H-2A workers and that neither entity had any pending H-2A applications "as the direct employer of temporary workers" as of the date of his declaration several months ago. (Doc. 22-1 at 3).  Barbour further maintains that the H-2A certifications Everglades did have for Franberry and G&F during the first half of 2023 expired before July 2023 and were therefore not impacted by the 2023 Rule.  *Id.* at 4.[12]

---

[12] In the context of addressing the issue of irreparable harm, the Amici analogously contend that Williamson's representations are insufficient to show that Franberry and G&F will suffer harm that is "both significant and imminent."  (Doc. 23 at 8–9).  In support of this contention, the Amici argue that Williamson has "no factual basis" for her assertions relative to the financial impact the 2023 Rule will have on Franberry and G&F because these entities do not "directly employ[ ] H-2A guestworkers" but instead secure those workers through a farm labor contractor.  *Id.* at 9.  And, the Amici submit, it is the farm labor contractors who will be compelled to pay the wage increase caused by the 2023 Rule, not Franberry and G&F.  *Id.*  In addition, akin to the Defendants, the Amici claim that the next growing season does not start up again until this time of the year and that Franberry and G&F have not  suffered an injury in the interim.  *Id.* at 9–10.

By my view, the Plaintiffs have the better argument.  I begin by highlighting that Franberry and G&F appear to be the "object of the action . . . at issue" (i.e., the 2023 Rule) and that, accordingly, there should "ordinarily [be] little question" they have standing.  *Lujan*, 504 U.S. at 561–62; *see also Am. Sec. Ass'n*, 2023 WL 1967573, at *8 ("Courts have . . . found standing 'self-evident' where the plaintiffs . . . themselves were regulated parties.") (citing *Nat'l Ass'n of Home Builders*, 417 F.3d at 1286–87).  The Defendants do not mention this line of authority, much less distinguish it.

Regardless of this case law, Williamson represents in her declaration—as noted above—that Franberry and G&F have recently "participate[d] in the H-2A visa program" by retaining H-2A workers and "will be hiring H-2A workers every season for the foreseeable future, so long as [they] can remain in business."  (Docs. 1-4 at 2, 5; 16-9 at 2, 5); *see also* (Doc. 53 at 5) (noting that "[a]s reliably as the seasons follow each year, employers submit H-2A applications for the same time periods year after year after year").  As also referenced above, Williamson additionally details that the 2023 Rule's implementation will adversely affect Franberry and G&F's profits and that it will even place their "family business in jeopardy."  (Docs. 1-4 at 2–5; 16-9 at 2–5).  These attestations adequately demonstrate that the harm the 2023 Rule posed to Franberry and G&F at the time they filed the complaint was "certainly impending" or, at the very least, that there was "a substantial risk" Franberry and G&F would suffer the requisite injury in fact from the rule's application.  *See Driehaus*, 573 U.S. at 158; *New York*, 139 S. Ct. at 2565; *Becerra*, 544 F. Supp. 3d at 1252; *see also Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("[T]he injury required for standing need

not be actualized.  A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct."); *Browning*, 522 F.3d at 1161 ("[A]lthough a plaintiff must establish 'a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement,' . . . he 'does not have to await the consummation of threatened injury to obtain preventive relief.'") (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).  This is especially true since—as the DOL acknowledges in the 2023 Rule and as it confirmed at the preliminary injunction hearing—the revised AEWR methodology will cause increased labor costs.  *See* 88 Fed. Reg. at 12771–72; (Doc. 40 at 113); *see also* (Docs. 33 at 2–6; 42 at 3).

The court's decision in the above-referenced *USA Farm Labor* case from the Western District of North Carolina is helpful in this regard.  In that action, like here, the defendants contended the farms and agri-businesses that were part of the lawsuit could not satisfy the injury in fact requirement because they "d[id] not have any current labor certifications or pending H-2A applications [which were] or [would] be affected by the [2023 Rule], nor [had] they alleged that they intend[ed] to submit such applications [which would] be affected by the [2023 Rule]."  2023 WL 6283333, at *6. The court rejected this argument, finding that the plaintiff farms sufficiently averred that their injury was "certainly impending."  *Id*. at *7.  To bolster this determination, the court observed that the plaintiff farms "ha[d] offered declarations explaining their reliance on the H-2A program and how implementation of the [2023] Rule [would] significantly and detrimentally increase their H-2A wage costs."  *Id*.  The court noted

as well that some of the plaintiffs "affirmatively state[d] their plans to file H-2A applications, despite the wage increases, in advance of their date of need." *Id.*

The Defendants' reliance on the fact that Franberry and G&F partially secure H-2A workers through labor contractors such as Everglades does not lead to a different conclusion.  The gist of the Defendants' contention in this regard seems to be that although Everglades may experience increased costs due to the 2023 Rule, Franberry and G&F do not show that they will.  (Docs. 42 at 7; 52 at 14–15).  The problem with this argument is twofold.

First, as discussed earlier, Williamson attests in her declaration that Franberry & G&F retain H-2A workers "*directly*."  (Docs. 1-4 at 3–5; 16-9 at 3–5) (emphasis added).  Defendants do not credit this attestation and instead cite Barbour's declaration for the proposition that "neither G&F nor Franberry directly employs H-2A workers."  (Docs. 42 at 7; 52 at 15).[13]  But Barbour does not make this claim anywhere in his declaration.  As noted above, he only states that at the time of his declaration, Franberry and G&F were then listed as fixed cite growers on Everglades's certification for H-2A workers and did "not have any pending H-2A applications with [the DOL] as the direct employer of temporary workers."  (Doc. 22-1 at 3).  Barbour's declaration thus does not appear to refute Williamson's representation that Franberry and G&F hire H-2A workers directly.

---

[13] Amici likewise allege that Franberry and G&F do not directly employ H-2A guestworkers and state in a footnote that this averment is "based on [an] analysis of DOL's H-2A performance data."  (Doc. 33 at 9 & n.1).  Notably, however, Amici fail to include a sworn declaration substantiating this analysis.

Second, the Defendants' argument overlooks the fact that courts may take into account "the basic laws of economics" in addressing matters pertaining to standing. *See, e.g.*, *United States v. Florida*, 2023 WL 4546188, at *12 (S.D. Fla. July 24, 2023) (internal quotation marks omitted) (quoting *Competitive Enter. Inst. v. Fed. Commc'ns Comm'n*, 970 F.3d 372, 381–82 (D.C. Cir. 2020)). As referenced previously, it is uncontested that the implementation of the 2023 Rule will result in elevated wages for agricultural workers. *See* 88 Fed. Reg. at 12771–72; (Doc. 40 at 113); *see also* (Doc. 33 at 2–6). It also appears undisputed that farm labor contractors who retain H-2A labor for farms will incur those higher costs as a result. *See* (Docs. 33 at 2–6, 10; 40 at 113; 42 at 3). Given these seemingly undisputed facts, there is at least a "substantial risk," *Driehaus*, 573 U.S. at 158, or a "sufficient likelihood," *Becerra*, 544 F. Supp. 3d at 1252, that the 2023 Rule will necessitate farm labor contractors (such as Everglades) to pass along at least a portion of their increased expenses to farms (such as Franberry and G&F) which rely on labor contractors and that the 2023 Rule will also detrimentally impact the farms' operational approach to their workforce moving forward. *See New York*, 139 S. Ct. at 2565 (concluding that certain state respondents had standing to challenge the Secretary of Commerce's reinstatement of a query about citizenship on the 2020 census where it was shown that if noncitizen households were undercounted by as little as two percent as a result of this governmental action, the plaintiffs would lose out on federal funds distributed on the basis of state population); *Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165, 176 (D.D.C. 2008) (finding that members of the American Petroleum Institute (API) had standing to contest the Environmental

Protection Agency's regulatory definition of "navigable waters" because the definition "directly influence[d] the business decisions of [API members]"); *Bayou Lawn & Landscape Servs. v. Johnson*, 173 F. Supp. 3d 1271, 1282–83 (N.D. Fla. 2016) (deeming the plaintiffs to have standing where their injury depended upon the actions of third-party contractors).   Contrary to the Defendants' suggestion (Doc. 52 at 18), this assessment does not rest on mere speculation about the decisions of outside entities such as Everglades, but rather is grounded "on the predictable effect of [g]overnment action on the decisions of third parties."  *New York*, 139 S. Ct. at 2566.

In light of the above, I find that Franberry and G&F have standing to bring this lawsuit.  And because only one Plaintiff needs to have standing to sustain an action, the portion of the Defendants' motion to dismiss based upon the Plaintiffs' supposed lack of standing fails.  *New York*, 139 S. Ct. at 2565; *Town of Chester*, 581 U.S. at 439; *Village of Arlington Heights*, 429 U.S. at 264 & n.9.

While this determination is dispositive of the Defendants' standing challenge, I will address the standing of one of the associational Plaintiffs, FFVA, out of an abundance of caution.  Recall that an associational plaintiff has standing when "(a) its members would otherwise have standing to sue in their own right; (b) the interests [the association] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Greater Birmingham Ministries*, 992 F.3d at 1316.

The Defendants do not appear to quarrel with the associational Plaintiffs' ability to meet the germaneness or participation prongs of this test.  Nor does it appear they

could validly do so.   FFVA's President, Michael A. Joyner, represents in his declaration that the FFVA has been affiliated with the "grower-shipper community" for eighty years, that its members currently consist of crop growers and farm labor contractors,  and that the services it provides its members include "assisting employers with all of the filings required for participation in the H-2A visa program," as well as "advocating on behalf of [its] members on labor issues[ ] generally, and H-2A labor issues[ ] specifically."  (Docs. 1-7 at 2–3; 16-13 at 2–3).  Accordingly, it would seem that the implementation of the 2023 Rule is germane to the FFVA's purposes.  As for the participation requirement, there is case authority that where, as here, "the relief sought is injunctive, individual participation of the organization's members is 'not normally necessary.'"  *Browning*, 522 F.3d at 1160 (quoting *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996)).

With respect to the question of whether FFVA's members would themselves have standing, the Plaintiffs aver in their complaint, *inter alia*, that a significant portion of FFVA's membership participates in the H-2A program, either as employers or by contracting with H-2A labor contractors, that labor costs are typically the single largest expense of FFVA's members, and that FFVA's members are facing wage increases of nearly 75% or more as result of the 2023 Rule.  (Doc. 1 at 12–13).  Joyner reiterates and expounds upon these allegations in his declaration, stating that "[a] large number of [its] members participate in the H-2A temporary agricultural visa program, either directly as H-2A employers or by contracting with the H-2A labor contractors," and that its members increasingly rely on the H-2A program because "the domestic

agricultural workforce continues to dwindle." (Docs. 1-7 at 2–3; 16-13 at 2–3). Joyner also describes the negative impact the 2023 Rule will have on the decision making and bottom line of its members, including ATP Groves, LLC (ATP Groves).[14] (Docs. 1-7 at 2–6; 16-13 at 2–6) (stating, *inter alia*, that the new AEWR methodology will increase the labor costs for FFVA's members and could "force some of [them] out of business"). Regarding ATP Groves in particular, Joyner attests:

> [FFVA]'s staff helps prepare and file H-2A applications for our members, so we have first-hand knowledge of the job duties that our members need and that the [DOL] will review. There are some positions that involve driving heavy trucks to bring fresh fruits and vegetables or sugar cane to be packed or processed. Under the [DOL]'s new rule, the wage for that work will jump from $12.41 just a few months ago up to an unbearable $21.62 per hour. That is a 74% increase in just six months, with an additional increase expected with the new OEWS results at the beginning of July [2023].
>
> * * *
>
> One of our members, ATP[ Groves], applied for H-2A workers to drive trucks for them. This company has been in business for more than [twenty-five] years. Their application was filed in late 2022, long before the [DOL] issued the final rule, but their contract extends into July 2023. The [DOL] has stated that[ ] although applications were filed and certified prior to the new methodology being announced, the new methodology will still apply to them beginning July 1, 2023, when the

---

[14] As Amici pointed out in their brief (Doc. 33 at 11 n.4) and as Plaintiffs' counsel confirmed at the hearing (Doc. 40 at 80), Joyner mistakenly identified ATP Groves as "ATP Logistics" in his declaration. The documentation supplied by Amici with their submission and counsel's representations at the hearing substantiate the claim that Joyner was actually referring to ATP Groves. *See* (Docs. 33 at 12–13; 33-6; 33-7; 40 at 80). The Defendants do not appear to take issue with this correction. *See* (Doc. 40 at 90).

OEWS wages are announced. . . .   ATP [Groves] . . . will suffer unavoidable costs from the retroactive application of this new rule.

(Docs. 1-7 at 4–5; 16-13 at 4–5).

Joyner also adds that part of the difficulty "with this new rule is the uncertainty connected with it.  Even the [DOL] does not seem to know how it will be applied, making it nearly impossible for farms or farm labor contractors to plan their own contracts."  (Docs. 1-7 at 4; 16-13 at 4).  He later states that "[b]ecause the [DOL] has rushed this rule into effect with only [thirty] days of lead-time and virtually zero guidance, our members are being required to make difficult decisions about eliminating positions or filing multiple applications for the same general harvesting activities."  (Docs. 1-7 at 5–6; 16-13 at 5–6).

At the hearing, the Defendants essentially acknowledged that ATP Groves "might be affected" by the implementation of the 2023 Rule within the relevant time frame and that this fact alone would be sufficient to resolve the standing issue "at least for the purposes of . . . the APA analysis."  (Doc. 40 at 107).[15]  Even were that not the case, as pointed out earlier, courts have found standing "self-evident" where plaintiffs are "representatives of . . . regulated parties."  *Am. Sec. Ass'n*, 2023 WL 1967573, at *8. Again, the Defendants do not reference this decisional law, nor do they show that it does not apply to FFVA (or to any of the other associational plaintiffs for that matter).

---

[15] In their brief, Amici also conceded in the context of their irreparable harm argument that ATP Groves faced at least a "marginal[ ] increase [in its] labor costs" beginning in July 2023 due to the new AEWR methodology.  (Doc. 33 at 13).

That the increased labor cost ATP Groves will experience is—as characterized by Amici—only a "marginal[ ]" one is no moment to the standing analysis.  (Doc. 33 at 13).  The Eleventh Circuit has observed that a plaintiff can establish the requisite injury in fact by showing "'very nearly *any level* of direct injury."  *Toste v. Beach Club at Fontainebleau Park Condo. Ass'n, Inc.*, 2022 WL 4091738, at *3 (11th Cir. 2022) (per curiam) (emphasis added) (quoting *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 927 (11th Cir. 2020) (en banc)); *see also Salcedo v. Hanna*, 936 F.3d 1162, 1167 (11th Cir. 2019) ("A concrete injury need be only an 'identifiable trifle.'") (quoting *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 689 n.14 (1973)).

In short, the attestations made by Joyner in his declaration sufficiently demonstrate that the harm the 2023 Rule posed to FFVA's members at the time the complaint was filed was "certainly impending" or, at the very least, that there was "a substantial risk" one or more of its members—including ATP Groves—would suffer the requisite injury in fact from the rule's implementation.  *See Driehaus*, 573 U.S. at 158; *New York*, 139 S. Ct. at 2565; *Davis*, 554 U.S. at 734; *Babbitt*, 442 U.S. at 298; *Becerra*, 544 F. Supp. 3d at 1252.

The cases the Defendants cite in support of their standing challenge—*Whitmore v. Arkansas*, 495 U.S. 149 (1990) and *Garcia v. Acosta*, 393 F. Supp. 3d 93 (D.D.C. 2019)—are inapposite.  *See* (Docs. 42 at 6; 52 at 14).  In *Whitmore*, the Supreme Court was faced with the question as to whether a third party had standing to contest the validity of a death sentence imposed on a capital defendant who elected to forgo his

right of appeal to the State Supreme Court.  495 U.S. at 151.  In the answering this question in the negative, the Court distinguished its decision in *United States v. SCRAP*, 412 U.S. 669 (1973).  In *SCRAP*, the Court ruled that an environmental group had standing to challenge the Interstate Commerce Commission's (ICC) approval of a surcharge on railroad freight rates based on the group's claim "that the adverse environmental impact of the ICC's action on the Washington metropolitan area would cause the group's members to suffer economic, recreational and aesthetic harm."  *Id*. at 158–59 (internal quotation marks and citation omitted); *see SCRAP*, 412 U.S. at 678, 683–84.  The Court in *Whitmore* noted that, in *SCRAP*, it found it enough to defeat a motion to dismiss that the group alleged that "a general rate increase would . . . cause increased use of nonrecyclable commodities as compared to recyclable goods, thus resulting in the need to use more natural resources to produce such goods, some of which resources might be taken from the Washington area, and resulting in more refuse that might be discarded in national parks in the Washington area."  *Whitmore*, 495 U.S. at 159.  The *Whitmore* Court found the injury alleged in *SCRAP* to be different than the one before it because there was "no amount of evidence that potentially could establish that Whitmore's asserted future injury [was] real and immediate."  *Id*. at 160 (internal quotation marks and citation omitted).  The Court's decision in *Whitmore* is of no help to the Defendants here.

In *Garcia*, the plaintiffs—four agricultural workers and a farmworkers labor union—claimed that the DOL had improperly adopted a policy and practice of certifying employers to hire H-2A workers at wages lower than the applicable

prevailing wages and that the DOL had wrongly granted five specific certifications. 393 F. Supp. 3d at 99.  As pertinent here, the court dismissed the plaintiffs' wrongful certification claims at the defendants' request, noting that those claims were moot since the "specific certifications at issue ha[d] expired" and that the court therefore could not "provide any meaningful relief with respect to [them]." *Id.* at 103.  The court rejected the plaintiffs' contention that these claims were still justiciable under the "capable-of-repetition-yet-evading-review" doctrine, which is triggered when (1) the duration of the challenged action is "too short to be fully litigated prior to cessation or expiration," and (2) "there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." *Id.* at 103–04 (internal quotation marks and citation omitted).  The court found that the plaintiffs could not invoke this doctrine because they delayed the disposition of the lawsuit. *Id.* at 104.  The court observed in this respect that rather than make a "full attempt" to obtain timely review of their wrongful certification claims, the plaintiffs waited more than six months to file suit and additionally "never moved for preliminary relief and never requested expedited briefing." *Id.*  The court's mootness determination in *Garcia* has no application to the standing inquiry here.

The Defendants' remaining contention that the Plaintiffs' claims are not ripe (Doc. 52 at 3) fails as well.  "Ripeness, like standing, 'present[s] the threshold jurisdictional question of whether a court may consider the merits of a dispute.'" *S. Grande View Dev. Co., Inc. v. City of Alabaster*, 1 F.4th 1299, 1305 (11th Cir. 2021) (quoting *Elend v. Basham*, 471 F.3d 1199, 1204 (11th Cir. 2006)).  Ripeness "keeps

federal courts from deciding cases prematurely" and "protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." *Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1227 (11th Cir. 2006) (citations omitted).

Although ripeness and standing are intertwined, the two concepts are different. Ripeness "asks whether a case is ready (i.e., 'ripe') for entertaining, while standing focuses on the parties themselves, asking whether they are the right persons to bring the suit." *Eternal Word Television Network, Inc. v. Sebelius*, 935 F. Supp. 2d 1196, 1220 (N.D. Ala. 2013) (citing *Wilderness Soc. v. Alcock*, 83 F.3d 386, 390 (11th Cir. 1996)).

To determine ripeness, courts evaluate "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1380 (11th Cir. 2019) (internal quotation marks and citations omitted). Regarding the first prong, courts inquire as to "whether the parties [have] raise[d] an issue that [the courts] can decide without further factual development and whether the institutional interests of the court and agency favor immediate review." *Id.* (citing *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1258 (11th Cir. 2010); *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir. 1995)). And with respect to the second prong, "litigants must show that they are 'forced to choose between foregoing lawful activity and risking substantial legal sanctions.'" *Id.* (quoting *Cheffer*, 55 F.3d at 1524). If courts determine that "a claim is fit for judicial decision, that is end of the inquiry, and the matter is ripe, given that the absence of a 'hardship' 'cannot

tip the balance against judicial review' under such circumstances." *Id.* (quoting *Harrell*, 608 F.3d at 1259).

The Defendants do not reference the above multi-pronged analysis, much less apply it to the particular facts of this case. Instead, they aver only in conclusory fashion that the Plaintiffs' claims are not ripe since they were brought before the next growing season starts at this time of the year. (Doc. 52 at 3). This perfunctory argument is facially insufficient and constitutes a waiver on the issue. *See Harner v. Soc. Sec. Admin., Comm'r*, 38 F.4th 892, 899 (11th Cir. 2022) (deeming an issue to be forfeited because it was "raise[d] . . . in a perfunctory manner without supporting arguments and authority") (internal quotation marks and citation omitted); *Battle v. Comm'r, Soc. Sec. Admin.*, 787 F. App'x 686, 687 (11th Cir. 2019) (per curiam) ("Issues raised in a perfunctory manner . . . are generally deemed to be waived.") (internal quotation marks and citation omitted). Even were the Defendants not to have waived this claim, the growing season—as the Defendants acknowledge—is now upon us, rendering the Plaintiffs' claims ripe in any event. *Progressive Mountain Ins. Co. v. Middlebrooks*, 805 F. App'x 731, 734 (11th Cir. 2020) (noting that subsequent events during the district court proceeding "may be able to ripen a case or controversy for decision").[16]

In sum, I respectfully recommend that the Court deny the Defendants' motion to dismiss as it relates to their standing and ripeness challenges on the grounds that at

---

[16] The Eleventh Circuit's opinion in *Middlebrooks* pointed to a possible intra-circuit conflict as to whether a complaint must be ripe at the time it is filed or whether ripeness may occur later. 805 F. App'x at 734–35. As this matter has not been properly briefed by the parties and has, in fact, been waived by the Defendants, I do not attempt to resolve any such conflict here.

least one of the Plaintiffs—namely, Franberry, G&F, and/or FFVA—properly establishes that it had standing at the time this lawsuit was initiated and that the Defendants' ripeness argument is fatally deficient.  Based upon this recommendation, I need not address whether the remaining Plaintiffs demonstrate that they had standing at the inception of this action as well.

B.

As noted above, the Defendants also seek dismissal of the Plaintiffs' RFA claim pursuant Rule 12(b)(6).  (Doc. 52 at 4, 18–21).  This request has merit.

To survive a motion to dismiss under Rule 12(b)(6), a claimant must aver "'sufficient factual matter . . . to state a claim to relief that is plausible on its face.'" *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), *cert. denied*, 139 S. Ct. 807 (2019).  This requirement ensures that the defendant is afforded "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  When reviewing a motion to dismiss under Rule 12(b)(6), a court must generally accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in the plaintiff's favor.  *See Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration All.*, 304 F.3d 1076, 1081 (11th Cir. 2002).  A court, however, must limit its review "to the four corners of the complaint."  *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002).

The RFA, as amended by Title II of Public Law 104-121, the Small Business Regulatory Enforcement Fairness Act (SBREFA), mandates that federal agencies

38

consider the potential impact of their rules on small entities. 5 U.S.C. §§ 601 *et seq.* The Plaintiffs' RFA claim is predicated upon section 603 of the Act.  (Doc. 1 at 30–34).   As relevant here, that provision—titled "Initial [R]egulatory [F]lexibility [A]nalysis"—directs that an agency required "to publish general notice of proposed rulemaking for any proposed rule . . . [must] prepare and make available for public comment an initial regulatory flexibility analysis." 5 U.S.C. § 603(a).  Of significance to the Defendants' motion to dismiss, this initial regulatory flexibility analysis must "contain a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities." *Id.* § 603(c).

In their RFA claim, the Plaintiffs specifically reference section 603 and describe the options that the DOL allegedly did and did not consider.  (Doc. 1 at 30–34).  The Plaintiffs additionally assert at the end of their RFA claim that "[b]y failing to accurately measure cost or consider significant alternatives, or even meaningfully attempting to do either, the [DOL] has acted in violation of the [RFA]" and that, as a result, the DOL must be "enjoined from enforcing any part of the [2023] Rule." (Doc. 1 at 34).  The Plaintiffs likewise cite section 603 as the basis for their RFA count in their preliminary injunction motion.  *See* (Doc. 16 at 19) (describing the strictures of the RFA and citing 5 U.S.C. § 603).

The Defendants contend that the Plaintiffs' RFA count is subject to dismissal because section 611 of the Act limits judicial review to claims pertaining to agency compliance with certain provisions of the Act other than section 603.  *See* (Docs. 52 at

18–19; 22 at 16); *see also* 5 U.S.C. § 611(a)(1), (c); *Coastal Conservation Ass'n v. Locke*, 2011 WL 4530631, at *8 (M.D. Fla. Aug. 16, 2011) ("In SBREFA, Congress limited judicial review of alleged violations of the RFA to claims regarding 'agency compliance with the requirements of sections 601, 604, 605(b), 608(b), and 610. . . .'") (citing 5 U.S.C. § 611(a)(1)), *report and recommendation adopted*, 2011 WL 4530544 (M.D. Fla. Sept. 29, 2011); *Allied Loc. & Reg'l Mfrs. Caucus v. U.S. E.P.A.*, 215 F.3d 61, 78–79 (D.C. Cir. 2000) (finding that the court was without jurisdiction to consider challenges to an agency's "compliance with the initial regulatory flexibility analysis requirements of section 603" since the judicial review provision—i.e., section 611(a)— omits section 603 from the list of provisions subject to judicial review under the RFA). As such, the Defendants assert that the Plaintiffs' RFA claim is jurisdictionally infirm. (Docs. 52 at 18–19; 22 at 16).

The Plaintiffs counter that they now wish to ground their RFA claim on section 604, which is titled "Final [R]egulatory [F]lexibility [A]nalysis." (Doc. 53 at 11 & n.4). The Plaintiffs express the same desire in their supplemental briefing relative to their preliminary injunction motion. (Doc. 43 at 5–8).

The Plaintiffs' effort to rewrite their RFA count to evade dismissal is unavailing. Even construing the Plaintiffs' allegations in their complaint liberally, a fair reading of their RFA claim is that it is based on section 603, not section 604. Indeed, the Plaintiffs do not refer to section 604 anywhere in their RFA count, their complaint, or even their motion for a preliminary injunction. *See Zen Grp., Inc. v. Agency for Health Care Admin.*, 80 F.4th 1319, 1334 (11th Cir. 2023) ("'[A] court's duty to liberally construe a

plaintiff's complaint in the face of a motion to dismiss is not the equivalent of a duty to re-write it for [the plaintiff].'") (quoting *Peterson v. Atlanta Hous. Auth.*, 998 F.2d 904, 912 (11th Cir. 1993)).  Allowing the Plaintiffs to proceed under section 604 at this point would therefore deprive the Defendants of "fair notice of what the . . . claim is and the grounds upon which it rests."  *Twombly*, 550 U.S. at 555; *see also Beckwith v. Bellsouth Telecomms. Inc.*, 146 F. App'x 368, 371 (11th Cir. 2005) (stating that a plaintiff must "identify claims with sufficient clarity to enable the defendant to frame a responsive pleading").

Contrary to the Plaintiffs' assertion (Doc. 43 at 5), the mere fact that they styled their RFA claim "as being under 5 U.S.C. § 601, *et seq*." does not cure this jurisdictional defect.  *See Binch v. PNC Bank, N.A.*, 2023 WL 2775980, at *2 (M.D. Fla. Mar. 8, 2023) (deeming a complaint to be deficient where it relied upon the entirety of a statute, "without specifying which subsections warrant[ed] relief," thereby precluding the court from "adequately assess[ing] the sufficiency of the pleading"), *report and recommendation adopted*, 2023 WL 2771299 (M.D. Fla. Apr. 4, 2023); *Skipper v. MEB Loan Trust IV*, 2021 WL 8314397, at *3 (N.D. Ga. Sept. 14, 2021) (same), *report and recommendation adopted*, 2021 WL 8314547 (N.D. Ga. Oct. 14, 2021).  This is especially true since section 603 and section 604 are materially different.  As mentioned above, section 603 relates to the DOL's *initial* regulatory flexibility analysis and is not subject to judicial review, while section 604 pertains to the DOL's *final* regulatory flexibility analysis and is subject to judicial review. 5 U.S.C. §§ 603, 604.  Nor can the Plaintiffs

rectify this error by attempting to amend their RFA count through their post-complaint legal memoranda.  *See Delia v. NewRez, LLC*, 2023 WL 3857438, at *2 n.2 (M.D. Fla. May 3, 2023) ("'[A] plaintiff cannot amend a complaint through arguments in briefs.'") (quoting *Henderson v. McMurray*, 611 F. Supp. 3d 1287, 1295 (N.D. Ala. 2020)); *Thompson v. Alabama*, 2017 WL 3223915, at *8 (M.D. Ala. July 28, 2017) ("[A]dding . . . claims[ ] in briefs circumvents the letter and spirit of the orderly procedures established by the Federal Rules of Civil Procedure for the efficient administration of a lawsuit"); *Hernandez v. King Ocean Servs. Ltd. (Cayman Islands) Inc.*, 2022 WL 2578652, at *4 n.7 (S.D. Fla. July 6, 2022) ("[A p]laintiff may not use a brief to amend his complaint.") (citation omitted).

    In sum, I recommend that the Court dismiss the Plaintiffs' RFA claim, albeit without prejudice so the Plaintiffs have an opportunity to amend it.  In light of this finding, the Court need not resolve the more involved question as to whether a RFA claim brought by the Plaintiffs pursuant to section 604 would survive the Defendants' motion to dismiss.[17]

---

[17] I note only at this preliminary juncture that it is not clear such a cause of action would be sustainable given the current allegations in the Plaintiffs' complaint.  By way of example, judicial review under section 604 is confined solely to "small entit[ies]."  *See* 5 U.S.C. § 611(a)(1); *see also Nw. Min. Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 13 (D.D.C. 1998) (quoting 5 U.S.C. § 611(a)(1)); *Alabama v. Ctrs. For Medicare & Medicaid Servs.*, 2010 WL 1268090, at *7 (M.D. Ala. Mar. 30, 2010).  The RFA defines a "small entity" as a "small business," "small organization," or "small governmental jurisdiction."  5 U.S.C. § 601(6).  The RFA additionally directs that "small business" has the same meaning as "small business concern" under section 3 of the Small Business Act, which is defined as a farming enterprise that "is independently owned and operated and [that] is not dominant in its field of operation."  5 U.S.C. § 601(3); Small Business Act § 3, 15 U.S.C. § 632.  And the RFA defines a "small organization" as "any not-for-profit enterprise which is independently owned and operated and which is not dominant in its field."  5 U.S.C. § 601(4).

III.

With the Defendants' motion to dismiss resolved, I turn to the Plaintiffs' motion for a preliminary injunction.  (Doc. 16).  I start with the legal framework governing such motions.

A.

A preliminary injunction—as the Supreme Court and other courts have often emphasized—is "an extraordinary and drastic remedy."  *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (internal quotation marks and citation omitted); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.") (citation omitted).  Designed to preserve the status quo until a final determination on the merits can be achieved, *Univ. of Tex. v. Camenisch*,

---

I cannot readily discern from the Plaintiffs' complaint that they have averred sufficient facts establishing they fall into one or more of these categories. *See W. Wood Preservers Inst. v. McHugh*, 925 F. Supp. 2d 63, 75 (D.D.C. 2013) (dismissing an RFA claim where the plaintiffs did not assert in their complaint that "they themselves [were] small entities covered by the RFA"); *Fla. Health Scis. Ctr., Inc. v. Becerra*, 2021 WL 2823104, at *13 (D.D.C. July 7, 2021) (noting that "while [the p]laintiffs claim in their papers to fall within the [RFA's] bounds, this is not the same as actually making the showing that they are small entities for the purposes of [the Act]").  Rather than address this question with the specificity it demands, the Plaintiffs offer only that they are composed of "family-owned strawberry farms," "a Florida not-for-profit corporation," "a national association . . . focusing exclusively on agricultural labor issues from the agricultural employer's viewpoint," an incorporation "serving Florida's grower-shipper community," and "Florida's largest citrus grower organization."  (Doc. 43 at 7) (citing Doc. 1 at ¶¶ 17–22). This general description appears inadequate, as it fails to demonstrate, among other things, that the Plaintiffs meet the requirement that they are "not dominant in [their] field."  5 U.S.C. §§ 601(3), (4); 15 U.S.C. § 632.  Indeed, if anything, the allegations they do include in their complaint suggest the opposite, at least for some of them. *See, e.g.*, (Doc. 1 at 11–13) (indicating that the NCAE, FFVA, and FCM are "dominant in [their] field").

Nor do I find helpful the one case that the Plaintiffs cite, *Southern Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411, 1415, 1434–37 (M.D. Fla. 1998).  That case involved a lawsuit brought by "a coalition of shark fishermen and shark fishing organizations" and, although it addressed an RFA claim, it does not seem to have much bearing on the facts of this case.

451 U.S. 390, 395 (1981), preliminary injunctions are the exception, not the rule, *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003) (citing *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975)).

To prevail on a motion for a preliminary injunction, the movant must "clearly establish[ ]" that (1) it has "a substantial likelihood of success on the merits;" (2) it will suffer "irreparable injury" unless the injunction issues; (3) "the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party;" and (4) "if issued, the injunction would not be adverse to the public interest." *Four Seasons Hotels & Resorts, B.V.*, 320 F.3d at 1210 (citations omitted). The first of these factors "is generally the most important." *Dream Defenders v. Governor of the State of Fla.*, 57 F.4th 879, 889 (11th Cir. 2023) (citation omitted). A movant, however, bears the burden of persuasion as to all four requirements, *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (per curiam) (citations omitted); *Ne. Fla. Ch. of Ass'n of Gen. Contrs. of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (citations omitted), and its failure to establish any one of the four necessitates a denial of its motion, *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (noting that the failure to meet even one of the four prerequisites for a preliminary injunction "dooms" such a request) (citation omitted).

In deciding whether the movant has met its burden, "a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives

of the injunctive proceeding." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (internal quotation marks and citation omitted); *see also Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1171 (11th Cir. 2002) ("Preliminary injunctions are, by their nature, products of an expedited process often based upon an underdeveloped and incomplete evidentiary record.") (citation omitted).   In the end, a district court has discretion to grant or deny a preliminary injunction, and its determination will be upheld on appeal unless it amounts to a clear abuse of that discretion.  *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1307 (11th Cir. 2010) (citation omitted).  Indeed, appellate review of a court's ruling on a preliminary injunction request is "exceedingly narrow" and "deferential" because "a district court often must make difficult judgments about the viability of a plaintiff's claims based on a limited record."  *Wreal, LLC*, 840 F.3d at 1248 (citations omitted).  As a result, not only does a movant face a "tough road in establishing [the] four prerequisites to obtain a preliminary injunction in the first instance, but, on appeal, [the movant] must also overcome the steep hurdles of showing that the district court clearly abused its discretion in its consideration of each of the four prerequisites."  *Id.* (citation omitted).

## B.

With respect to the substantial likelihood of success on the merits prong, the Plaintiffs' first claim is that the DOL's promulgation of the 2023 Rule exceeded its statutory authority under the INA and thus violated the APA. (Doc. 16 at 13–16). The Plaintiffs ground this ultra vires claim on their contention that the 2023 Rule impermissibly sets wages as a means of attracting U.S. workers to engage in the

agricultural work conducted by H-2A laborers, rather than to prevent an adverse effect on the pay of similarly employed U.S. workers.  (Doc. 16 at 15) (averring that the 2023 Rule improperly and illegally "sets wages to be attractive and to maximize earnings"). The Plaintiffs assert, for example, that the 2023 Rule's use of OEWS data for occupations not covered by the FLS effectively incentivizes U.S. workers to take on farm work since some AEWRs are now based on more highly paid non-agricultural occupations.  *Id.*  The Plaintiffs additionally rest their APA claim on the 2023 Rule's requirement that the highest AEWR be applied to job opportunities which include a "mix of duties" falling both inside and outside of the FLS combined field and livestock workers category.  *Id.*

The APA provides for judicial review of final agency decisions and authorizes courts to set aside an agency action if that action is, *inter alia*, arbitrary or capricious or "otherwise not in accordance with law."  5 U.S.C. §§ 702, 704, 706(2)(A).  An agency action is deemed to be arbitrary and capricious where the agency: (1) "relied on factors which Congress has not intended it to consider;" (2) "entirely failed to consider an important aspect of the problem;" or (3) "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1254 (11th Cir. 2007) (citation omitted).

Review under the APA, however, "is exceedingly deferential" and is restricted "to ensur[ing] that the agency came to a rational conclusion."  *Sierra Club v. Van*

*Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (quotation and citations omitted). Accordingly, a court may overturn an agency action only if it falls outside the "zone of reasonableness." *Jaxma Greenhouses, Inc. v. Vilsack*, 2022 WL 4229336, at *4 (M.D. Fla. July 11, 2022), *report and recommendation adopted*, 2022 WL 3054011 (M.D. Fla. Aug. 3, 2022).

In this case, the Plaintiffs do not clearly establish that they are likely to succeed on their argument that the DOL exceeded its authority in promulgating the 2023 Rule. While it is true that the DOL may not employ the AEWR to entice U.S. workers into assuming positions occupied by H-2A workers, *Williams v. Usery*, 531 F.2d 305, 306–07 (5th Cir. 1976), the Plaintiffs fail to tender sufficient evidence showing that the DOL is using the 2023 Rule to accomplish such a goal.

To the contrary, the DOL makes clear in the 2023 Rule that its modification of the AEWR methodology is intended to effectuate Congress's directive that it "balance the competing goals of the [INA by] providing an adequate labor supply and protecting the jobs of domestic workers," *Dole*, 923 F.2d at 187, in a manner that allows for the sound and efficient administration of the H-2A program, 88 Fed. Reg. at 12761, 12777. The DOL maintains that the utilization of the OEWS data advances these objectives because it is the "next best alternative" for the field and livestock workers (combined) category where FLS data is unavailable and because it is a better wage source than the FLS for H-2A job opportunities which fall outside that category.  *See* 88 Fed. Reg. at 12769–72.  As the DOL explained in the 2023 Rule:

While the FLS is the most accurate and comprehensive wage source to determine the AEWRs for the field and livestock workers (combined) occupational group, the OEWS survey is a more accurate data source for other SOC codes common in agricultural operations, such as supervisors, that the FLS does not adequately or consistently survey . . . . In addition, the OEWS survey includes SOC codes that are more often contracted-for services (e.g., construction supporting farm production) than farmer-employed positions, which makes the OEWS data collection from farm labor contractors a more direct, relevant data source for determining AEWRs for these SOC codes than the FLS.

\* \* \*

In contrast, an AEWR based solely on the field and livestock worker (combined) category wage may have the effect of depressing wages in these other, typically higher-paid [occupational] codes [more often employed by farm labor contractors] because the FLS field and livestock worker (combined) category does not reflect the wages in these [occupational] codes as accurately as the OEWS survey does. *This aspect of the methodology under the 2010 Final Rule did not adequately prevent adverse effects on the wages of such workers in the United States similarly employed, contrary to the [DOL's] statutory mandate.*

88 Fed. Reg. at 12771 (emphasis added); *see also* 88 Fed. Reg. at 12775 ("The methodology in [the 2023 Rule] uses the OEWS to provide appropriate wage increases for many highly skilled workers in positions like construction labor and first-line supervisors, and will better protect the wages of workers in States or regions where the FLS does not provide wage data."); 88 Fed. Reg. at 12770 ("[T]he OEWS survey is a reliable and comprehensive wage survey that consistently produces annual average hourly gross wages for nearly all SOC codes other than the six codes covering the field and livestock workers (combined) occupational category and is, therefore, a better wage source for those other SOC codes [than the FLS].").

The DOL likewise posits that imposing the highest AEWR where a job opportunity encompasses a "variety of duties" both inside and outside of the combined field and livestock workers occupational group helps to shield the wages of similarly employed U.S. workers from being artificially deflated. *See* 88 Fed. Reg. at 12778. As the DOL articulated in the 2023 Rule:

> Where an employer's job opportunity involves a variety of duties, some of which are consistent with higher paid SOC codes in the State, territory, or equivalent area, *the [DOL] would not satisfy its statutory obligation if it were to establish the required wage floor for H-2A employers at a lower rate than the AEWR applicable to workers in the United States who perform work in the higher paid SOC code. An AEWR determined using the lower-paid SOC code does not adequately guard against adverse effect on the wages of workers in the United States similarly employed*.

*See* 88 Fed. Reg. at 12778 (emphasis added); *see also* 88 Fed. Reg. at 12776–77 (stating that for "H-2A job opportunities [which] include duties that fall both within and outside of th[e field and livestock workers (combined)] category, . . . the [DOL] believes that using the AEWR for the higher paid SOC code is necessary to prevent adverse effects on the wages of workers in the United States similarly employed resulting from inaccurate SOC code assignment").

These statements by the DOL bolster its position that its revision of the AEWR methodology is tethered to its statutory mandate to prevent the reduction of the wages of similarly employed U.S. workers. *See* 88 Fed. Reg. at 12761, 12765, 12768–72. The Plaintiffs' contention that the DOL should have adopted an approach more to the Plaintiffs' liking amounts to "a policy disagreement with [the DOL]," *USA Farm Labor*

*Inc.*, 2023 WL 6283333, at *9, not a meaningful argument that the DOL transgressed the limits imposed upon it by Congress.  Since the Plaintiffs do not clearly demonstrate that the DOL acted outside the bounds of its delegated authority in promulgating the 2023 Rule, the Plaintiffs' effort to secure a preliminary injunction based upon their ultra vires claim fails.

The Plaintiffs' next contention under the substantial likelihood of success prong is that the DOL's 2023 Rule violates the APA because it is arbitrary and capricious. This argument too is wanting.  (Doc. 16 at 16–19).

In reviewing an agency's construction of a statute it administers, courts apply the two-part analysis set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984).  *See Autauga Cnty. Emergency Mgmt. Comm. Dist. v. FCC*, 17 F.4th 88, 98 (11th Cir. 2021) (citing *Nat'l Ass'n of State Util. Consumer Advocs.*, 457 F.3d 1238, 1253 (11th Cir. 2006)).  The first component of this test requires a court to evaluate:

> whether Congress has spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.  But if, after employing all the traditional tools of statutory construction, the statute remains genuinely ambiguous on the specific issue, [a court must] proceed to *Chevron*'s second step.

*Id.* (quoting *Chevron*, 467 U.S. at 842–43, 482 n.9 and citing *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (internal quotation marks omitted)).

The second part tasks a court with assessing whether "the agency's interpretation of the statute is reasonable"—that is, whether the interpretation is

"rational and consistent with the statute."  *In re Gateway Radiology Consults. P.A.*, 983

F.3d 1239, 1256 (11th Cir. 2020) (citing *Friends of the Everglades v. S. Fla. Water Mgmt.*

*Dist.*, 570 F.3d 1210, 1227–28 (11th Cir. 2009)).[18]  In rendering this determination:

> [A court] may not substitute [its] own construction of a statutory
> provision for a reasonable interpretation made by the administrator of an
> agency.  *Chevron* requires a federal court to accept the agency's reasonable
> interpretation of the statute, even if the agency's reading differs from
> what the court believes is the best statutory interpretation.   When
> Congress intends to accommodate competing interests but does not do
> so with enough specificity in the statute, [a court must] defer to an
> agency's interpretation [that] represents a reasonable accommodation of
> manifestly competing interests.

*Id.* (internal quotation marks omitted) (quoting *Chevron*, 467 U.S. at 865; *Regions Bank*

*v. Legal Outsource PA*, 936 F.3d 1184, 1190 (11th Cir. 2019); *Friends of the Everglades*,

570 F.3d at 1219, 1221)).  Further, "[t]he degree of deference [afforded the agency] is

especially great in [the area of] immigration."  *Mazariegos v. Off. of U.S. Att'y Gen.*, 241

F.3d 1320, 1327 n.4 (11th Cir. 2001) (citation omitted).

The first part of the *Chevron* test is met here because the INA is silent as to how

the AEWR should be calculated.  *See Am. Fed'n of Lab. & Cong. of Indus. Orgs.*, 835 F.2d

at 915; *Dole*, 923 F.2d at 184.  It states only that the employment of foreign workers

should not "*adversely affect* the wages and working conditions of workers in the United

States *similarly employed*" without defining the phrases "adversely affect" or "similarly

---

[18] *Chevron*'s second prong is "functionally equivalent to . . . arbitrary and capricious review under the
APA."  *Nat'l Min. Ass'n v. Sec'y, U.S. Dep't of Labor*, 812 F.3d 843, 865 n.23 (11th Cir. 2016) (citing
*Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011)).

situated."  8 U.S.C. § 1188(a)(1)(A)–(B) (emphasis added).  Instead, it leaves to the DOL's "discretion how to ensure that the importation of farmworkers [meets] the statutory requirements."  *Dole*, 923 F.2d at 184; *see also Solis*, 697 F. Supp. at 9.

In an attempt to satisfy the second part of the *Chevron* test, the Plaintiffs argue that the 2023 Rule is irrational and conflicts with the INA insofar as it (1) "insist[s]" on using "non-farm wage surveys" (i.e., the OEWS survey) to "dictate on-farm wages;" (2) "impose[s an] absolutist approach to wage-setting" (i.e., ignores the "primary" or "main" duty of work being conducted and requires that the highest AEWR controls); and (3) unfairly applies retroactively to contracts certified before the 2023 Rule took effect.  (Doc. 16 at 16–19); *see also* (Doc. 43 at 3–5).  These contentions do not survive scrutiny.

### 1.    *DOL's Purported Use of "Non-Farm" Wages*

In analyzing the Plaintiffs' first claim, it is important to highlight at the outset the relative infrequency with which the DOL expects that OEWS data will come into play under the 2023 Rule.  *See, e.g.*, 88 Fed. Reg. at 12766.  This is because the DOL's modified AEWR methodology does not alter how the AEWR is determined for the six occupational codes within the field and livestock workers (combined) category, which compose most of the H-2A jobs opportunities.  *Id.*  As the DOL stated in the 2023 Rule:

> Based on the [DOL's] program estimates, 98 percent of H-2A job opportunities are classified within the[ ] six SOC titles and codes [comprising the FLS field and livestock workers (combined) category]. The [DOL] acknowledges that some of the job opportunities within that

98 percent may involve some work that cannot be classified solely within the field and livestock workers (combined) occupational group and, instead, constitutes a combination of job duties covering multiple SOC codes subject to different AEWRs under the proposed methodology. However, . . . *the [DOL] anticipates the AEWRs established for the vast majority of H-2A job opportunities will not change under this final rule, and will impact H-2A wage requirements only for: (1) the small percentage of job opportunities that cannot be encompassed within the six SOC codes and titles in the FLS field and livestock workers (combined) reporting category, and (2) the small number of field and livestock workers (combined) job opportunities in States or regions, or equivalent districts or territories, for which the FLS does not report a wage (e.g., Alaska and Puerto Rico).*

*Id.* (emphasis added); *see also* 88 Fed. Reg. at 12775 (noting that "[b]ased on program experience, . . . the [DOL] estimates that approximately 98 percent of H-2A job opportunities will experience no change in assigned SOC code, wage source, or AEWR adjustment cycle under th[e 2023 Rule]"); 88 Fed. Reg. at 12781 ("[T]he [DOL] believes that the vast majority of job opportunities [under the 2023 Rule] will continue to be covered by the six field and livestock workers (combined) SOC codes[,] . . . [which] are quite broad, both individually and as a grouping"). Indeed, the DOL emphasized in the 2023 Rule that it would be the "*rare* circumstance[ ]" where "a job opportunity [would] require[ ] workers under the job order or work contract to perform not only field and livestock workers (combined) category duties . . . , but also duties from another SOC code . . . for which the OEWS-based AEWR m[ight] be higher." 88 Fed. Reg. at 12775 (emphasis added); *see also id.* (advising that "the incidence of H-2A job opportunities that are assigned multiple SOC codes and subject to two different AEWR adjustment cycles is expected to be rare, and

that the vast majority of H-2A job opportunities will continue to be subject only to FLS-based AEWR adjustment").

Regardless of the limited impact the OEWS data is expected to have on wage rates, the DOL provided a number of justifications for its reliance on such data.  As relevant to the Plaintiffs' first claim that this data pertains only to "non-farm" wages, the DOL rejected that very same argument in promulgating the 2023 Rule on the grounds that there was a sufficient link between the OEWS survey and the agricultural industry given the purpose of the AEWR.  *See* 88 Fed. Reg. at 12769–72.  The DOL reasoned:

> Some . . . commenters generally opposed use of the OEWS to establish the AEWR or set a wage floor for primarily agricultural operations, while others expressed concern that use of the OEWS in these cases may disconnect the AEWR from actual market wages paid to workers employed on farms because the OEWS does not survey farms and ranches.  The [DOL] appreciates the concerns of the commenters, but maintains that the OEWS is the best available alternative source of wage data to use to determine the AEWR for the field and livestock worker (combined) category if the FLS is not available.  Aside from the FLS, the *OEWS survey is the only comprehensive and statistically valid source of wage data for agricultural occupations* and geographic areas common in the H-2A program.  The OEWS is also the wage source most consistent with the SOC-based wage collection of the FLS.  *Within the agricultural sector of the U.S. economy, the OEWS survey collects employment and hourly gross wage data from farm labor contractors that support fixed-site agricultural employers. Although the OEWS survey does not collect data from such fixed-site agricultural employers, the farm labor contractors surveyed by OEWS employ workers to provide agricultural labor or services similar to that of workers employed by fixed-site agricultural employers.  In addition, farm labor contractors participate in the H-2A program and represent an increasing share of the H-2A worker positions certified by the [DOL].*

88 Fed. Reg. at 12769–70 (emphasis added); *see also* 88 Fed. Reg. at 12771 (stating that "whereas in 2010 H-2A Labor Contractors . . . comprised a much smaller percentage of participants in the H-2A program, [such contractors'] participation has grown in recent years, which supports using OEWS wage data collected from farm labor contractors who employ workers to perform duties not covered by the six field and livestock workers (combined) category [occupational] codes, as an appropriate source of actual market wages in agriculture to determine the AEWR for these [occupational] codes"); 88 Fed. Reg. at 12777 ("[A]pplying th[e] AEWR [for the field and livestock workers (combined) category] to other SOC codes would not satisfy the [DOL's] objective to strike[ ] a reasonable balance between the statute's competing goals of providing employers with an adequate supply of legal agricultural labor and protecting the wages and working conditions of workers in the United States similarly employed [because] . . . such an approach [for other SOC codes] would not use actual wage data for workers similarly employed to determine the AEWR.").

Another closely related and pertinent rationale the DOL offered in the 2023 Rule for employing OEWS data is that this data better represents the proper compensation to be paid for certain jobs outside the FLS field and livestock workers (combined) occupational group.  88 Fed. Reg. at 12771. That is, as referenced above, the OEWS survey more accurately reflects the wages in the "typically higher-paid SOC codes" that are not part of the combined field and livestock worker category.  *Id*. The DOL explained:

> While the FLS is the most accurate and comprehensive wage source to
> determine the AEWRs for the field and livestock workers (combined)
> occupational group, *the OEWS survey is a more accurate data source for other*
> *SOC codes common in agricultural operations, such as supervisors, that the FLS*
> *does not adequately or consistently survey* . . . .  In addition, the OEWS survey
> includes SOC codes that are more often contracted-for services (e.g.,
> construction supporting farm production) than farmer-employed
> positions, *which makes the OEWS data collection from farm labor contractors a*
> *more direct, relevant data source for determining AEWRs for these SOC codes*
> *than the FLS*.

*Id.* (emphasis added); *see also* 88 Fed. Reg. at 12772 (noting that to the extent "the
revised methodology may result in some AEWR increases in those SOC codes for
which the [DOL] will use the OEWS survey, . . . [t]hese changes . . . would be the
result of the [DOL's] use of more accurate occupational data that better reflect[s] the
actual wage paid, and thus better protect against adverse effect").[19]

The Plaintiffs do not make an adequate showing in their motion that the DOL's
reasons for utilizing OEWS data in the delimited manner outlined in the 2023 Rule
are illogical or inconsistent with the INA.  As evidenced by the DOL's statements in
the 2023 Rule, it chose to adopt OEWS-based AEWRs only for those discrete
situations where FLS data is unavailable or where the DOL deemed the OEWS to
contain more accurate data, thereby allowing it to better fulfill its statutory mandate

---

[19] These are not the only justifications the DOL provided for utilizing OEWS data in the above-
described circumstances.  The DOL also cited its concern that there could "be future instances where
FLS data is unavailable to establish an AEWR for at least some workers."  88 Fed. Reg. at 12770.
The DOL noted in this respect that the USDA, not the DOL, has control over the FLS and that the
USDA "could elect to suspend or even terminate the survey at some point" down the road, "as it has
[done] three times previously."  *Id.*  The Plaintiffs do not meaningfully contest this rationale.

to prevent diminished wages.  As also evidenced in the rule itself, the DOL arrived at this conclusion only after a robust consideration of the input it received from various commentators, as well as its own experience in administering the H-2A program. While the Plaintiffs vigorously disagree with the AEWR methodology the DOL selected, they do not show at this juncture that the DOL's decided-upon approach falls outside the broad discretion afforded to it under the APA and *Chevron*.  *See In re Gateway Radiology Consults. P.A.*, 983 F.3d at 1256; *Fla. Fruit & Vegetable Ass'n v. Brock*, 771 F.2d 1455, 1460 (11th Cir. 1985) (per curiam) (stating that DOL has "'broad discretion' to set AEWRs in accordance with 'any of a number of reasonable formulas'") (quoting *Fla. Sugar Cane League, Inc. v. Usery*, 531 F.2d 299, 303–04 (5th Cir. 1976)).

Notably, the court in *USA Farm Labor* reached the same conclusion in addressing a similar argument made by the plaintiffs in that case.  2023 WL 6283333, at *8–9. Akin to the situation here, the plaintiffs in *USA Farm Labor* argued that they were likely to succeed on their APA claim because the DOL purportedly erred in allowing "non-agricultural" wage data to be considered in setting the AEWR.  *Id.* at *8.  Like the rationales offered in the NPRM, the DOL responded, *inter alia*, that "its use of nonagricultural wage data to calculate the AEWR [was] reasonable and [was] a more effective method of accomplishing the statute's goals because it [was] 'designed to eliminate the incongruities embedded within the 2010 AEWR methodology.'"  *Id.* at *8–9 (citation omitted).  The DOL asserted, for example, that "there are certain occupations . . . where the skills, qualifications, and tasks of the occupation are the

same in both an agricultural and nonagricultural context." *Id*. at *8.  The DOL further asserted that if a laborer in one these non-farm jobs is currently working for a nonagricultural employer, his wage will not be factored into the computation of the AEWR for an H-2A worker in the same role, even if the laborer "would be willing and able to work [in that position] for an agricultural employer." *Id*.  The DOL therefore maintained that by not capturing domestic workers in this type of scenario, "the AEWR for H-2A positions that have substantial overlap with nonagricultural positions might be artificially depressed." *Id*.

Following its discussion of the DOL's rationales for utilizing the OEWS in certain circumstances, the court in *USA Farm Labor* found:

> [I]t appears that the [DOL], in its discretion, determined that failing to consider the wages of employees working outside of the agricultural industry—or within the industry and simply not captured by the FLS because they work for contractors—depressed the wages of workers in some occupations. As it is mandated to prevent adverse effects on domestic workers, the [DOL] adopted the [2023] Rule to counter this wage depression.

*Id*. at *9.

2. *DOL's Decision Not to Apply the "Primary" or "Main" Duty Test and to Apply the Highest AEWR*

Perhaps realizing the difficulty of prevailing (at least at this stage) on their challenge to the DOL's utilization of OEWS data at all, the Plaintiffs alternatively assert that the DOL should have confined its reliance on this data by "(1) look[ing] to the 'primary' or 'main' duty of the work to see if the H-2A workers would be 'similarly

employed,' or (2) apply[ing] the specific wage to the specific work that the [DOL] considered to be 'similar' employment, rather than applying the high-water wage [i.e., the highest AEWR rate] to all workers at all times under the contract." (Doc. 16 at 17). The DOL, however, declined to adopt either of these options after they were broached by commentators, determining that they could lead to adverse effects to similarly employed U.S. workers and could also prove administratively burdensome. Specifically, as for the "primary" or "main" duty test, the DOL advised:

> [T]he [DOL] is concerned with how such [an approach] would work in practice. Rather than resulting in more appropriate and consistent AEWR determinations, assigning an SOC code based on the "primary duties" or the percentage of time identified for each duty in an employer's job opportunity description could permit or encourage employers to combine work from various SOC codes, interspersing higher-skilled, higher-paying work among many workers so that the higher-paying work is never a duty performed by any one employee more than the specified percentage. Such an approach would undermine the [DOL's] goals of providing predictability, consistency, and administrative efficiency in AEWR determinations, and of preventing inaccurate SOC code assignment. In addition, such an approach to assigning SOC codes could permit an employer to gain the benefit of work in a higher paid SOC code, while paying less than the AEWR applicable to that work. Ultimately, a "primary duties"-type approach runs a risk of adversely affecting the wages of workers in the United States who are employed in the higher paid SOC code. In addition, implementing the "percentage per duty" disclosure requirement would increase administrative burden for employers (e.g., substantial recordkeeping to ensure that the actual work each worker performed aligns with the percentages disclosed), and potentially restrict fluid movement of workers among all the duties the employer requires in the job opportunity, which was a concern many commenters expressed. The [DOL] believes that the CO's review of the totality of each H-2A job opportunity . . . addresses commenters' concerns regarding consistency and accuracy of SOC code assignment,

without increasing administrative burden, complexity, or risk of inadequate AEWRs.

88 Fed. Reg. at 12781–82.

With respect to the DOL's decision to apply the highest AEWR where there are a mix of duties, the DOL stated:

> Based on the statutory and regulatory framework governing the definition of what constitutes agricultural labor or services, the [DOL's] experience is that a wide range of jobs within the U.S. agricultural economy, depending on the nature and location of work performed, could be eligible under the H-2A visa classification.  Though the vast majority of job opportunities will be classifiable within a relatively small number of SOC codes, the [DOL] has issued H-2A certifications to employers covering jobs classified in dozens of SOC codes, including approximately three dozen in fiscal year 2021 alone.  *Use of the highest applicable wage in these cases reduces the potential for employers to offer and pay workers a wage rate that, while appropriate for the general duties to be performed, is not appropriate for other, more specialized duties the employer requires.*[20]  *In addition, use of the highest applicable wage imposes a lower recordkeeping burden than if the [DOL] permitted employers to pay different AEWRs for job duties falling within different SOC codes on a single [a]pplication. . . .  This policy is also consistent with the way the [DOL] determines prevailing wage rates for jobs that cover multiple SOC codes in other employment-based visa programs.*

*Id*. at 12783 (emphasis added).[21]

---

[20] At the hearing, the government elaborated on the potential for "gamesmanship" by employers in structuring their job orders:

> Th[is] type of gamesmanship . . . is a bigger issue in the agricultural industry now, where you have plaintiffs . . . who are contracting out for everything, filling out these job orders for everything, and they are doing this in a way where they have only one homogenized wage rate that winds up depressing the . . . wage rates for U.S. workers. That's precisely what [the] DOL is supposed to protect against.

(Doc. 40 at 68).

[21] The DOL provided another basis in the 2023 Rule for employing the highest AEWR approach as well.  In particular, it offered that the rule's use of one AEWR for a job opportunity coheres with other

60

In a further attempt to undermine the DOL's justification for employing the highest AEWR rate, the Plaintiffs conjure a situation involving an individual who transports farmworkers to and from their housing (which is presumably not on the farm) and the worksite and who also labors at the worksite.  (Doc. 16 at 8–9).  The Plaintiffs maintain that, under the 2023 Rule, this individual and his fellow workers would all be paid "nearly $20/hr." rather than "from under $17/hr." due to the individual's driving responsibilities.  *Id.* at 9.  The Plaintiffs characterize this result as "shocking" and "absurd."  *Id.*

The Plaintiffs' hypothetical is unpersuasive.  As an initial matter, the task of assigning SOC codes under the 2023 Rule is more nuanced than the Plaintiffs suggest. This is because the rule stipulates that each H-2A opportunity be assessed "on a case-by-case basis considering the totality of the information in an H-2A application and job order."  88 Fed. Reg. at 12780.  As the DOL explained in the rule by way of example:

---

relevant H-2A regulations promulgated under the INA, which refer to "'*the* AEWR' in the singular." 88 Fed. Reg. at 12778 (emphasis added) (citing 20 C.F.R. §§ 655.120(a), (b)(3), (c)(3), and 655.122(l)). As the DOL expounded in the 2023 Rule:

> To address potential confusion, and for conformity, . . . if an employer's H-2A job opportunity were assigned more than one SOC code, and the SOC codes assigned are subject to different AEWR determinations, the highest of the applicable AEWR determinations would be "*the* AEWR" and "*the* updated AEWR" for purposes of the employer's H-2A program wage obligations.  That is, the highest of the AEWRs applicable to the H-2A job opportunity would be "*the* AEWR" in 20 CFR 655.120(c)(3) and 655.122(l) and "*the* updated AEWR" in 20 CFR 655.120(b)(3), which is then compared to the other wage sources (e.g., a prevailing wage determination or State minimum wage) in 20 CFR 655.120(a).

*Id.* (emphasis added).  The Plaintiffs seemingly do not challenge this rationale.

> For job opportunities involving driving duties, . . . the CO will . . . look at factors such as the type of equipment involved (e.g., pickup trucks, custom combine machinery, or semi tractor-trailer trucks; makes and models of machines to be used), the location where the work will be performed (e.g., on a farm or off), and any qualifications and requirements for the job opportunity in order to determine the appropriate SOC code to assign to the employer's job opportunity. Similarly, for job opportunities that involve driving farmworkers from place to place around the farm property during the course of performing hand-harvest work, the CO will consider factors such as the type of vehicle (e.g., a farm truck or van or a hired van or bus, such as a Calvans vehicle), the location where the farmworker transport will be performed (e.g., around the farm, including on private roads, or on public roads), and any qualifications and requirements for the transport (e.g., type of driver's licensure, gross vehicle weight, vehicle maintenance responsibilities, paperwork requirements) to determine the appropriate SOC code to assign to the employer's job opportunity.

*Id.*

Moreover, the 2023 Rule additionally makes clear that simply because a job order requiring driving involves more than one SOC code does not mean that the highest AEWR requirement will automatically be triggered. As the DOL articulated in the rule:

> For example, an H-2A job opportunity that requires a worker to hand harvest field crops and operate light trucks to drive themselves along with other farmworkers from place to place around the farm property during the course of performing hand-harvest work, may be assigned SOC code 45-2091 (Agricultural Equipment Operators), which encompasses driving "trucks to haul . . . farm workers," in addition to SOC code 45-2092 (Farmworkers and Laborers, Crop, Nursery, and Greenhouse). As both SOC codes 45-2091 and 45-2092 are subject to the same AEWR determination . . . , this H-2A job opportunity [would be] subject to a

single AEWR determination, and [the highest AEWR requirement] would not apply.

* * *

[As another] example, absent additional job details that might indicate otherwise, an H-2A job opportunity that requires a worker to care for livestock, including driving a truck loaded with supplemental feed to the locations where livestock are grazing and repairing fences, would be assigned only SOC code 45-2093 (Farmworkers, Farm, Ranch, and Aquacultural Animals), as the list of tasks for this SOC code . . . includes duties driving trucks to distribute feed and repairing fences and other enclosures. Likewise, an H-2A job opportunity that requires a worker to manually harvest crops in a field or orchard, perform other crop cultivation duties, and move the truck that holds the harvested crop from one place in the field or orchard to another and to storage or a pick-up point on the farm would be assigned only SOC code 45-2092 (Farmworkers and Laborers, Crop, Nursery, and Greenhouse), as the list of tasks for this SOC code . . . includes duties driving trucks loaded with agricultural products on the farm. If, in the second example, the "truck" was a heavy or more specialized piece of agricultural equipment than the basic example suggests (e.g., a harvesting machine that gathers and holds the crop during harvest), SOC code 45-2091 (Agricultural Equipment Operators) would be assigned in addition to SOC code 45-2092, because operating heavy agricultural machinery is not covered in SOC code 45-2092, but it is covered in SOC code 45-2091, while manual harvesting is covered in SOC code 45-2092, but is not covered in SOC code 45-2091. However, based on the description of the location, type of equipment involved, and purpose of the truck driving in this example (i.e., driving trucks loaded with harvested crops from one location to another on the farm), neither SOC code 53-3033 (Light Truck Drivers) nor SOC code 53-3032 (Heavy and Tractor-Trailer Truck Drivers) would be assigned to the job opportunity. Therefore, even if . . . a combination of SOC codes—45-2091 and 45-2092—[were assigned, the highest AEWR

requirement would not be implicated] as both SOC codes are subject to the same AEWR.

88 Fed. Reg. at 12780–81.[22]

Against this backdrop, the Plaintiffs do not meet their burden of clearly establishing that the DOL acted arbitrarily and capriciously in declining to utilize the "primary" or "main" duties test and in electing to implement the highest AEWR approach.

There is yet another basis for viewing the Plaintiffs' challenge to the highest AEWR requirement with some skepticism. This is because the 2023 Rule expressly allows employers to submit as many H-2A worker applications for certification as they wish. *See* 88 Fed. Reg. at 12778–79. In other words, if an employer is worried about the costs associated with paying their H-2A workers the higher AEWR, it may submit more than one H-2A application to the DOL for approval. *Id.* As the DOL detailed in the 2023 Rule:

> Commenters asserted that the proposal would result in higher wage obligations for employers who include a variety of duties in the H-2A job order, which the employer considers to be routine farm work, but which the [DOL] views as a combination of SOC codes subject to a higher AEWR determination.

---

[22] As the above excerpts reveal, the approach adopted by the DOL in the 2023 Rule for the "similarly employed" analysis was to focus on the SOC codes applicable to a job opportunity, not on the industries involved. *See* 88 Fed. Reg. at 12782. As it concerns the Plaintiffs' trucking scenario, for instance, the DOL rejected the view of some commenters that truck driving duties "performed in agriculture are categorically different than truck driving . . . duties performed in other industries and should not be classified using SOC codes outside the field and livestock workers (combined) occupational group[.]" *Id.* Rather, the DOL took the position that "operating semi-trucks hauling commodities over public roads to generally involve the same or similar skills, qualifications, and tasks, whether the commodity is agricultural or nonagricultural in nature." *Id.*

\* \* \*

*The AEWR methodology adopted in this final rule does not dictate how many H-2A applications an employer may choose to file, the duties included in each H-2A application filed*, or whether an employer chooses to address its labor needs through the H-2A program or through options other than the H-2A program.  Rather, it provides a minimum wage rate threshold that an employer must offer and pay a worker for performing the H-2A job opportunity, including those H-2A job opportunities that require a worker to perform a combination of tasks that cannot reasonably be classified within a single code. The [DOL] understands that the AEWR determination applicable to an H-2A job opportunity—and the employer's resulting H-2A wage obligation—and the costs or benefits associated with *filing multiple single-[occupational] code-specific H-2A applications* or filing one H-2A application for a job opportunity encompassing a combination of duties from multiple [occupational] codes, . . .  may be factors employers weigh when making business decisions regarding their agricultural operations.  However, the [DOL] maintains that the final rule does not require employers to file additional [code]-specific H-2A applications for job opportunities that require performing job duties encompassed by a combination of SOC codes. *Employers may determine whether it is more cost effective—or beneficial to their business operation in other ways*—to file one H-2A application for a job opportunity encompassing duties of more than one [ ] code; *to file more than one H-2A application, each focused on the duties of a single code*; or, to find avenues other than H-2A to address particular duties that are not regularly required, such as driving a semi tractor-trailer truck to market when crops are harvested.  In any event, the [DOL] has determined that requiring the payment of the highest applicable AEWR is necessary to protect against adverse effect, as discussed above.

*Id.* (emphasis added).

This option of tendering multiple H-2A applications does not appear to present a substantial hurdle for employers.  In fact, according to Amici, one of the FFVA's members, ATP Groves, "has [already] limited the spillover effect of the new

regulations by submitting separate job orders for its crop worker and truck drivers." (Doc. 33 at 14).

In response to this "multiple applications" approach, the Plaintiffs point to the implications the highest AEWR rate poses in the context of "corresponding employment" by U.S. workers. (Doc. 43 at 1–3).  Recall that this requirement dictates that an employer pay the highest applicable wage not only to H-2A workers but also to domestic laborers engaging in "corresponding employment."  *See* 20 C.F.R. §§ 655.103(b), 655.182(d)(1).   A non-H-2A worker is deemed to be engaging in "'corresponding employment' with an H-2A worker if the non-H-2A worker performs any duties included in the H-2A job order, or any other agricultural work performed by the H-2A worker(s), regardless of whether the non-H-2A worker performs all of the duties listed in the job order."  88 Fed. Reg. at 12783 (citing *Overdevest Nurseries LP v. Walsh*, 2 F.4th 977, 981 (D.C. Cir. 2021)). The Plaintiffs put forth the following hypothetical to make their argument:

> [A] strawberry farm needs [thirty] workers to harvest its berries on a full-time basis.  Once the berries have been picked, the farm would need another worker to drive a truck loaded with berries to be cooled and packed for shipment to supermarkets. . . .  [T]hat work only requires about [thirty] minutes per day, so the driver would also need to help with the hand-harvesting when not driving.  The farm files [two] job orders: [(1)] harvest-only for $14.33/hour in Florida; and [(2)] truck-driving and harvest for $23.89/hour in Florida under the [2023] AEWR rule.  If the farm employs one or more U.S. workers who would only perform hand-harvesting duties and never drive trucks, cannot drive trucks, would the

[DOL] say that the U.S. workers must be paid $14.33/hour or $23.89/hour?

(Doc. 43 at 2).

The answer to the Plaintiffs' query is that the U.S. workers would be entitled to the $23.89/hour rate, according to communications the Plaintiffs apparently had with the DOL after the hearing. *Id*. The Plaintiffs draw from this scenario that the DOL is impermissibly "ignoring the worker's actual abilities and job duties when setting their wage and simply applying wages based on which is highest." *Id*.

The Plaintiffs' reliance on the proffered hypothetical as a basis for their proposed nationwide injunction is unconvincing. The DOL addressed the matter of corresponding employment in the 2023 Rule and advised that it expected there would be few instances involving the type of issue cited by the Plaintiffs. *See* 88 Fed. Reg. at 12783. In fact, the DOL "anticipate[d] that most H-2A job opportunities will fall within one or more of the SOC codes encompassed within the six field and livestock workers (combined) SOC codes, and, therefore, [that] wage complexities related to 'corresponding employment' [like the ones raised by the Plaintiffs here] are *unlikely to occur*" at all. *Id*. (emphasis added).

To the extent that the Plaintiffs are challenging the corresponding employment requirement itself, any such challenge would seemingly fail. (Doc. 43 at 1–3). The court's decision in *Overdevest Nurseries L.P.* is instructive in this regard. In that case, the court brushed aside a similar contention, stating:

> [We] agree with the Secretary that the [corresponding employment] regulation is reasonable. The regulation advances the statute's purpose by ensuring that when H-2A workers are performing duties that do not implicate their qualifications, non-H-2A workers will not be placed at a disadvantage. It does so by requiring employers to pay non-H-2A workers the same amount that they pay the H-2A workers when they are doing the same work. This is an eminently reasonable interpretation of [the] mandate that the DOL protect "similarly employed" workers who are "adversely affected."

*Overdevest Nurseries L.P.*, 2 F.4th at 984 (citing *Mendoza v. Perez*, 754 F.3d 1002, 1017 (D.C. Cir. 2014)). The Plaintiffs do not provide a sufficient justification for diverging from this conclusion under the circumstances presented in this case.

### 3. *The 2023 Rule's Allegedly Improper Retroactivity*

As noted above, the Plaintiffs separately maintain that the 2023 Rule is arbitrary and capricious because it is retroactive. (Doc. 16 at 17–18). The gist of this contention is that although the 2023 Rule on its face applies only to "job orders submitted . . . on or after March 30, 2023," *id.* at 17 (citing 88 Fed. Reg. 12802), the DOL has supposedly revealed "[l]ess publicly" that the rule will extend to job orders filed before March 30 and even to ones certified before that date, *id.* at 17–18. As support for this claim, the Plaintiffs cite a response the DOL provided to one of a set of "Frequently Asked Questions" compiled by the OFLC. *Id.* In that response, the DOL stated, *inter alia*, that the 2023 Rule "changes the methodology used to determine the AEWRs, but otherwise does not change the employer's wage obligations under the [DOL's] regulations, including the duty to pay a higher wage AEWR if one is published during the period of employment." (Doc. 16-11 at 7). The Plaintiffs aver that this means that,

as of July 1, 2023, any AEWR calculated under the 2023 Rule will impact those jobs certified under the prior rule if those jobs received an occupational code outside the scope of the FLS.  (Doc. 44 at 10).  The Plaintiffs further assert that an "employer has no opportunity to challenge the [DOL's] SOC code assignment or to take any other steps to mitigate its harm."  (Doc. 16 at 18).

The Plaintiffs' argument fails on a number of levels.  As an initial matter, "[a] statute or administrative regulation does not operate retroactively merely because it applies to prior conduct."  *Ga. Power Co. v. Teleport Comms. Atlanta, Inc.*, 346 F.3d 1033, 1042 (11th Cir. 2003) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994) and citing *Resolution Trust Corp. v. Ford Motor Credit Corp.*, 30 F.3d 1384, 1388 (11th Cir. 1994)).  To have a retroactive effect, a statute or regulation must instead "'impair rights a party possessed when [it] acted, [must] increase [its] liability for past conduct, or [must] impose new duties with respect to transactions already completed.'"  *Id*.  The Plaintiffs do not reference this standard in their motion, let alone explain how it leads to the conclusion that the 2023 Rule is retroactive.  They have therefore arguably waived any such challenge.  *See Harner*, 38 F.4th at 899; *Battle*, 787 F. App'x at 687.

Even if the Plaintiffs have not waived this issue, their retroactivity argument is unavailing in any event.  The Defendants insist and the Plaintiffs do not seem to dispute that employers attest in their H-2A Application for Temporary Employment Certifications that the following condition applies to any approval of their application:

> [I]f the applicable AEWR or prevailing wage is adjusted during the contract period, and that new rate is higher than the highest of the

AEWR, the prevailing wage, the [collective bargaining wage], the Federal minimum wage, or the State minimum wage, the employer will increase the pay of all employees in the same occupation to at least the higher rate no later than the effective date of the adjustment. . . . Furthermore, if a new monthly AEWR is published during the contract period, and that new rate is higher than both the agreed upon [collective bargaining] wage, and the minimum wage imposed by Federal or State law or judicial action in effect at the time the work is performed, *the employer must pay at least that new monthly AEWR no later than the effective date of the update.*

(Doc. 22-2) (emphasis added).[23]  The Plaintiffs do not mention this language in their motion, much less show that it does not govern here.

The best that the Plaintiffs arguably have to offer on this point is their apparent contention at the hearing that while they were aware the DOL could change the *amount* of the AEWR, they could not reasonably have known that the DOL could modify the *methodology* for calculating this rate.  *See, e.g.*, (Doc. 40 at 85–86).  The Plaintiffs, however, do not identify any language in the agreement or any case law in their submissions that buttresses this argument.[24]  That the DOL proposed the new

---

[23] This language is consistent with the 2023 Rule, which states:

> [I]f an updated AEWR is published by the OFLC Administrator in the Federal Register during the work contract period for a temporary agricultural labor certification processed using the 2010 Final Rule methodology, and the updated AEWR is higher than the highest of the previous AEWR, the prevailing wage, the agreed-upon collective bargaining wage, or the Federal or State minimum wage in effect at the time the work is performed, the employer must pay at least the updated AEWR upon the effective date published in the Federal Register, as required by 20 CFR [§] 655.120.

88 Fed. Reg. at 12763 & n.34 (citing 20 C.F.R. § 655.120(c) of the 2010 Final Rule, which provides for AEWR adjustments "at least once each calendar year").

[24] In their motion and at the hearing, the Plaintiffs cited the Supreme Court's decision in *Bowen v. Georgetown University Hospital*, 488 U.S. 204 (1988) in support of their retroactivity challenge.  (Docs. 16 at 16; 40 at 89).  The Plaintiffs' reliance on *Bowen* is misplaced.  In that case, the Court invalidated

methodology in 2021, which presumably was before the Plaintiffs signed on to their most recent agreement(s) with the DOL, further undercuts their contention. (Doc. 40 at 88–90).

The Plaintiffs additionally do not demonstrate that the 2023 Rule increases their liability for past conduct, or imposes upon them new duties with respect to any transactions already completed. *Ga. Power Co.*, 346 F.3d at 1042. In fact, the Plaintiffs admitted at the hearing that the 2023 Rule only extends to labor performed on or after July 1, 2023, and does "not look back[wards] to work done from September [2022] through June [2023]." (Doc. 40 at 86–87).

In sum, the Plaintiffs have not met their burden of clearly establishing they will prevail on their retroactivity claim.

The Plaintiffs' last claim under the substantial likelihood of success prong is that the Defendants violated section 603 of the RFA. (Doc. 16 at 19–20). This challenge is fatally infirm for the reasons set forth above.

### C.

The Plaintiffs' failure to carry their burden on the substantial likelihood of success prong is alone dispositive of their preliminary injunction request. *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994). I will nonetheless address the

---

retroactive cost-limit rules promulgated by the Secretary of Health and Human Services on the grounds that the Medicare Act did not expressly delegate such retroactive rulemaking authority to the Secretary. *Bowen*, 488 U.S. at 215 ("Our interpretation of the Medicare Act compels the conclusion that the Secretary has no authority to promulgate retroactive cost-limit rules."). The Plaintiffs do not raise this type of challenge here.

remaining components of the preliminary injunction analysis in the interest of completeness, beginning with the matter of irreparable harm.[25]  *Siegel*, 234 F.3d at 1176.

Harm is deemed to be "irreparable" only if it will occur without the sought-after injunction and only if it cannot be remedied through monetary relief.  *See Swain v. Junior*, 961 F.3d 1276, 1292 (11th Cir. 2020) (citation omitted); *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987) (citation omitted).  While "economic harm will not satisfy the irreparable-harm element in many cases, that general rule does not necessarily hold where there is no adequate remedy at law to recover damages for the harm suffered."  *Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres of Land*, 910 F.3d 1130, 1165 (11th Cir. 2018) (citing *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013); *Seatrain Int'l, S. A.*, 518 F.2d at 179).  Irrespective of these considerations, there is case authority that irreparable harm must be imminent to meet this prong.  *InVue Sec. Prods. Inc. v. Vanguard Prods. Grp. Inc.*, 2019 WL 4671143, at *4 (M.D. Fla. July 1, 2019) ("A preliminary injunction is premised on the need for 'speedy and urgent action,' and, as such, requires a showing of 'imminent' irreparable harm to protect a plaintiff's rights before a case can be resolved on its merits.") (quoting

---

[25] Irreparable harm is distinct from standing.  Unlike standing, which requires a legal determination, irreparable harm represents an "equitable" consideration that is decided "based on the specific facts of the case."  *Swisher Int'l, Inc. v. U.S. Food & Drug Admin.*, 2022 WL 320889, at *6 n.5 (11th Cir. Feb. 3, 2022) (per curiam) (citing *America's Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1334 (11th Cir. 2014)).

*Roberts v. Swearingen*, 2018 WL 4620707, at *2 (M.D. Fla. Sept. 26, 2018); *Wreal*, 840 F.3d at 1248).

Here, as noted above, the Plaintiffs have tendered declarations attesting to the wage increases and the potential loss of their businesses that will result from the implementation of the 2023 Rule. *See, e.g.*, (Docs. 16-10 at 3; 16-9 at 2–4). The Plaintiffs also maintain in their motion, *inter alia*, that they will not be able to recover from either their employees or the DOL the "illegal and ruinous wage increases" they have to pay under the 2023 Rule and that these wage increases will, at a minimum, cause the cancellation of their contracts and the destruction of their reputations. (Doc. 16 at 21–23).

In their response, the Defendants do not dispute the Plaintiffs' contention that the additional costs they will incur in complying with the 2023 Rule are not recoverable. Instead, they argue—as they did in contesting the matter of standing—that the Plaintiffs' claim they will suffer a significant injury is speculative. (Doc. 22 at 17–18). And despite acknowledging that "[a] threat to a [litigant's] existence or continued operations may constitute irreparable harm," the Defendants assert that the Plaintiffs "fail to show that they would be personally harmed at anything close to this degree." *Id.* at 18.

The Defendants' position is unpersuasive. As noted, they do not quarrel with, much less refute, the assertion made by the Plaintiffs that they have no avenue for recouping the elevated outlays they will have to make under the revised AEWR methodology. *See Transcon. Gas Pipe Line Co.*, 910 F.3d at 1166 ("Defendants have not

rebutted [plaintiff's] assertion [it will incur irrecoverable costs] by pointing to any legal remedy through which [plaintiff] might recover any economic harm it would suffer from delayed access to [d]efendants' properties.  In the absence of such a remedy, [plaintiff's] economic damages . . . are irreparable."); *see also USA Farm Labor, Inc.*, 2023 WL 6283333, at *14 ("Financial losses may constitute irreparable harm . . . where the plaintiff cannot recoup its losses later due to the defendant's sovereign immunity.") (citing *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019); *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008)).  As for the Defendants' claim that the economic, reputational, and other injuries the Plaintiffs will allegedly suffer are insufficient and conjectural, those contentions are unsupported for the reasons discussed previously.  *See supra*, at 28–29; *see also Kotori Designs, LLC v. Living Well Spending Less, Inc.*, 2016 WL 6833004, at *3 (M.D. Fla. Nov. 21, 2016) ("It is true that '[d]amage to [a] plaintiff's reputation and goodwill [is] difficult to quantify and [cannot] be undone through an award of money damages.'") (quoting *Nane Jan, LLC v. Seasalt & Pepper, LLC*, 2014 WL 5177655, at *7 (M.D. Fla. Oct. 14, 2014)).

In light of the above, I will assume for purposes of my R&R that the Plaintiffs meet their burden on the irreparable injury prong.  *Accord USA Farm Labor, Inc.*, 2023 WL 6283333, at *14 (finding that "the [p]laintiffs have made at least a preliminary showing of irreparable harm" in that action).  As referenced previously and as discussed further below, however, this does not disturb my determination that the Plaintiffs are not entitled to the requested injunctive relief.

D.

The last two prongs of the preliminary injunction analysis—that the threatened harm to the movant outweighs whatever damage the proposed injunction may cause the opposing party and that the proposed injunction would not disserve or be adverse to the public interest—merge in this case.  This is because the Plaintiffs "request[ ] an injunction against an agency of the federal government."  *Becerra*, 544 F. Supp. 3d at 1302 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020)).

In an effort to show they satisfy these requirements, the Plaintiffs claim that while they "will suffer immediate harm absent preliminary relief staying the implementation of the [2023] Rule[, the] DOL will not suffer any harm whatsoever." (Doc. 16 at 24).  The Plaintiffs place great weight in this respect on their assertion that "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Id*. at 24–25 (internal quotation marks and citations omitted).  The Defendants counter that "the Plaintiffs make no showing that their alleged 'irreparable injury' outweighs the harm an injunction would cause to employees seeking jobs with wages that would benefit from the 2023 Rule, [to] employees promised wages under the 2023 Rule who would be confused, and to employers that would benefit from regulatory certainty." (Doc. 22 at 19).

I find that the Defendants have the better argument.  As they point out, the Plaintiffs do not establish that the detrimental effects employers will experience from paying enhanced labor expenses are materially greater than the economic hardship H-

75

2A and corresponding U.S. workers will suffer from being denied the higher wages they are due under the 2023 Rule.  I note in this regard that the court in *USA Farm Labor* ruled in favor of the DOL on this issue as well, concluding that "[t]he requested injunction could cause at least as much harm to [H-2A and corresponding domestic laborers], who would be deprived of wages that they are entitled to under the [2023] Rule, as a denial would harm the [p]laintiffs, who would potentially avoid having to pay these wages."  2023 WL 6283333, at *14.  The DOL's assessment of these competing interests in the 2023 Rule also undermine the Plaintiffs' position.  *See* 88 Fed. Reg. at 12772 ("The [DOL] recognizes that the revised methodology may result in some AEWR increases in those SOC codes for which the [DOL] will use the OEWS survey, depending upon geographic location and the specific SOC code. . . .  *In the [DOL's] policy judgement, any incremental burden placed on employers is outweighed by the benefits attendant to better protection against adverse effect on the wages of workers in the United States similarly employed*.") (emphasis added).

In addition to these grounds, the contemplated injunction—as the Defendants contend and as the court additionally found in *USA Farm Labor*—"would inject a degree of uncertainty into the H-2A program because employers using the program would be [unsure] about how much they will owe workers if [the] DOL ultimately prevails in this action."  *USA Farm Labor, Inc.*, 2023 WL 6283333, at *14 (citing *Di Biase v. SPX Corp.*, 872 F.3d 224, 235–36 (4th Cir. 2017)).  Moreover, there is a fair argument that "there is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct an agency to develop

and enforce." *Nat'l Propane Gas Ass'n v. U.S. Dept. of Homeland Security*, 534 F. Supp. 2d 16, 20 (D.D.C. 2008) (citing *Hunter v. Fed. Energy Regul. Comm'n*, 527 F. Supp. 2d 9, 18 (D.D.C. 2007)).  This is especially true where, as here, the regulations pertain to immigration laws.  *See USA Farm Labor, Inc.*, 2023 WL 6283333, at *15 (commenting that the reservation about enjoining statutes enacted by the people's representatives "weighs particularly heavily with respect to the enforcement of immigration laws, which implicate[ ] the government's 'sovereign prerogative'") (quoting *Miranda v. Garland*, 34 F.4th 338, 365–66 (4th Cir. 2022)); *Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 14 (D.D.C. 2020) ("The [g]overnment has a strong interest in the uniform and proper application of its regulations governing the granting of visas to foreign nationals.").

In sum, the Plaintiffs do not clearly show that the balance of the harms and the public interest counsel in favor of the sought-after preliminary injunction.

## E.

Two additional points militate in favor of denying the Plaintiffs' preliminary injunction.  The first is their insistence on a nationwide injunction.  (Doc. 43 at 9). While a district court may issue such universal relief "in appropriate circumstances," the instances where such circumstances exist are "rare."  *Florida v. Dep't of Health and Hum. Servs.*, 19 F.4th 1271, 1281–82 (11th Cir. 2021) (citations omitted).  This is because nationwide injunctions "push against the boundaries of judicial power, and

very often impede the proper functioning of our federal court system." *Georgia v. President of the U.S.*, 46 F.4th 1283, 1303 (11th Cir. 2022).[26]

Accordingly, when evaluating a preliminary request to enjoin a national rule or policy, "a district court should thoroughly analyze the extent of relief necessary to protect the plaintiffs from harm, taking care that the remedy issued is not 'more burdensome to the defendant[s] than necessary to provide complete relief to the plaintiffs.'" *Id.* (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). This assessment requires a district court to consider a number of factors, including whether a nationwide injunction is essential to ensure the plaintiffs are made whole, "to protect similarly situated nonparties, or to avoid the 'chaos and confusion' of a patchwork of injunctions." *Florida*, 19 F.4th at 1282.

In this case, the Plaintiffs fail to offer any meaningful analysis in their motion bolstering their request for a universal injunction, much less establish that this case presents the type of "rare" situation where such extraordinary relief is warranted. The only submission in which they even mention this issue is their supplemental memorandum and, even there, they touch upon it only briefly. (Doc. 43 at 9). Further, they do not reference the recent Eleventh Circuit case law discussed above and instead

---

[26] As the Eleventh Circuit expounded in *Georgia v. President of the U.S.*, nationwide injunctions "frustrate foundational principles of the federal court system," "encourage gamesmanship, motivating plaintiffs to seek out the friendliest forum and rush to litigate important legal questions in a preliminary posture," "disturb comity by hindering other courts from evaluating legal issues for themselves," and "escalate pressure on the Supreme Court docket by limiting percolation and raising the stakes of individual lower-court decisions." 46 F.4th at 1305. These concerns, the court highlighted, "cannot be lightly set aside." *Id.* at 1306.

rely solely on an Eleventh Circuit decision from ten years ago. *Id.* (citing *Bayou Lawn & Landscape Servs. v. Sec'y of Lab.*, 713 F.3d 1080 (11th Cir. 2013)). This type of perfunctory argument is insufficient.

The other item that counsels against the granting of the sought-after injunction is the question of security. Under Federal Rule of Civil Procedure 65, a court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

Here, the Plaintiffs assert that a bond is not always necessary where the party to be enjoined will not suffer any economic harm. (Doc. 16 at 2) (citing *Air Force Officer v. Austin*, 588 F. Supp. 3d 1338 (M.D. Ga. 2022); *Wynn v. Vilsack*, 545 F. Supp. 3d 1271 (M.D. Fla. 2021)). The government responds that the Plaintiffs overlook the harm to H-2A and corresponding U.S. workers and that a bond "could be used to pay back employees whose work was summarily discounted after a preliminary injunction is issued." (Doc. 22 at 21 n.6) (citing *Ala. ex rel. Siegelman v. EPA*, 925 F.2d 385, 390 (11th Cir. 1991); *Williams v. Walsh*, 619 F. Supp. 3d 48, 63–66 (D.D.C. 2022)). I find that the government again has the better argument.

As a threshold matter, by its terms, Rule 65's requirement of a bond is not permissive and necessitates that a party give security as a condition for being awarded an injunction. Fed. R. Civ. P. 65(c) (stating that a court "may issue a preliminary injunction . . . *only if* the movant gives security") (emphasis added). Moreover, there is decisional law supporting the posting of a bond in cases brought against federal

agencies.  *See, e.g.*, *Christian & Missionary All. Found., Inc. v. Burwell*, 2015 WL 437631, at *8 (M.D. Fla. Feb. 3, 2015) (directing that each plaintiff post a bond); *Beckwith Elec. Co., Inc. v. Sebelius*, 960 F. Supp. 2d 1328, 1351 (M.D. Fla. 2013) (same).

The cases cited by the Plaintiffs—*Air Force Officer v. Austin* and *Wynn v. Vilsack*—are distinguishable.   In *Austin*, the government granted an Air Force officer's preliminary injunction request that precluded the Air Force from forcing her to take a vaccine.  588 F. Supp. 3d at 1357.  The Air Force's mandate was otherwise still in effect for the rest of the military branch, and there was no discussion in the decision about the propriety of a bond.  *Id.*  In *Wynn*, although the court noted that the defendants did not "provide any evidence that they [would] suffer monetary losses as a result of the injunction," the defendants did not seek a bond or otherwise argue that one should be granted.  545 F. Supp. 3d at 1295 n.20.

IV.

Based upon the foregoing, I respectfully recommend:

1.     The Defendants' motion to dismiss (Doc. 52) be granted solely as to the Plaintiffs' RFA claim and denied in all other respects, and the Plaintiffs be afforded leave to amend their RFA claim.

2.     The Plaintiffs' motion for a preliminary injunction (Doc. 16) be denied.

3.     If the Court reaches a contrary conclusion regarding the Plaintiffs' preliminary injunction motion, the Plaintiffs be required to give security after the parties submit supplemental briefing regarding the amount of the bond to be posted.

Respectfully submitted this 5th day of January 2024.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

## NOTICE

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections, or to move for an extension of time to do so, waives that party's right to challenge on appeal any unobjected-to factual finding(s) or legal conclusion(s) the District Judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

Copies to:
Honorable Charlene E. Honeywell, United States District Judge
Counsel of record